# Exhibit B

Electronically FILED by Superior Court of California, County of Los Angeles on 05/03/2019 01:00 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez,Deputy Clerk
19STCV15506

Assigned for all purposes to: Stanley Mosk Courthouse, Judicial Officer: Mel Red Recana

Michael D. Resnick (SBN 245215)
e-mail: mresnick@clrattorney.com
Neil Gieleghem (SBN 107389)
e-mail: ng@clrattorney.com
**Consumer Legal Remedies, APC**
153 ½ North Arnaz Drive
Beverly Hills, CA 90211
Telephone:  (310) 213-1398
Facsimile:  (213) 210-2196

Attorneys for Plaintiffs

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF LOS ANGELES – UNLIMITED JURISDICTION

AARON ISKENDERIAN and PAT HURT, as individuals; ADRIANNA ARANA, an individual; ALAINA BIGGER, an individual; AMINA WESTBERG, an individual; AMMON RIORDAN and ANDREW RIORDAN, as individuals; AMY HOLBERG, an individual; ANDREW BARBOSA, an individual; ANDREW HOLDBROOKS and JESSICA HOLDBROOKS, as individuals; ANDREW WHYNAUGHT, an individual; ANTHONY ELIAS JR., an individual; ANTONIO VEGA, an individual; AUSTIN PETTY, an individual; BENJAMIN G. MORANA, an individual; BILL LARGEY, an individual; BOBBY MCMICHAEL and KAREN MCMICHAEL, as individuals; BRANDON REITZ, an individual; BRANDON TAMURA, an individual; BRENT LEBLANC, an individual; BRIAN CARRILLO, an individual; BRIAN CORBETT and MUREL ANN CORBETT, as individuals; BRIAN CORWIN and SUSAN CORWIN, as individuals; BRIAN PERRY, an individual; CANDICE KOPCAK, an individual; CARLOS LUGO and MARIA LUGO, as individuals; CARLOS ROJO LOPEZ and NORMA RUELAS, as individuals; CHAD BRUMMELL and CAROL BRUMMEL, as individuals; CHAD ELAM, an individual; CHARLES HUDDLESTON [1], an individual; CHARLES HUDDLESTON [2], an individual; CHARLES MCCARTNEY, an individual; CHARLES WEDEL and MICKIE

Case Nos.:   19STCV15506

Hon.:
Dept.:

**COMPLAINT FOR DAMAGES FOR:**

1. **BREACH OF EXPRESS WARRANTY (Cal. Com. Code §§ 2313 and 10210)**
2. **BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Cal. Com. Code §§ 2314 and 10212)**
3. **VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF EXPRESS WARRANTIES (Cal. Civ. Code §§ 1791.2 & 1793.2(d))**
4. **VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY (Cal. Civ. Code §§ 1791.1 and 1792)**
5. **BREACH OF EXPRESS CALIFORNIA EMISSIONS WARRANTIES (Cal. Civ. Code § 1793.2, et seq.)**
6. **FRAUD BY OMISSION**
7. **VIOLATION OF BUS. &: PROF. CODE § 17000, et seq.**

**INDIVIDUAL JURY TRIALS DEMANDED**

CONSUMER LEGAL REMEDIES, APC
153 1/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

WEDEL, as individuals; CHARLEY EVANS, an individual; CHRIS CAMPION, an individual; CHRISTOPHER ALLEN POLHERT and CHRISTI MARIE POLHERT, as individuals; CHRISTOPHER DENOVELLIS, an individual; CHRISTOPHER EDGAR, an individual; CHRISTOPHER LEO FARRIS and MELISSA FARRIS, as individuals; CHRISTOPHER STANLEY and CHERYL STANLEY, as individuals; CLAUDIO VASQUEZ, an individual; CONRAD GONZALEZ and SHARA GONZALEZ, as individuals; COREY RINGER, an individual; CORNAN JOHN JOHNSON, an individual; DALE GILLETTE, an individual; DANIEL FOSTER, an individual; DANIEL ROCKETT, an individual; DANIEL RODEBACK, an individual; DANIEL SMITH, an individual; DARRELL JOHNSON and LISA JOHNSON, as individuals; DAVE BALLARD and TERRY BALLARD, as individuals; DAVID C. ANDERSON and ELEANOR M. ANDERSON, as individuals; DAVID HALL, an individual; DAVID J. COLELLO JR. and ROSANNE COLELLO, as individuals; DAVID MILLER, an individual; DAVID STURROCK, an individual; DAVID SZYMUSIAK, an individual; DAVID W. THOMAS, an individual; DELIA TORRES, an individual; DENNIS LONG and CINDY LONG, as individuals; DENNIS WHITE and REBEKAH DAWN LAWRENCE, as individuals; DON DIGBY, an individual; DON NELSON, an individual; DOUGLAS CRYER and JERI CRYER, as individuals; DOUGLAS KEELING and LISA KEELING, as individuals; DOUGLAS SEYMOUR, an individual,

          Plaintiffs,

  vs.

FCA US LLC; and DOES 1 through 10, inclusive,

          Defendants.

CONSUMER LEGAL REMEDIES, APC
133 1/2 NORTH MANSFIELD AVE. BEVERLY HILLS, CA 90211

**COMPLAINT FOR DAMAGES**

Plaintiffs, and each of them, allege as follows:

**PRELIMINARY STATEMENT**

1.      This action arises out of an international race to the bottom. Defendant FCA US LLC ("FCA"), a rival of automaker Volkswagen struggling to compete on the world stage, sought to grab a piece of the U.S. "clean" diesel market with 2014-2016 EcoDiesel® trucks marketed under the Jeep Grand Cherokee and Ram 1500 model names (the "Subject Vehicles"). But like Volkswagen, FCA fought dirty. That is, like Volkswagen did with its "clean diesels," FCA concealed from regulators and consumers alike that the EcoDiesel® trucks were far from "Eco."

2.      Broadly stated, this lawsuit is a "Lemon Law"/Fraudulent Omission case based on defective emissions systems that FCA installed in the Subject Vehicles. Specifically, unknown to the Plaintiffs to this action, at the time their vehicles were purchased, they were equipped with an emissions system that turned off or limited their emissions reduction system during normal driving conditions and emitted pollutants such as nitrogen oxide ("NOx") at many multiples of emissions emitted from gasoline powered vehicles, at many times the level a reasonable consumer would expect from a "clean" diesel, and at many multiples of that allowed by federal law.

3.      Indeed, as the Environmental Protection Agency ("EPA") has since discovered, FCA concealed emission treatment software features in the Subject Vehicle engine's diesel controls on applications for EPA Certificates of Conformity ("COCs") and California Air Resources Board ("CARB") Executive Orders ("EOs"). This hidden software, designed and implemented by Bosch GmbH and Bosch LLC, allowed the Subject Vehicles to "pass" emission testing and obtain COCs and EOs so that FCA could import and sell the Subject Vehicles in the U.S. and California, respectively. Once on America's roads, however, the emission controls are de-activated or severely restricted such that the Subject Vehicles spew much higher amounts of polluting nitrogen oxides ("NOx") than permitted by law.

4.      On January 12, 2017, the EPA issued a Notice of Violation ("NOV") against Fiat and FCA for failing "to disclose [eight] Auxiliary Emission Control Devices (AECDs)" in the

CONSUMER LEGAL REMEDIES, A PC
9595 WILSHIRE BOULEVARD, BEVERLY HILLS, CA 90211

2014-2016 FCA Ram 1500s and Jeep Grand Cherokees.[1] In the NOV, the EPA explained that, despite having the opportunity to do so, Fiat and FCA failed to refute that the "principal effect of one or more of these AECDs was to bypass, defeat, or render inoperative one or more elements of design installed to comply with emissions standards under the [Clean Air Act]."

5. The same day, CARB publicly announced that it, too, had notified Fiat and FCA of its violations after detecting the AECDs in their 2014, 2015, and 2016 Jeep Grand Cherokee and Ram 1500 EcoDiesel® vehicles. CARB also said Fiat and FCA failed to disclose the devices, which can significantly increase NOx emissions when activated. "Once again," observed CARB Chair Mary D. Nichols, "a major automaker made the business decision to skirt the rules and got caught."[2]

6. The U.S. has since sued FCA, Fiat, VM Italy, and VM America for violating the Clean Air Act ("CAA") and applicable regulations, seeking injunctive relief and civil penalties.[3] As the U.S. has found, "one or more of these undisclosed software features, alone or in combination with one or more of the others, bypass, defeat and/or render inoperative the [Subject] Vehicles' emission control system, causing the vehicles to emit substantially higher levels of NOx during certain normal real world driving conditions than during federal emission tests."[4]

7. American consumers were caught in the middle of FCA's scheme. Consumers have been wary of diesel engines as a relic of the past: noisy and spewing thick, toxic smoke. This was an understandable concern. A byproduct of diesel combustion is NOx, a pollutant linked with serious health dangers and climate change. Seeking to expand the diesel market in the U.S., large automakers in the late 2000's sought to reimagine diesel for regulators and consumers alike. For its part, FCA touted its "EcoDiesel" technology as the best of both worlds: a "green" alternative to gasoline with reduced emissions coupled with diesel's benefits of

[1] EPA's January 12, 2017 Notice of Violation to Fiat Chrysler Automobiles, https://www.epa.gov/sites/production/files/2017-01/documents/fca-caa-nov-2017-01-12.pdf.
[2] EPA News Release, EPA Notifies Fiat Chrysler of Clean Air Act Violations (Jan. 12, 2017), https://www.epa.gov/newsreleases/epa-notifies-fiat-chrysler-clean-air-act-violations.
[3] *United States v. Fiat US LLC, et al.*, No. 2:17-cv-11633-JCO-EAS (E.D. Mich. filed May 23, 2017) (Dkt. No. 1).
[4] *Id.* at ¶ 2.

CONSUMER LEGAL REMEDIES, APC
13312 NORTH AMAGZ DRIVE, BEVERLY HILLS, CA 90211

greater torque, power, and fuel efficiency. FCA extracted a premium for these "EcoDiesel" trucks, selling them for thousands of dollars more than the cost of otherwise-comparable gasoline trucks.

8.      Contrary to its public representations, and concealed from consumers and regulators alike, FCA secretly programmed its EcoDiesel® vehicles with hidden software features that significantly reduced the effectiveness of the NOx reduction technology during real-world driving conditions. As a result, the Subject Vehicles emitted harmful pollutants at levels that were illegally high and far in excess of what a reasonable consumer would expect from an "Eco" vehicle. Plaintiffs confirmed that the Subject Vehicles produced NOx emissions at an average of 222 mg/mile in city driving (four times the Federal Test Procedure ("FTP") standard of 50 mg/mile) and 353 mg/mile in highway driving (five times higher than the U.S. highway standard of 70 mg/mile). In many instances, NOx values were in excess of 1,600 mg/mile—*more than 20 times governmental standards.*

9.      Compounding this problem is the interplay between performance and emissions in diesel engines. FCA could not achieve the fuel economy and performance that it promises for the Subject Vehicles without cheating on emissions—a fact that it concealed from consumers around the country.

10.     FCA did not act alone. At the heart of the diesel scandal is Robert Bosch GmbH and Robert Bosch, LLC (collectively "Bosch"). Bosch, along with its CEO Volkmar Denner ("Denner"), were active and knowing participants in the scheme. Bosch designed, created, and tested the electronic diesel control ("EDC") units that allowed FCA to "pass" emission tests for its COC and EO applications. Bosch went so far as to boast that the "2014 Jeep Grand Cherokee features a Bosch emission system compliant with the most stringent emission regulations in the world. From fuel tank to tailpipe, Bosch is pleased to equip this vehicle with top technologies to give consumers a great driving experience requiring fewer stops at the pump." Bosch has since, however, acknowledged its role in the creation of defeat devices in certain FCA diesel vehicles sold in the European Union ("EU").

11.     Moreover, several auto parts manufacturers owned by FCA's parent corporation,

CONSUMER LEGAL REMEDIES, APC
1533 1/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

Fiat Chrysler Automobiles N.V. ("Fiat"), namely, VM Motori S.p.A. ("VM Italy") and VM North America, Inc. ("VM America"), also knowingly participated in the scheme by designing, manufacturing, and calibrating the "EcoDiesel" engines in the Subject Vehicles.

12.    FCA's unfair, unlawful, and deceptive conduct in designing, manufacturing, marketing, selling, and leasing the Subject Vehicles without proper emission controls has caused Plaintiffs out-of-pocket losses in the form of overpayment at the time of purchase/lease, and/or diminished value of their vehicles. FCA knew about, or recklessly disregarded, the inadequate emission controls during normal driving conditions, but did not disclose such facts or their effects to Plaintiffs, so Plaintiffs purchased their vehicles on the reasonable but mistaken belief that their vehicles were "clean" diesels and/or "low emission" diesels, complied with U.S. emissions standards, were properly EPA-certified, and would retain all of their promised fuel economy and performance throughout their useful life. Each of the Plaintiffs selected and ultimately purchased/leased their vehicles, in part, because of the diesel system, as represented through advertisements and representations made by FCA, such as those representations made on FCA's website, and representations from FCA's authorized dealers touting the efficiency, fuel economy, and power and performance of the Subject Vehicle's engine. Had FCA disclosed this design or the fact that the Subject Vehicles actually emitted unlawfully high levels of pollutants, Plaintiffs would not have purchased/leased their vehicles or would have paid substantially less for them.

13.    Each of the Plaintiffs have suffered an ascertainable loss as a result of FCA's omissions and/or misrepresentations associated with the Super Duty diesel engine system, including but not limited to a high premium for the Super Duty diesel engine compared to what they would have paid for a gasoline-powered engine, out-of-pocket losses by overpaying for the vehicles at the time of purchase/lease, and future attempted repairs, future additional fuel costs, decreased performance of the vehicles, and diminished value of the vehicles. Neither FCA nor any of its agents, dealers, or other representatives ever informed Plaintiffs of the existence of the unlawfully high emissions and/or defective nature of the Super Duty diesel engine system of the Subject Vehicles prior to purchase/lease.

4

**COMPLAINT FOR DAMAGES**      Exhibit B, Page 16

CONSUMER LEGAL REMEDIES, A PC
1531/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

14.    Due to the defects in the Subject Vehicle's emissions systems, FCA's failure to remedy those problems, and FCA's fraud on consumers, including Plaintiffs, Plaintiffs have been forced to join the ranks of tens of thousands of consumers who have sued FCA in California and other courts nationwide.

**PARTIES**

*Defendants*

15.    Defendant FCA US, LLC is a Delaware limited liability company with its headquarters and principal place of business in the state of Michigan. Defendant does business in the state of California. At all times relevant herein, Defendant was engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and selling automobiles and other motor vehicles and motor vehicle components in Los Angeles County.

16.    Plaintiffs are ignorant of the true names and capacities of the Defendants sued under the fictitious names DOES 1 to 10, and said DOES are sued pursuant to Code of Civil Procedure section 474. When Plaintiffs become aware of the true names and capacities of the Defendants sued as DOES 1 to 10, Plaintiffs will amend this Complaint to state their true names and capacities.

17.    As used in this Complaint ("Complaint"), the word "Defendant" shall refer to all Defendants named in this Complaint.

18.    All acts of corporate employees as alleged were authorized or ratified by an officer, director or managing agent of the corporate employer.

19.    Each Defendant whether actually or fictitiously named herein, was the principal, agent, (actual or ostensible), or employee of each other Defendant and in acting as such principal or within the course and scope of such employment or agency, took some part in the acts and omissions hereinafter set forth by reason of which each Defendant is liable to Plaintiffs for the relief prayed for herein.

*Plaintiffs*

20.    Plaintiffs AARON ISKENDERIAN and PAT HURT (for the purpose of this paragraph only, "Plaintiffs") are residents of Lake County, Illinois. On or about August 17,

CONSUMER LEGAL REMEDIES, APC
1551/2 NORTH ALPINE DRIVE, BEVERLY HILLS, CA 90211

2015, Plaintiffs purchased a 2015 Jeep Grand Cherokee EcoDiesel, Vehicle Identification Number 1C4RJFBM5FC853458 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

**COMPLAINT FOR DAMAGES**                    Exhibit B, Page 18

1  3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or

2  before April 15, 2019.

3      21.    Plaintiff ADRIANNA ARANA (for the purpose of this paragraph only,

4  "Plaintiff") is a resident of San Bernardino County, California. On or about March 1, 2017,

5  Plaintiff purchased a 2015 Jeep Grand Cherokee EcoDiesel, Vehicle Identification Number

6  1C4RJEBM5FC749823 (for the purpose of this paragraph only, the "Vehicle"), which was

7  manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale

8  of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or

9  performance of the Vehicle or provide compensation if there was a failure in such utility or

10 performance. The Vehicle was purchased or used primarily for personal, family, or household

11 purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to

12 the warranty and developed other serious defects and nonconformities to the warranty including,

13 but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based

14 in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and

15 fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles

16 were represented as environmentally friendly, having low emissions and good fuel economy.

17 Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff

18 went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,

19 including its fuel economy and performance. These representations, along with the advertised

20 fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of

21 purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting

22 NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware

23 that her Vehicle was equipped with undisclosed and unauthorized emission control devices

24 designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not

25 have purchased the Vehicle, or would have paid substantially less for it, had she known that it

26 did not comply with emission standards; that its emission treatment system was designed to de-

27 activate during real-world driving conditions; and that it could not achieve the advertised towing

28 power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

CONSUMER LEGAL REMEDIES, APC
1551/2 NORTH AVENUE DRIVE, BEVERLY HILLS, CA 90211

7

CONSUMER LEGAL REMEDIES, APC
1531 J 25 NORTH MORAGE DRIVE, BEVERLY HILLS, CA 90211

1    a concrete injury as a direct and proximate result of FCA's misconduct, and would not have

2    purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the

3    unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-*

4    *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

5    3:17-md-2777, by timely submitting her opt out form to the Class claims administrator on or

6    before April 15, 2019.

7          22.     Plaintiff ALAINA BIGGER (for the purpose of this paragraph only, "Plaintiff")

8    is a resident of Los Angeles County, California. On or about July 21, 2015, Plaintiff purchased

9    a 2015 Jeep Grand Cherokee EcoDiesel, Vehicle Identification Number 1C4RJEBM9FC920167

10   (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or

11   distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to

12   Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the

13   Vehicle or provide compensation if there was a failure in such utility or performance. The

14   Vehicle was purchased or used primarily for personal, family, or household purposes. The

15   Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and

16   developed other serious defects and nonconformities to the warranty including, but not limited

17   to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's

18   representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).

19   Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were

20   represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff

21   also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to

22   purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including

23   its fuel economy and performance. These representations, along with the advertised fuel

24   economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase,

25   Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at

26   levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that her

27   Vehicle was equipped with undisclosed and unauthorized emission control devices designed to

28   cheat emission tests and to deceive consumers and regulators. Plaintiff would not have

1    purchased the Vehicle, or would have paid substantially less for it, had she known that it did

2    not comply with emission standards; that its emission treatment system was designed to de-

3    activate during real-world driving conditions; and that it could not achieve the advertised towing

4    power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

5    a concrete injury as a direct and proximate result of FCA's misconduct, and would not have

6    purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the

7    unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-*

8    *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

9    3:17-md-2777, by timely submitting her opt out form to the Class claims administrator on or

10   before April 15, 2019.

11       23.     Plaintiff AMINA WESTBERG (for the purpose of this paragraph only,

12   "Plaintiff") is a resident of Calaveras County, California. On or about June 17, 2016, Plaintiff

13   purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number

14   1C6RR6PM7FS623404 (for the purpose of this paragraph only, the "Vehicle"), which was

15   manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale

16   of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or

17   performance of the Vehicle or provide compensation if there was a failure in such utility or

18   performance. The Vehicle was purchased or used primarily for personal, family, or household

19   purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to

20   the warranty and developed other serious defects and nonconformities to the warranty including,

21   but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based

22   in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and

23   fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles

24   were represented as environmentally friendly, having low emissions and good fuel economy.

25   Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff

26   went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,

27   including its fuel economy and performance. These representations, along with the advertised

28   fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of

CONSUMER LEGAL REMEDIES, A PC
1333 1/2 NORTH ABRACE DRIVE, BEVERLY HILLS, CA 90211

9

CONSUMER LEGAL REMEDIES, A PC
1533 1/2 NORTH ARONAGE DRIVE BEVERLY HILLS, CA 90211

1   purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting

2   NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware

3   that her Vehicle was equipped with undisclosed and unauthorized emission control devices

4   designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not

5   have purchased the Vehicle, or would have paid substantially less for it, had she known that it

6   did not comply with emission standards; that its emission treatment system was designed to de-

7   activate during real-world driving conditions; and that it could not achieve the advertised towing

8   power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

9   a concrete injury as a direct and proximate result of FCA's misconduct, and would not have

10  purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the

11  unauthorized emission control devices.   Plaintiff opted out of the Class in *In Re Chrysler-*

12  *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

13  3:17-md-2777, by timely submitting her opt out form to the Class claims administrator on or

14  before April 15, 2019.

15          24.     Plaintiffs AMMON RIORDAN and ANDREW RIORDAN (for the purpose of

16  this paragraph only, "Plaintiffs") are residents of Placer County, California. On or about August

17  13, 2018, Plaintiffs purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification

18  Number 1C6RR7VMXFS694640 (for the purpose of this paragraph only, the "Vehicle"), which

19  was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the

20  sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or

21  performance of the Vehicle or provide compensation if there was a failure in such utility or

22  performance. The Vehicle was purchased or used primarily for personal, family, or household

23  purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to

24  the warranty and developed other serious defects and nonconformities to the warranty including,

25  but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based

26  in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and

27  fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles

28  were represented as environmentally friendly, having low emissions and good fuel economy.

Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or before April 15, 2019.

25.    Plaintiff AMY HOLBERG (for the purpose of this paragraph only, "Plaintiff") is a resident of Humboldt County, California. On or about June 28, 2016, Plaintiff purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7KM2FS660079 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a

CONSUMER LEGAL REMEDIES, APC
15317 2 SOUTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that her Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had she known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting her opt out form to the Class claims administrator on or before April 15, 2019.

26.     Plaintiff ANDREW BARBOSA (for the purpose of this paragraph only, "Plaintiff") is a resident of Imperial County, California. On or about September 30, 2016, Plaintiff purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7NM0GS365981 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or

**COMPLAINT FOR DAMAGES**     Exhibit B, Page 24

CONSUMER LEGAL REMEDIES, A PC
153152 SANTA MONICA BLVD, PENTHOUSE, BEVERLY HILLS, CA 90211

1   performance of the Vehicle or provide compensation if there was a failure in such utility or
2   performance. The Vehicle was purchased or used primarily for personal, family, or household
3   purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to
4   the warranty and developed other serious defects and nonconformities to the warranty including,
5   but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based
6   in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and
7   fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles
8   were represented as environmentally friendly, having low emissions and good fuel economy.
9   Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff
10  went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,
11· including its fuel economy and performance. These representations, along with the advertised
12  fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of
13  purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting
14  NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware
15  that his Vehicle was equipped with undisclosed and unauthorized emission control devices
16  designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not
17  have purchased the Vehicle, or would have paid substantially less for it, had he known that it
18  did not comply with emission standards; that its emission treatment system was designed to de-
19  activate during real-world driving conditions; and that it could not achieve the advertised towing
20  power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered
21  a concrete injury as a direct and proximate result of FCA's misconduct, and would not have
22  purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the
23  unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-*
24  *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.
25  3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or
26  before April 15, 2019.
27       27.    Plaintiffs ANDREW HOLDBROOKS and JESSICA HOLDBROOKS (for the
28  purpose of this paragraph only, "Plaintiffs") are residents of Tulare County, California. On or

13

CONSUMER LEGAL REMEDIES, APC
15312 NORTH MANGO DRIVE, BEVERLY HILLS, CA 90211

about May 21, 2016, Plaintiffs purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7LM5GS338262 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales*

*Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or before April 15, 2019.

28.     Plaintiff ANDREW WHYNAUGHT (for the purpose of this paragraph only, "Plaintiff") is a resident of Tulare County, California. On or about November 1, 2017, Plaintiff purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7LM5GS174558 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

CONSUMER LEGAL REMEDIES, APC
15112 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

29.   Plaintiff ANTHONY ELIAS JR. (for the purpose of this paragraph only, "Plaintiff") is a resident of Los Angeles County, California. On or about July 26, 2017, Plaintiff purchased a 2014 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR6JM8ES382508 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not

CONSUMER LEGAL REMEDIES, APC
15 1/2 NORTH ARROZ DRIVE, BEVERLY HILLS, CA 90211

1  have purchased the Vehicle, or would have paid substantially less for it, had he known that it

2  did not comply with emission standards; that its emission treatment system was designed to de-

3  activate during real-world driving conditions; and that it could not achieve the advertised towing

4  power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

5  a concrete injury as a direct and proximate result of FCA's misconduct, and would not have

6  purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the

7  unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-*

8  *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

9  3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or

10  before April 15, 2019.

11      30.     Plaintiff ANTONIO VEGA (for the purpose of this paragraph only, "Plaintiff")

12  is a resident of San Bernardino County, California. On or about May 14, 2018, Plaintiff

13  purchased a 2014 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number

14  1C6RR7PM9ES363608 (for the purpose of this paragraph only, the "Vehicle"), which was

15  manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale

16  of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or

17  performance of the Vehicle or provide compensation if there was a failure in such utility or

18  performance. The Vehicle was purchased or used primarily for personal, family, or household

19  purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to

20  the warranty and developed other serious defects and nonconformities to the warranty including,

21  but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based

22  in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and

23  fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles

24  were represented as environmentally friendly, having low emissions and good fuel economy.

25  Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff

26  went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,

27  including its fuel economy and performance. These representations, along with the advertised

28  fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of

*(left margin, rotated)* CONSUMER LEGAL REMEDIES, APC
153 1/2 NORTH ARDEN DRIVE, BEVERLY HILLS, CA 90211

17

CONSUMER LEGAL REMEDIES, APC
1531/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

1  purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting

2  NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware

3  that his Vehicle was equipped with undisclosed and unauthorized emission control devices

4  designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not

5  have purchased the Vehicle, or would have paid substantially less for it, had he known that it

6  did not comply with emission standards; that its emission treatment system was designed to de-

7  activate during real-world driving conditions; and that it could not achieve the advertised towing

8  power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

9  a concrete injury as a direct and proximate result of FCA's misconduct, and would not have

10  purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the

11  unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-*

12  *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

13  3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or

14  before April 15, 2019.

15       31.      Plaintiff AUSTIN PETTY (for the purpose of this paragraph only, "Plaintiff") is

16  a resident of Placer County, California. On or about October 27, 2015, Plaintiff purchased a

17  2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7PM4FS751525 (for

18  the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed

19  by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by

20  which FCA undertook to preserve or maintain the utility or performance of the Vehicle or

21  provide compensation if there was a failure in such utility or performance. The Vehicle was

22  purchased or used primarily for personal, family, or household purposes. The Vehicle was

23  delivered to Plaintiff with serious defects and nonconformities to the warranty and developed

24  other serious defects and nonconformities to the warranty including, but not limited to, a

25  defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's

26  representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).

27  Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were

28  represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff

**COMPLAINT FOR DAMAGES**      Exhibit B, Page 30

also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

32.     Plaintiff BENJAMIN G. MORANA (for the purpose of this paragraph only, "Plaintiff") is a resident of San Bernardino County, California. On or about August 15, 2017, Plaintiff purchased a 2014 Jeep Grand Cherokee EcoDiesel, Vehicle Identification Number 1C4RJFCM6EC580575 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including,

CONSUMER LEGAL REMEDIES, APC
153112 SOUTH ARMACZ DRIVE, BEVERLY HILLS, CA 90211

19

CONSUMER LEGAL REMEDIES, APC
133 1/2 N NORTH AMOAZ DRIVE, BEVERLY HILLS, CA 90211

but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

33.    Plaintiff BILL LARGEY (for the purpose of this paragraph only, "Plaintiff") is a resident of Maricopa County, Arizona. On or about December 24, 2015, Plaintiff purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7NM5GS184990 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or

provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

34.    Plaintiffs BOBBY MCMICHAEL and KAREN MCMICHAEL (for the purpose of this paragraph only, "Plaintiffs") are residents of Tehama County, California. On or about

CONSUMER LEGAL REMEDIES, APC
15312 NORTH AMAGE DRIVE, BEVERLY HILLS, CA 90211

1   December 30, 2016, Plaintiffs purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle
2   Identification Number 1C6RR7LM2GS339448 (for the purpose of this paragraph only, the
3   "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties
4   accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or
5   maintain the utility or performance of the Vehicle or provide compensation if there was a failure
6   in such utility or performance. The Vehicle was purchased or used primarily for personal,
7   family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and
8   nonconformities to the warranty and developed other serious defects and nonconformities to the
9   warranty including, but not limited to, a defective emission system. Plaintiffs decided to
10  purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle
11  (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on
12  which the Subject Vehicles were represented as environmentally friendly, having low emissions
13  and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject
14  Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's
15  EcoDiesel® attributes, including its fuel economy and performance. These representations,
16  along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the
17  Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as
18  advertised only by emitting NOx at levels that are greater than advertised and above legal limits.
19  Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized
20  emission control devices designed to cheat emission tests and to deceive consumers and
21  regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially
22  less for it, had they known that it did not comply with emission standards; that its emission
23  treatment system was designed to de-activate during real-world driving conditions; and that it
24  could not achieve the advertised towing power, performance, and/or fuel economy without
25  cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate
26  result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid
27  substantially less for it, had FCA not concealed the unauthorized emission control devices.
28  Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales*

**COMPLAINT FOR DAMAGES**    Exhibit B, Page 34

*Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or before April 15, 2019.

35.    Plaintiff BRANDON REITZ (for the purpose of this paragraph only, "Plaintiff") is a resident of Sacramento County, California. On or about November 16, 2016, Plaintiff purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7GM5GS372180 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

CONSUMER LEGAL REMEDIES, APC
15312 NORTH AMOS DRIVE, BEVERLY HILLS, CA 90211

23

a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

36.   Plaintiff BRANDON TAMURA (for the purpose of this paragraph only, "Plaintiff") is a resident of Fresno County, California. On or about December 31, 2015, Plaintiff purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7NM5GS166862 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not

CONSUMER LEGAL REMEDIES, APC
15312 ENSMITH ROAD, BEVERLY HILLS, CA 90211

1    have purchased the Vehicle, or would have paid substantially less for it, had he known that it

2    did not comply with emission standards; that its emission treatment system was designed to de-

3    activate during real-world driving conditions; and that it could not achieve the advertised towing

4    power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

5    a concrete injury as a direct and proximate result of FCA's misconduct, and would not have

6    purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the

7    unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-

8    Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

9    3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or

10   before April 15, 2019.

11       37.    Plaintiff BRENT LEBLANC (for the purpose of this paragraph only, "Plaintiff")

12   is a resident of Riverside County, California. On or about December 21, 2015, Plaintiff

13   purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number

14   1C6RR7TM9GS186874 (for the purpose of this paragraph only, the "Vehicle"), which was

15   manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale

16   of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or

17   performance of the Vehicle or provide compensation if there was a failure in such utility or

18   performance. The Vehicle was purchased or used primarily for personal, family, or household

19   purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to

20   the warranty and developed other serious defects and nonconformities to the warranty including,

21   but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based

22   in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and

23   fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles

24   were represented as environmentally friendly, having low emissions and good fuel economy.

25   Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff

26   went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,

27   including its fuel economy and performance. These representations, along with the advertised

28   fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of

CONSUMER LEGAL REMEDIES, APC
133 1/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

25

**COMPLAINT FOR DAMAGES**      Exhibit B, Page 37

purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

38.     Plaintiff BRIAN CARRILLO (for the purpose of this paragraph only, "Plaintiff") is a resident of Livermore County, California. On or about October 31, 2015, Plaintiff purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7NM8FS724170 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff

CONSUMER LEGAL REMEDIES, A PC
133 1/2 S NORTH ALMONT DRIVE, BEVERLY HILLS, CA 90211

**COMPLAINT FOR DAMAGES**                    Exhibit B, Page 38

also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

39. Plaintiffs BRIAN CORBETT and MUREL ANN CORBETT (for the purpose of this paragraph only, "Plaintiffs") are residents of Orange County, California. On or about March 21, 2016, Plaintiffs purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7NM6GS154140 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including,

27

CONSUMER LEGAL REMEDIES, A PC
15312 NORTH ARROWPOINTE, BEVERLY HILLS, CA 90211

CONSUMER LEGAL REMEDIES, APC
15317 25 NORTH ABBAGE DRIVE, BEVERLY HILLS, CA 90211

but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or before April 15, 2019.

40.     Plaintiffs BRIAN CORWIN and SUSAN CORWIN (for the purpose of this paragraph only, "Plaintiffs") are residents of San Bernardino County, California. On or about February 24, 2018, Plaintiffs purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7LM3FS531699 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or

maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting $NOx$ at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or before April 15, 2019.

41. Plaintiff BRIAN PERRY (for the purpose of this paragraph only, "Plaintiff") is a resident of Tulare County, California. On or about September 6, 2015, Plaintiff purchased a

CONSUMER LEGAL REMEDIES, A PC
8511/23 NORTH AMAGE DRIVE, BEVERLY HILLS CA 90211

2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7VM6FS689032 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

CONSUMER LEGAL REMEDIES, APC
15312 NORTH MILWAUKEE DRIVE, BEVERLY HILLS, CA 90211

30

1    3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or

2    before April 15, 2019.

3         42.    Plaintiff CANDICE KOPCAK (for the purpose of this paragraph only,

4    "Plaintiff") is a resident of Riverside County, California. On or about April 10, 2016, Plaintiff

5    purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number

6    1C6RR6KM6GS165122 (for the purpose of this paragraph only, the "Vehicle"), which was

7    manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale

8    of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or

9    performance of the Vehicle or provide compensation if there was a failure in such utility or

10   performance. The Vehicle was purchased or used primarily for personal, family, or household

11   purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to

12   the warranty and developed other serious defects and nonconformities to the warranty including,

13   but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based

14   in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and

15   fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles

16   were represented as environmentally friendly, having low emissions and good fuel economy.

17   Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff

18   went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,

19   including its fuel economy and performance. These representations, along with the advertised

20   fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of

21   purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting

22   NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware

23   that her Vehicle was equipped with undisclosed and unauthorized emission control devices

24   designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not

25   have purchased the Vehicle, or would have paid substantially less for it, had she known that it

26   did not comply with emission standards; that its emission treatment system was designed to de-

27   activate during real-world driving conditions; and that it could not achieve the advertised towing

28   power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

CONSUMER LEGAL REMEDIES, APC
1551/25 NORTH AVENUE DRIVE, BEVERLY HILLS CA 90211

31

a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting her opt out form to the Class claims administrator on or before April 15, 2019.

43. Plaintiffs CARLOS LUGO and MARIA LUGO (for the purpose of this paragraph only, "Plaintiffs") are residents of San Joaquin County, California. On or about January 30, 2015, Plaintiffs purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7VM1FS532105 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and

32

Exhibit B, Page 44

CONSUMER LEGAL REMEDIES, APC
1351/2 NORTH AMAGE DRIVE, BEVERLY HILLS, CA 90211

regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or before April 15, 2019.

44.   Plaintiffs CARLOS ROJO LOPEZ and NORMA RUELAS (for the purpose of this paragraph only, "Plaintiffs") are residents of Imperial County, California. On or about June 17, 2015, Plaintiffs purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7PM4FS665289 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of

purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or before April 15, 2019.

45. Plaintiffs CHAD BRUMMELL and CAROL BRUMMEL (for the purpose of this paragraph only, "Plaintiffs") are residents of Orange County, California. On or about December 1, 2015, Plaintiffs purchased a 2014 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR6NM1ES403970 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy.

CONSUMER LEGAL REMEDIES, APC
1551 N. SEPULVEDA BLVD DRIVE BEVERLY HILLS, CA 90211

**COMPLAINT FOR DAMAGES**      Exhibit B, Page 46

CONSUMER LEGAL REMEDIES, APC
153 1/2 NORTH ARNAGE DRIVE, BEVERLY HILLS, CA 90211

1    Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs
2    went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,
3    including its fuel economy and performance. These representations, along with the advertised
4    fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of
5    purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting
6    NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware
7    that their Vehicle was equipped with undisclosed and unauthorized emission control devices
8    designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not
9    have purchased the Vehicle, or would have paid substantially less for it, had they known that it
10   did not comply with emission standards; that its emission treatment system was designed to de-
11   activate during real-world driving conditions; and that it could not achieve the advertised towing
12   power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have
13   suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not
14   have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed
15   the unauthorized emission control devices.  Plaintiffs opted out of the Class in *In Re Chrysler-
16   Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.
17   3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or
18   before April 15, 2019.
19        46.    Plaintiff CHAD ELAM (for the purpose of this paragraph only, "Plaintiff") is a
20   resident of Los Angeles County, California. On or about March 24, 2016, Plaintiff purchased a
21   2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7KM0GS145079 (for
22   the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed
23   by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by
24   which FCA undertook to preserve or maintain the utility or performance of the Vehicle or
25   provide compensation if there was a failure in such utility or performance. The Vehicle was
26   purchased or used primarily for personal, family, or household purposes. The Vehicle was
27   delivered to Plaintiff with serious defects and nonconformities to the warranty and developed
28   other serious defects and nonconformities to the warranty including, but not limited to, a

**COMPLAINT FOR DAMAGES**    Exhibit B, Page 47

CONSUMER LEGAL REMEDIES, A PC
15332 NORTH ARRAGE DRIVE, BEVERLY HILLS CA 90211

defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

47.     Plaintiff CHARLES HUDDLESTON [1] (for the purpose of this paragraph only, "Plaintiff") is a resident of San Diego County, California. On or about July 2, 2016, Plaintiff purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7LM3GS174557 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or

CONSUMER LEGAL REMEDIES, APC
1351/2 NORTH ARMAND DRIVE, BEVERLY HILLS, CA 90211

1    performance of the Vehicle or provide compensation if there was a failure in such utility or

2    performance. The Vehicle was purchased or used primarily for personal, family, or household

3    purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to

4    the warranty and developed other serious defects and nonconformities to the warranty including,

5    but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based

6    in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and

7    fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles

8    were represented as environmentally friendly, having low emissions and good fuel economy.

9    Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff

10   went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,

11   including its fuel economy and performance. These representations, along with the advertised

12   fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of

13   purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting

14   NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware

15   that his Vehicle was equipped with undisclosed and unauthorized emission control devices

16   designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not

17   have purchased the Vehicle, or would have paid substantially less for it, had he known that it

18   did not comply with emission standards; that its emission treatment system was designed to de-

19   activate during real-world driving conditions; and that it could not achieve the advertised towing

20   power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

21   a concrete injury as a direct and proximate result of FCA's misconduct, and would not have

22   purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the

23   unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-*

24   *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

25   3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or

26   before April 15, 2019.

27        48.    Plaintiff CHARLES HUDDLESTON [2] (for the purpose of this paragraph only,

28   "Plaintiff") is a resident of San Diego County, California. On or about April 27, 2015, Plaintiff

1   purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number
2   1C6RR6PM9FS530528 (for the purpose of this paragraph only, the "Vehicle"), which was
3   manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale
4   of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or
5   performance of the Vehicle or provide compensation if there was a failure in such utility or
6   performance. The Vehicle was purchased or used primarily for personal, family, or household
7   purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to
8   the warranty and developed other serious defects and nonconformities to the warranty including,
9   but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based
10  in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and
11  fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles
12  were represented as environmentally friendly, having low emissions and good fuel economy.
13  Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff
14  went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,
15  including its fuel economy and performance. These representations, along with the advertised
16  fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of
17  purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting
18  NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware
19  that his Vehicle was equipped with undisclosed and unauthorized emission control devices
20  designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not
21  have purchased the Vehicle, or would have paid substantially less for it, had he known that it
22  did not comply with emission standards; that its emission treatment system was designed to de-
23  activate during real-world driving conditions; and that it could not achieve the advertised towing
24  power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered
25  a concrete injury as a direct and proximate result of FCA's misconduct, and would not have
26  purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the
27  unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-*
28  *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

1 | 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or
2 | before April 15, 2019.
3 |     49.    Plaintiff CHARLES MCCARTNEY (for the purpose of this paragraph only,
4 | "Plaintiff") is a resident of Solano County, California. On or about May 25, 2016, Plaintiff
5 | purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number
6 | 1C6RR7LMXGS172918 (for the purpose of this paragraph only, the "Vehicle"), which was
7 | manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale
8 | of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or
9 | performance of the Vehicle or provide compensation if there was a failure in such utility or
10 | performance. The Vehicle was purchased or used primarily for personal, family, or household
11 | purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to
12 | the warranty and developed other serious defects and nonconformities to the warranty including,
13 | but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based
14 | in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and
15 | fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles
16 | were represented as environmentally friendly, having low emissions and good fuel economy.
17 | Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff
18 | went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,
19 | including its fuel economy and performance. These representations, along with the advertised
20 | fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of
21 | purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting
22 | NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware
23 | that his Vehicle was equipped with undisclosed and unauthorized emission control devices
24 | designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not
25 | have purchased the Vehicle, or would have paid substantially less for it, had he known that it
26 | did not comply with emission standards; that its emission treatment system was designed to de-
27 | activate during real-world driving conditions; and that it could not achieve the advertised towing
28 | power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

CONSUMER LEGAL REMEDIES, A PC<br/>1551/25 NORTH AMOAGEMONT, BEVERLY HILLS, CA 90211

CONSUMER LEGAL REMEDIES, A P C
1515 NORTH ARROZE HWY, BEVERLY HILLS, CA 90211

1  a concrete injury as a direct and proximate result of FCA's misconduct, and would not have

2  purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the

3  unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-*

4  *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

5  3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or

6  before April 15, 2019.

7      50.    Plaintiffs CHARLES WEDEL and MICKIE WEDEL (for the purpose of this

8  paragraph only, "Plaintiffs") are residents of Kern County, California. On or about April 27,

9  2015, Plaintiffs purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number

10  1C6RR7PM4FS668421 (for the purpose of this paragraph only, the "Vehicle"), which was

11  manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale

12  of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or

13  performance of the Vehicle or provide compensation if there was a failure in such utility or

14  performance. The Vehicle was purchased or used primarily for personal, family, or household

15  purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to

16  the warranty and developed other serious defects and nonconformities to the warranty including,

17  but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based

18  in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and

19  fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles

20  were represented as environmentally friendly, having low emissions and good fuel economy.

21  Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs

22  went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,

23  including its fuel economy and performance. These representations, along with the advertised

24  fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of

25  purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting

26  NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware

27  that their Vehicle was equipped with undisclosed and unauthorized emission control devices

28  designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not

**COMPLAINT FOR DAMAGES**        Exhibit B, Page 52

CONSUMER LEGAL REMEDIES, APC
15312 NORTH AMIGO CIRCLE, BEVERLY HILLS, CA 90211

1   have purchased the Vehicle, or would have paid substantially less for it, had they known that it

2   did not comply with emission standards; that its emission treatment system was designed to de-

3   activate during real-world driving conditions; and that it could not achieve the advertised towing

4   power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have

5   suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not

6   have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed

7   the unauthorized emission control devices.  Plaintiffs opted out of the Class in *In Re Chrysler-*

8   *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

9   3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or

10  before April 15, 2019.

11          51.     Plaintiff CHARLEY EVANS (for the purpose of this paragraph only, "Plaintiff")

12  is a resident of Madera County, California. On or about March 23, 2016, Plaintiff purchased a

13  2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7KM1GS153899 (for

14  the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed

15  by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by

16  which FCA undertook to preserve or maintain the utility or performance of the Vehicle or

17  provide compensation if there was a failure in such utility or performance. The Vehicle was

18  purchased or used primarily for personal, family, or household purposes. The Vehicle was

19  delivered to Plaintiff with serious defects and nonconformities to the warranty and developed

20  other serious defects and nonconformities to the warranty including, but not limited to, a

21  defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's

22  representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).

23  Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were

24  represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff

25  also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to

26  purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including

27  its fuel economy and performance. These representations, along with the advertised fuel

28  economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase,

41

1    Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at

2    levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his

3    Vehicle was equipped with undisclosed and unauthorized emission control devices designed to

4    cheat emission tests and to deceive consumers and regulators. Plaintiff would not have

5    purchased the Vehicle, or would have paid substantially less for it, had he known that it did not

6    comply with emission standards; that its emission treatment system was designed to de-activate

7    during real-world driving conditions; and that it could not achieve the advertised towing power,

8    performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a

9    concrete injury as a direct and proximate result of FCA's misconduct, and would not have

10   purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the

11   unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-*

12   *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

13   3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or

14   before April 15, 2019.

15       52.    Plaintiff CHRIS CAMPION (for the purpose of this paragraph only, "Plaintiff")

16   is a resident of San Diego County, California. On or about November 20, 2017, Plaintiff

17   purchased  a  2015  Dodge  Ram  1500  EcoDiesel,  Vehicle  Identification  Number

18   1C6RR7LM1FS728001 (for the purpose of this paragraph only, the "Vehicle"), which was

19   manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale

20   of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or

21   performance of the Vehicle or provide compensation if there was a failure in such utility or

22   performance. The Vehicle was purchased or used primarily for personal, family, or household

23   purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to

24   the warranty and developed other serious defects and nonconformities to the warranty including,

25   but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based

26   in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and

27   fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles

28   were represented as environmentally friendly, having low emissions and good fuel economy.

CONSUMER LEGAL REMEDIES, APC
15312 NORTH AMAGE DRIVE, BEVERLY HILLS, CA 90211

**COMPLAINT FOR DAMAGES**            Exhibit B, Page 54

CONSUMER LEGAL REMEDIES, APC
1531/2 NORTH ARDMORE DRIVE, BEVERLY HILLS, CA 90211

1    Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff

2    went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,

3    including its fuel economy and performance. These representations, along with the advertised

4    fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of

5    purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting

6    NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware

7    that his Vehicle was equipped with undisclosed and unauthorized emission control devices

8    designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not

9    have purchased the Vehicle, or would have paid substantially less for it, had he known that it

10   did not comply with emission standards; that its emission treatment system was designed to de-

11   activate during real-world driving conditions; and that it could not achieve the advertised towing

12   power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

13   a concrete injury as a direct and proximate result of FCA's misconduct, and would not have

14   purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the

15   unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-*

16   *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

17   3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or

18   before April 15, 2019.

19         53.    Plaintiffs CHRISTOPHER ALLEN POLHERT and CHRISTI MARIE

20   POLHERT (for the purpose of this paragraph only, "Plaintiffs") are residents of Kern County,

21   California. On or about November 7, 2015, Plaintiffs leased a 2015 Jeep Grand Cherokee

22   EcoDiesel, Vehicle Identification Number 1C4RJFBM9FC944085 (for the purpose of this

23   paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA.

24   Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook

25   to preserve or maintain the utility or performance of the Vehicle or provide compensation if

26   there was a failure in such utility or performance. The Vehicle was leased or used primarily for

27   personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious

28   defects and nonconformities to the warranty and developed other serious defects and

43

CONSUMER LEGAL REMEDIES, APC
1531 1/2 NORTH ARDMORE DRIVE, BEVERLY HILLS, CA 90211

1  nonconformities to the warranty including, but not limited to, a defective emission system.

2  Plaintiffs decided to lease the Vehicle based in part on FCA's representations that it was an

3  "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the

4  JEEP/RAM website, on which the Subject Vehicles were represented as environmentally

5  friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television

6  commercials about the Subject Vehicles. When Plaintiffs went to lease the Vehicle, the sales

7  associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and

8  performance. These representations, along with the advertised fuel economy, were among the

9  primary reasons Plaintiffs chose the Vehicle. At the time of lease, Plaintiffs did not know that

10  the Vehicle could perform as advertised only by emitting NOx at levels that are greater than

11  advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped

12  with undisclosed and unauthorized emission control devices designed to cheat emission tests

13  and to deceive consumers and regulators. Plaintiffs would not have leased the Vehicle, or would

14  have paid substantially less for it, had they known that it did not comply with emission

15  standards; that its emission treatment system was designed to de-activate during real-world

16  driving conditions; and that it could not achieve the advertised towing power, performance,

17  and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury

18  as a direct and proximate result of FCA's misconduct, and would not have leased the Vehicle,

19  or would have paid substantially less for it, had FCA not concealed the unauthorized emission

20  control devices.  Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel*

21  *Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by

22  timely submitting their opt out form to the Class claims administrator on or before April 15,

23  2019.

24         54.    Plaintiff CHRISTOPHER DENOVELLIS (for the purpose of this paragraph

25  only, "Plaintiff") is a resident of Santa Clara County, California. On or about December 12,

26  2013, Plaintiff purchased a 2014 Jeep Grand Cherokee EcoDiesel, Vehicle Identification

27  Number 1C4RJFCM7EC305605 (for the purpose of this paragraph only, the "Vehicle"), which

28  was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the

CONSUMER LEGAL REMEDIES, APC
1531/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

1    sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or

2    performance of the Vehicle or provide compensation if there was a failure in such utility or

3    performance. The Vehicle was purchased or used primarily for personal, family, or household

4    purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to

5    the warranty and developed other serious defects and nonconformities to the warranty including,

6    but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based

7    in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and

8    fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles

9    were represented as environmentally friendly, having low emissions and good fuel economy.

10   Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff

11   went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,

12   including its fuel economy and performance. These representations, along with the advertised

13   fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of

14   purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting

15   NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware

16   that his Vehicle was equipped with undisclosed and unauthorized emission control devices

17   designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not

18   have purchased the Vehicle, or would have paid substantially less for it, had he known that it

19   did not comply with emission standards; that its emission treatment system was designed to de-

20   activate during real-world driving conditions; and that it could not achieve the advertised towing

21   power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

22   a concrete injury as a direct and proximate result of FCA's misconduct, and would not have

23   purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the

24   unauthorized emission control devices. Plaintiff opted out of the Class in *In Re Chrysler-

25   Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

26   3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or

27   before April 15, 2019.

28          55.    Plaintiff CHRISTOPHER EDGAR (for the purpose of this paragraph only,

45

CONSUMER LEGAL REMEDIES, APC
153 1/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

"Plaintiff") is a resident of Los Angeles County, California. On or about September 1, 2014, Plaintiff purchased a 2014 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7LM9ES440919 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-*

*Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

56.     Plaintiffs CHRISTOPHER LEO FARRIS and MELISSA FARRIS (for the purpose of this paragraph only, "Plaintiffs") are residents of Solano County, California. On or about July 30, 2014, Plaintiffs purchased a 2014 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7NM3ES428777 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it

could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or before April 15, 2019.

57.     Plaintiffs CHRISTOPHER STANLEY and CHERYL STANLEY (for the purpose of this paragraph only, "Plaintiffs") are residents of San Diego County, California. On or about July 27, 2015, Plaintiffs purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR6LM9FS729939 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized

**COMPLAINT FOR DAMAGES**          Exhibit B, Page 60

emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or before April 15, 2019.

58.     Plaintiff CLAUDIO VASQUEZ (for the purpose of this paragraph only, "Plaintiff") is a resident of Kern County, California. On or about September 25, 2017, Plaintiff purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7GM6FS665133 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised

CONSUMER LEGAL REMEDIES, APC
1551 1/2 NORTH AMALFI DRIVE, BEVERLY HILLS, CA 90211

CONSUMER LEGAL REMEDIES, APC
1531/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

1  fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of

2  purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting

3  NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware

4  that his Vehicle was equipped with undisclosed and unauthorized emission control devices

5  designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not

6  have purchased the Vehicle, or would have paid substantially less for it, had he known that it

7  did not comply with emission standards; that its emission treatment system was designed to de-

8  activate during real-world driving conditions; and that it could not achieve the advertised towing

9  power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

10 a concrete injury as a direct and proximate result of FCA's misconduct, and would not have

11 purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the

12 unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-*

13 *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

14 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or

15 before April 15, 2019.

16     59.     Plaintiffs CONRAD GONZALEZ and SHARA GONZALEZ (for the purpose of

17 this paragraph only, "Plaintiffs") are residents of Lassen County, California. On or about July

18 15, 2017, Plaintiffs purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification

19 Number 1C6RR7PM5FS555366 (for the purpose of this paragraph only, the "Vehicle"), which

20 was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the

21 sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or

22 performance of the Vehicle or provide compensation if there was a failure in such utility or

23 performance. The Vehicle was purchased or used primarily for personal, family, or household

24 purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to

25 the warranty and developed other serious defects and nonconformities to the warranty including,

26 but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based

27 in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and

28 fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles

CONSUMER LEGAL REMEDIES, APC
1531/2 NORTH ARANDO DRIVE, BEVERLY HILLS, CA 90211

1    were represented as environmentally friendly, having low emissions and good fuel economy.

2    Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs

3    went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,

4    including its fuel economy and performance. These representations, along with the advertised

5    fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of

6    purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting

7    NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware

8    that their Vehicle was equipped with undisclosed and unauthorized emission control devices

9    designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not

10   have purchased the Vehicle, or would have paid substantially less for it, had they known that it

11   did not comply with emission standards; that its emission treatment system was designed to de-

12   activate during real-world driving conditions; and that it could not achieve the advertised towing

13   power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have

14   suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not

15   have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed

16   the unauthorized emission control devices.  Plaintiffs opted out of the Class in *In Re Chrysler-*

17   *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

18   3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or

19   before April 15, 2019.

20        60.    Plaintiff COREY RINGER (for the purpose of this paragraph only, "Plaintiff")

21   is a resident of Placer County, California. On or about June 24, 2016, Plaintiff purchased a 2016

22   Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7NM4GS337505 (for the

23   purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by

24   Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which

25   FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide

26   compensation if there was a failure in such utility or performance. The Vehicle was purchased

27   or used primarily for personal, family, or household purposes. The Vehicle was delivered to

28   Plaintiff with serious defects and nonconformities to the warranty and developed other serious

defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

61. Plaintiff CORNAN JOHN JOHNSON (for the purpose of this paragraph only, "Plaintiff") is a resident of Riverside County, California. On or about December 31, 2016, Plaintiff purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR6LM0GS201370 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or

CONSUMER LEGAL REMEDIES, A PC
153 1/2 SANTA MONICA DRIVE, BEVERLY HILLS, CA 90211

52

**COMPLAINT FOR DAMAGES**    Exhibit B, Page 64

performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

62.     Plaintiff DALE GILLETTE (for the purpose of this paragraph only, "Plaintiff") is a resident of San Bernardino County, California. On or about June 14, 2014, Plaintiff

CONSUMER LEGAL REMEDIES, APC
1531 7 25 NORTH AVENUE DRIVE, BEVERLY HILLS, CA 90211

1   purchased a 2014 Jeep Grand Cherokee EcoDiesel, Vehicle Identification Number
2   1C4RJEBM5EC396434 (for the purpose of this paragraph only, the "Vehicle"), which was
3   manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale
4   of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or
5   performance of the Vehicle or provide compensation if there was a failure in such utility or
6   performance. The Vehicle was purchased or used primarily for personal, family, or household
7   purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to
8   the warranty and developed other serious defects and nonconformities to the warranty including,
9   but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based
10  in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and
11  fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles
12  were represented as environmentally friendly, having low emissions and good fuel economy.
13  Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff
14  went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,
15  including its fuel economy and performance. These representations, along with the advertised
16  fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of
17  purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting
18  NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware
19  that his Vehicle was equipped with undisclosed and unauthorized emission control devices
20  designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not
21  have purchased the Vehicle, or would have paid substantially less for it, had he known that it
22  did not comply with emission standards; that its emission treatment system was designed to de-
23  activate during real-world driving conditions; and that it could not achieve the advertised towing
24  power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered
25  a concrete injury as a direct and proximate result of FCA's misconduct, and would not have
26  purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the
27  unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-*
28  *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

CONSUMER LEGAL REMEDIES, APC
1551/25 NORTH AVENUE DRIVE, BEVERLY HILLS, CA 90211

54

**COMPLAINT FOR DAMAGES**    Exhibit B, Page 66

3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

63.     Plaintiff DANIEL FOSTER (for the purpose of this paragraph only, "Plaintiff") is a resident of Humboldt County, California. On or about September 1, 2017, Plaintiff purchased a 2014 Jeep Grand Cherokee EcoDiesel, Vehicle Identification Number 1C4RJFBM3EC302380 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

**COMPLAINT FOR DAMAGES**     Exhibit B, Page 67

CONSUMER LEGAL REMEDIES, APC
15311/2 NORTH MIRAGE DRIVE, BEVERLY HILLS, CA 90211

a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

64.   Plaintiff DANIEL ROCKETT (for the purpose of this paragraph only, "Plaintiff") is a resident of Sacramento County, California. On or about May 23, 2016, Plaintiff purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7KM8GS134928 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not

**COMPLAINT FOR DAMAGES**

CONSUMER LEGAL REMEDIES, APC
15312 SOUTH MANGO DRIVE BEVERLY HILLS CA 90211

have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to deactivate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

65.    Plaintiff DANIEL RODEBACK (for the purpose of this paragraph only, "Plaintiff") is a resident of Los Angeles County, California. On or about June 6, 2014, Plaintiff purchased a 2014 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7FM4ES363663 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of

CONSUMER LEGAL REMEDIES, APC
15311/2 NORTH MANGE DRIVE, BEVERLY HILLS, CA 90211

1    purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting

2    NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware

3    that his Vehicle was equipped with undisclosed and unauthorized emission control devices

4    designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not

5    have purchased the Vehicle, or would have paid substantially less for it, had he known that it

6    did not comply with emission standards; that its emission treatment system was designed to de-

7    activate during real-world driving conditions; and that it could not achieve the advertised towing

8    power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

9    a concrete injury as a direct and proximate result of FCA's misconduct, and would not have

10   purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the

11   unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-*

12   *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

13   3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or

14   before April 15, 2019.

15          66.     Plaintiff DANIEL SMITH (for the purpose of this paragraph only, "Plaintiff") is

16   a resident of Placer County, California. On or about March 24, 2016, Plaintiff purchased a 2016

17   Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7KM3GS115221 (for the

18   purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by

19   Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which

20   FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide

21   compensation if there was a failure in such utility or performance. The Vehicle was purchased

22   or used primarily for personal, family, or household purposes. The Vehicle was delivered to

23   Plaintiff with serious defects and nonconformities to the warranty and developed other serious

24   defects and nonconformities to the warranty including, but not limited to, a defective emission

25   system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it

26   was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting

27   the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally

28   friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television

CONSUMER LEGAL REMEDIES, APC
1551/2 NORTH MOAZ DRIVE BEVERLY HILLS, CA 90211

58

**COMPLAINT FOR DAMAGES**     Exhibit B, Page 70

commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

67.     Plaintiffs DARRELL JOHNSON and LISA JOHNSON (for the purpose of this paragraph only, "Plaintiffs") are residents of Fresno County, California. On or about October 1, 2015, Plaintiffs purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7FMXFS662303 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based

CONSUMER LEGAL REMEDIES, APC
15311/2 SANTA MONICA DRIVE, BEVERLY HILLS, CA 90211

in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de- activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or before April 15, 2019.

68.      Plaintiffs DAVE BALLARD and TERRY BALLARD (for the purpose of this paragraph only, "Plaintiffs") are residents of San Luis Obispo County, California. On or about April 12, 2018, Plaintiffs purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7TM8GS118467 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or

CONSUMER LEGAL REMEDIES, APC
133 1/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

60

CONSUMER LEGAL REMEDIES, APC
153 1/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or before April 15, 2019.

69.    Plaintiffs DAVID C. ANDERSON and ELEANOR M. ANDERSON (for the purpose of this paragraph only, "Plaintiffs") are residents of Butte County, California. On or about April 23, 2016, Plaintiffs purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle

Identification Number 1C6RR7VM2GS267003 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their

**COMPLAINT FOR DAMAGES**          Exhibit B, Page 74

CONSUMER LEGAL REMEDIES, APC
15311/23 NORTH ABRAGO DRIVE, BEVERLY HILLS, CA 90211

1    opt out form to the Class claims administrator on or before April 15, 2019.

2         70.    Plaintiff DAVID HALL (for the purpose of this paragraph only, "Plaintiff") is a

3    resident of Sacramento County, California. On or about January 1, 2016, Plaintiff purchased a

4    2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7LM1GS337593 (for

5    the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed

6    by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by

7    which FCA undertook to preserve or maintain the utility or performance of the Vehicle or

8    provide compensation if there was a failure in such utility or performance. The Vehicle was

9    purchased or used primarily for personal, family, or household purposes. The Vehicle was

10   delivered to Plaintiff with serious defects and nonconformities to the warranty and developed

11   other serious defects and nonconformities to the warranty including, but not limited to, a

12   defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's

13   representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient).

14   Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were

15   represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff

16   also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to

17   purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including

18   its fuel economy and performance. These representations, along with the advertised fuel

19   economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase,

20   Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at

21   levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his

22   Vehicle was equipped with undisclosed and unauthorized emission control devices designed to

23   cheat emission tests and to deceive consumers and regulators. Plaintiff would not have

24   purchased the Vehicle, or would have paid substantially less for it, had he known that it did not

25   comply with emission standards; that its emission treatment system was designed to de-activate

26   during real-world driving conditions; and that it could not achieve the advertised towing power,

27   performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a

28   concrete injury as a direct and proximate result of FCA's misconduct, and would not have

CONSUMER LEGAL REMEDIES, APC
1531/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

71.     Plaintiffs DAVID J. COLELLO JR. and ROSANNE COLELLO (for the purpose of this paragraph only, "Plaintiffs") are residents of Los Angeles County, California. On or about October 26, 2016, Plaintiffs purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7LM9GS214723 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially

CONSUMER LEGAL REMEDIES, APC
1531/2 N.WILSHIRE/WOODMONT DRIVE, BEVERLY HILLS, CA 90211

less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or before April 15, 2019.

72.     Plaintiff DAVID MILLER (for the purpose of this paragraph only, "Plaintiff") is a resident of Butte County, California. On or about May 13, 2015, Plaintiff purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7JM4FS670209 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than

CONSUMER LEGAL REMEDIES, APC
153 1/2 NORTH ARNAZ DRIVE BEVERLY HILLS, CA 90211

**COMPLAINT FOR DAMAGES**     Exhibit B, Page 77

advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

73.     Plaintiff DAVID STURROCK (for the purpose of this paragraph only, "Plaintiff") is a resident of Los Angeles County, California. On or about May 7, 2017, Plaintiff purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR6GM7FS621605 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,

CONSUMER LEGAL REMEDIES, APC
15312 NORTH AMAGE PACIFIC BEVERLY HILLS, CA 90211

including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation,* Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

74.     Plaintiff DAVID SZYMUSIAK (for the purpose of this paragraph only, "Plaintiff") is a resident of Riverside County, California. On or about April 22, 2015, Plaintiff purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7NM8FS586033 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and

Exhibit B, Page 79

CONSUMER LEGAL REMEDIES, APC
15312 NORTH DAMAGE DRIVE, BEVERLY HILLS, CA 90211

CONSUMER LEGAL REMEDIES, APC
1551/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

1   fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles
2   were represented as environmentally friendly, having low emissions and good fuel economy.
3   Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff
4   went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,
5   including its fuel economy and performance. These representations, along with the advertised
6   fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of
7   purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting
8   NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware
9   that his Vehicle was equipped with undisclosed and unauthorized emission control devices
10  designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not
11  have purchased the Vehicle, or would have paid substantially less for it, had he known that it
12  did not comply with emission standards; that its emission treatment system was designed to de-
13  activate during real-world driving conditions; and that it could not achieve the advertised towing
14  power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered
15  a concrete injury as a direct and proximate result of FCA's misconduct, and would not have
16  purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the
17  unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-*
18  *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.
19  3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or
20  before April 15, 2019.

21      75.    Plaintiff DAVID W. THOMAS (for the purpose of this paragraph only,
22  "Plaintiff") is a resident of Los Angeles County, California. On or about March 30, 2014,
23  Plaintiff purchased a 2014 Jeep Grand Cherokee EcoDiesel, Vehicle Identification Number
24  1C4RJFCM6EC305966 (for the purpose of this paragraph only, the "Vehicle"), which was
25  manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale
26  of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or
27  performance of the Vehicle or provide compensation if there was a failure in such utility or
28  performance. The Vehicle was purchased or used primarily for personal, family, or household

CONSUMER LEGAL REMEDIES, APC
15317 ENCINO MANOR DRIVE, BEVERLY HILLS, CA 90211

1    purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to

2    the warranty and developed other serious defects and nonconformities to the warranty including,

3    but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based

4    in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and

5    fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles

6    were represented as environmentally friendly, having low emissions and good fuel economy.

7    Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff

8    went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes,

9    including its fuel economy and performance. These representations, along with the advertised

10   fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of

11   purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting

12   NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware

13   that his Vehicle was equipped with undisclosed and unauthorized emission control devices

14   designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not

15   have purchased the Vehicle, or would have paid substantially less for it, had he known that it

16   did not comply with emission standards; that its emission treatment system was designed to de-

17   activate during real-world driving conditions; and that it could not achieve the advertised towing

18   power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered

19   a concrete injury as a direct and proximate result of FCA's misconduct, and would not have

20   purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the

21   unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-*

22   *Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No.

23   3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or

24   before April 15, 2019.

25          76.    Plaintiff DELIA TORRES (for the purpose of this paragraph only, "Plaintiff") is

26   a resident of Los Angeles County, California. On or about May 24, 2015, Plaintiff purchased a

27   2015 Jeep Grand Cherokee EcoDiesel, Vehicle Identification Number 1C4RJFBM3FC845987

28   (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or

["

77.     Plaintiffs DENNIS LONG and CINDY LONG (for the purpose of this paragraph only, "Plaintiffs") are residents of Orange County, California. On or about September 6, 2015, Plaintiffs purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7LM0FS716910 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed

CONSUMER LEGAL REMEDIES, APC
15315 NORTH ARDEN DRIVE, BEVERLY HILLS, CA 90211

71

the unauthorized emission control devices. Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or before April 15, 2019.

78.    Plaintiffs DENNIS WHITE and REBEKAH DAWN LAWRENCE (for the purpose of this paragraph only, "Plaintiffs") are residents of Los Angeles County, California. On or about October 15, 2018, Plaintiffs purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR6LMXGS193696 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially less for it, had they known that it did not comply with emission standards; that its emission

CONSUMER LEGAL REMEDIES, APC
15312 NORTH MADOC DRIVE, BEVERLY HILLS, CA 90211

72

treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or before April 15, 2019.

79.     Plaintiff DON DIGBY (for the purpose of this paragraph only, "Plaintiff") is a resident of Riverside County, California. On or about October 12, 2015, Plaintiff purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7VM4FS760714 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his

Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

80.     Plaintiff DON NELSON (for the purpose of this paragraph only, "Plaintiff") is a resident of Plumas County, California. On or about July 11, 2015, Plaintiff purchased a 2015 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7TM4FS572097 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and

CONSUMER LEGAL REMEDIES, APC
1551/2 NORTH ARMAO DRIVE, BEVERLY HILLS, CA 90211

performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices. Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

81. Plaintiffs DOUGLAS CRYER and JERI CRYER (for the purpose of this paragraph only, "Plaintiffs") are residents of San Luis Obispo County, California. On or about April 17, 2016, Plaintiffs purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7TM5GS175967 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles

CONSUMER LEGAL REMEDIES, APC
15 J 1/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or before April 15, 2019.

82.    Plaintiffs DOUGLAS KEELING and LISA KEELING (for the purpose of this paragraph only, "Plaintiffs") are residents of Sutter County, California. On or about August 23, 2014, Plaintiffs purchased a 2014 Jeep Grand Cherokee EcoDiesel, Vehicle Identification Number 1C4RJFBM8EC536241 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale of the Vehicle to Plaintiffs by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiffs with serious defects and nonconformities to

CONSUMER LEGAL REMEDIES, APC
12312 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiffs decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiffs recall visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiffs also recall seeing television commercials about the Subject Vehicles. When Plaintiffs went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiffs chose the Vehicle. At the time of purchase, Plaintiffs did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor were Plaintiffs aware that their Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiffs would not have purchased the Vehicle, or would have paid substantially less for it, had they known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs have suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiffs opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting their opt out form to the Class claims administrator on or before April 15, 2019.

83.   Plaintiff DOUGLAS SEYMOUR (for the purpose of this paragraph only, "Plaintiff") is a resident of Bexar County, Texas. On or about October 5, 2017, Plaintiff purchased a 2016 Dodge Ram 1500 EcoDiesel, Vehicle Identification Number 1C6RR7KM5GS223517 (for the purpose of this paragraph only, the "Vehicle"), which was manufactured and/or distributed by Defendant FCA. Express warranties accompanied the sale

CONSUMER LEGAL REMEDIES, A PC
15317 2 NORTH ARGAZ DRIVE BEVERLY HILLS, CA 90211

CONSUMER LEGAL REMEDIES, APC
15311/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

of the Vehicle to Plaintiff by which FCA undertook to preserve or maintain the utility or performance of the Vehicle or provide compensation if there was a failure in such utility or performance. The Vehicle was purchased or used primarily for personal, family, or household purposes. The Vehicle was delivered to Plaintiff with serious defects and nonconformities to the warranty and developed other serious defects and nonconformities to the warranty including, but not limited to, a defective emission system. Plaintiff decided to purchase the Vehicle based in part on FCA's representations that it was an "EcoDiesel" vehicle (i.e., reduced emissions and fuel efficient). Plaintiff recalls visiting the JEEP/RAM website, on which the Subject Vehicles were represented as environmentally friendly, having low emissions and good fuel economy. Plaintiff also recalls seeing television commercials about the Subject Vehicles. When Plaintiff went to purchase the Vehicle, the sales associate touted the Vehicle's EcoDiesel® attributes, including its fuel economy and performance. These representations, along with the advertised fuel economy, were among the primary reasons Plaintiff chose the Vehicle. At the time of purchase, Plaintiff did not know that the Vehicle could perform as advertised only by emitting NOx at levels that are greater than advertised and above legal limits. Nor was Plaintiff aware that his Vehicle was equipped with undisclosed and unauthorized emission control devices designed to cheat emission tests and to deceive consumers and regulators. Plaintiff would not have purchased the Vehicle, or would have paid substantially less for it, had he known that it did not comply with emission standards; that its emission treatment system was designed to de-activate during real-world driving conditions; and that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiff has suffered a concrete injury as a direct and proximate result of FCA's misconduct, and would not have purchased the Vehicle, or would have paid substantially less for it, had FCA not concealed the unauthorized emission control devices.  Plaintiff opted out of the Class in *In Re Chrysler-Dodge-Jeep EcoDiesel Marketing, Sales Practices, and Products Liability Litigation*, Case No. 3:17-md-2777, by timely submitting his opt out form to the Class claims administrator on or before April 15, 2019.

84.

**COMPLAINT FOR DAMAGES**   Exhibit B, Page 90

85. Each and every plaintiff to this Complaint is collectively referred to as the "Plaintiffs" and individually as a "Plaintiff."

86. Plaintiffs and each of them jointly file the instant lawsuit, with each having individual claims against Defendants, as a permissive joinder of parties and claims pursuant to Code of Civil Procedure sections 378(a) & (b), and 427.10 *et seq.*

87. Plaintiffs ALAINA BIGGER, ANTHONY ELIAS JR., CHAD ELAM, CHRISTOPHER EDGAR, DANIEL RODEBACK, DAVID J. COLELLO JR., ROSANNE COLELLO, DAVID STURROCK, DAVID W. THOMAS, DELIA TORRES, DENNIS WHITE and REBEKAH DAWN LAWRENCE are collectively referred to as the "Los Angeles County Plaintiffs."

## JURISDICTION AND VENUE

88. Jurisdiction is proper in the Superior Court of California, County of Los Angeles pursuant to the California Constitution, Article VI, Section 10 and § 410.10 of the California Code of Civil Procedure because it has general subject matter jurisdiction and because this case is a cause not given by statute to other trial courts.

89. This Court has jurisdiction over Defendants because each are individuals, associations, or corporations that are either authorized to conduct or, in fact, do conduct substantial business in the State of California, County of Los Angeles.

90. Venue is proper in Los Angeles County pursuant to Code of Civil Procedure sections 395(a)[5], 395(b), 395(c), and/or 395.5 because the acts upon which this action is based arise from the provision of goods or services intended primarily for personal or household use and because the Defendants, and each of them, do business in this County, and in respect of the Los Angeles County Plaintiffs, the transactions complained of occurred in this County.

91. In respect of the Los Angeles County Plaintiffs, the contracts for products and services at issue in this case were entered into in this County, communications from Defendants

[5] Defendants may argue that Code of Civil Procedure sections 395(a) and (b) only relate to actions in contract. There is nothing in Sections 395(a) or (b) that say so. To the contrary, Section 395(a) refers to "the trial of an action founded on [an] obligation," which would encompass the causes of action alleged herein. And Section 395(b) refers to a case "arising from" "an offer or provision of...services." Thus, both subsections contemplate actions arising from the causes of action alleged herein.

79

CONSUMER LEGAL REMEDIES, APC
15 M/Z NORTH MARAGE DRIVE, BEVERLY HILLS, CA 90211

were received in this County, the Los Angeles County Plaintiffs' vehicles are permanently stored within this County, and the obligations of Defendants were to be performed in this County.

92.      Thereby, the Los Angeles County Plaintiffs were injured and/or subjected to irreparable harm in this venue. Defendants received substantial compensation and profits from its products and services in this County, caused misrepresentations to be disseminated, entered into agreements and transactions, and breached agreements in this County. Thus, Defendants' liabilities arose in this County.

93.      Venue is proper in this district because a substantial part of the events, misrepresentations, and/or omissions that give rise to the Los Angeles County Plaintiffs' claims took place in this district, including but not limited to the marketing, advertisement, and/or sale of the vehicles to the Los Angeles County Plaintiffs.

## THE PERMISSIVE JOINDER OF PLAINTIFFS' CLAIMS

94.      Plaintiffs and each of them jointly file the instant lawsuit, with each having individual claims against Defendants, as a permissive joinder of parties and claims pursuant to Code of Civil Procedure sections 378(a) & (b), and 427.10 et seq.

95.      Code of Civil Procedure section 378 allows joinder of plaintiffs where the plaintiffs are asserting a right to relief arising out of a series of transactions or occurrences committed by the same defendants. See C.C.P., § 378(a)(1).

96.      Specifically, under Section 378, "the action of each plaintiff [is] joined in one case, but they remain independent actions." Brennan v. Superior Court (1994) 30 Cal.App.4th 454, 461.

> The statute] contemplates...an action single in form, but with each 'case' or demand retaining its distinctive identity as though pleaded in an independent action. No plaintiff is interested in the entire complaint. The interest of each is in his own 'case' or cause of action; and the complaint as a whole is merely a series of 'cases' embodied in one document. *The institution of a joint action thus amounts to an election [by the plaintiffs] to consolidate at the outset several causes of action for trial instead of bringing several actions based on common grounds, and then having them consolidated later.*

*Id.* at pp. 461-462 (emphasis added).

CONSUMER LEGAL REMEDIES, APC
151 1/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

**COMPLAINT FOR DAMAGES**      Exhibit B, Page 92

97.     Such is the case here: Plaintiffs are alleging a common scheme to defraud and mislead them as perpetrated by Defendants herein. Instead of having to file their own individual lawsuits, Plaintiffs submit that it would be easier to establish a pattern of wrongful conduct committed by Defendants if Plaintiffs can present during their individual trials a succession of evidence showing just how Defendants defrauded and mislead them into purchasing their vehicles. This is exactly what is anticipated by Section 378.

98.     This complaint alleges, infra, that Defendants engaged in unfair competition and unlawful, unfair, and fraudulent business practices in respect of the sale of Rogue Vehicles to Plaintiffs. Such systemic defrauding of consumers of Rogue Vehicles, including Plaintiffs, can surely be presented in one complaint by multiple plaintiffs, according to Section 378 and prevailing case law.

## COMMON ALLEGATIONS

### *FCA Seeks To Capitalize On The Growing U.S. "Clean" Diesel Market*

99.     As part of a strategy to expand its North American presence, in 2009, Fiat began its acquisition of one of the "Big 3" U.S. automakers, Chrysler. In November of that year, CEO Marchionne unveiled an ambitious five-year plan to, among other things, roll out "more diesel variants" under the Jeep brand and to give Ram's "Light duty (1500)" pickup truck a "refresh/facelift."[6]

100.    By 2014, Fiat had become Fiat Chrysler Automobiles, Chrysler had become FCA, and VM Motori, a long-time supplier, was now part of the Fiat Chrysler sprawling family of affiliated companies. In May of that year, Marchionne announced another five-year plan at FCA's headquarters in Auburn Hills, Michigan, to increase Fiat Chrysler's competitiveness against global auto giants, such as Toyota, Volkswagen, and General Motors, by increasing annual sales to seven million vehicles by 2018, up from 4.4 million in 2013.[7] Integral to the strategy was the expansion of the "Jeep portfolio" and updates to the "bread-and-butter Ram

[6] Todd Lassa, *Fiatopolooza! Chyrsler's Five-Year Plan, MotorTrend* (Nov. 6, 2009), http://www.motortrend.com/ news/Chrysler-five-year-plan/
[7] Jerry Hirsch and David Undercoffler, Fiat Chrysler Unveils Aggressive Five-Year Plan, Los Angeles Times (May 6, 2014), http://www.latimes.com/business/la-fi-chrysler-revamp-20140507-story.html

81

CONSUMER LEGAL REMEDIES, APC
15312 NORTH ROAD, DRIVE, BEVERLY HILLS, CA 90211

1500," including "diesel engines."[8]

101.    During this same time frame, emission standards in the United States were ratcheting up. In contrast to other global automakers, like Toyota and Ford, which were focusing on developing hybrid and electric cars, Chrysler—now FCA and under the control of Fiat—took another path: "[r]eflecting its ties with Europe-based Fiat, Chrysler appears to be taking yet another route that focuses less on electrification and *more heavily on light-duty diesels* and compressed natural gas."[9]

102.    Indeed, as early as July 2010, Chrysler commissioned and presented research to "[i]dentify the trade-offs that consumers make relative to powertrain technologies"—including diesel—and "[i]dentify possible conquest opportunities associated with offering a RAM light-duty Diesel engine." FCA-MDL-001184465-524. Among other things, the study "recommend[ed] ... [c]apitalizing on improved fuel economy to increase interest in a Light Duty Diesel engine among L[ight] D[uty] owners." Id.

103.    In December 2010, Chrysler requested a meeting with Bosch and Fiat to discuss "Chrysler's main motivation" of "captur[ing] the developing N[orth] A[merican] diesel market." RBL-MDL2777-PE-300169862-64. Bosch's notes of the meeting indicate that the projected profitability status" for SUVs (and other vehicle segments) was "medium to high (+$300 to 14+$800 margin per diesel vehicle)." Id. An additional meeting was planned for December 8, 2010 with "Chrysler, VM, [and] Bosch" to "discuss further," and a "Chrysler NA diesel decision meeting with Marchionne" was "scheduled for" December 11, 2010. Id.

104.    In 2012, Marchionne was quoted as saying, "with 2016 'just around the corner' and 2025 not far away given the auto industry's long product-development lead times, 'there are big choices to be made[.]'"[10] Marchionne explained that "Chrysler, which is starting to share platforms and powertrains with Fiat, wants to leverage the European auto maker's

---

[8] Christian Seabaugh, Ram and Ferrari's Place in Fiat Chrysler's Five-Year Plan, MotorTrend (May 6, 2014), http://www.motortrend.com/news/ram-and-ferraris-place-in-fiat chryslers-five-year-plan/

[9] Drew Winter, Chrysler Eyes Different Path to Meeting New CAFE Standards, WardsAuto (Aug. 29, 2012), http://wardsauto.com/technology/chrysler-eyes-different-path-meeting-new-cafe-standards. (Emphasis added.)

[10] Id.

**COMPLAINT FOR DAMAGES**     Exhibit B, Page 94

CONSUMER LEGAL REMEDIES, APC
15312 NORTH MANGE DRIVE, BEVERLY HILLS, CA 90211

strengths in diesels and CNG-powered vehicles."[11]   As one commentator put it at the time, "[f]uel-efficient towing remains a strong point of diesels, and Marchionne says he still is optimistic about the potential of light-duty diesels in the U.S. despite significant emissions challenges."[12]

105.   This is further reflected in a March 2013 Chrysler research document entitled "Alternative Powertrain" in which the company sought to better understand the "needs, wants, expectations and functional requirements relative to . . . alternative powertrain technologies such as hybrids, electric, diesel, and compressed natural gas." FCA-MDL-001239766-774. The research concluded that "consumers want their next vehicle to do everything their current vehicle does, with better fuel economy and no sacrifice in usability," and further noted that "[l]arge segments (Pickups) with a need to tow and haul show most interest in Alternative fuels/technology for internal combustion engines." Id. at 9.

106.   FCA ultimately decided to push into this market beyond its existing heavy-duty diesel trucks (which use engines from a different supplier, Cummins) and, in 2014, it introduced both the light-duty Ram 1500 "EcoDiesel®" and the Jeep Grand Cherokee "EcoDiesel®." These are the Subject Vehicles at issue here.

107.   FCA was not alone. Seeing an opportunity for growth in the U.S. market, other major automakers rushed to develop and market "clean diesel" engines. Volkswagen, Mercedes-Benz, Ford, General Motors, and other manufacturers also began selling diesel cars and trucks as a more efficient (and thus environmentally-friendly) alternative to gasoline vehicles with no loss of power or performance: the advertised difference was that new emission control technology could make small diesel engines (long regarded by American consumers as fuel efficient but foul-smelling polluters) powerful and clean in addition to fuel-efficient. The marketing worked, and millions of diesel vehicles were sold and leased in the United States between 2007 and 2016.

108.   The green bubble for diesel vehicles first popped on September 18, 2015, when the EPA issued a Notice of Violation of the CAA to Volkswagen and Audi for installing illegal

[11] *Id.* (Emphasis added.)
[12] *Id.*

**COMPLAINT FOR DAMAGES**            Exhibit B, Page 95

"defeat devices" in 2009–2015 2.0-liter diesel vehicles. A defeat device, as defined by the EPA, is any apparatus or technology that unduly reduces the effectiveness of emission control systems under normal driving conditions. The EPA found that the Volkswagen/Audi defeat device allowed the vehicles to pass emission testing while polluting far in excess of emission standards, revealing the new "clean diesel" technology to be illusory. CARB also announced that it had initiated an enforcement investigation of Volkswagen pertaining to the vehicles at issue in the Notice of Violation. On September 22, 2015, Volkswagen admitted that 11 million diesel cars worldwide were installed with the same defeat device software. Volkswagen wasn't alone as, soon after, government agencies began to reveal that other automakers sold dozens of models exceeding allowable emission levels under applicable standards. Nevertheless, the Defendants in this action continued with business as usual, concealing from regulators and consumers their Subject Vehicles' emissions-related behavior and performance.

### *Defendants' Dirty "Ecodiesel®" Scheme*

109.    Federal and state emission standards are in place to protect Americans from pollution and certain chemicals known to cause disease in humans. Automobile manufacturers must abide by applicable laws and adhere to EPA rules and regulations (and those of CARB in California and 14 other states that have adopted California's standards). The CAA requires vehicle manufacturers to certify to the EPA that the vehicles sold in the United States meet applicable federal emission standards to control air pollution. Every vehicle sold in the United States must be covered by an EPA-issued COC, and every vehicle sold in the State of California must be covered by a CARB-issued EO.

110.    There is a very good reason that these laws and regulations exist and apply to vehicles with diesel engines: in 2012, the World Health Organization declared diesel vehicle emissions to be carcinogenic and about as dangerous as asbestos.

111.    Diesel engines pose a unique challenge because they have an inherent trade-off between power, fuel efficiency, and emissions: the greater the power and fuel efficiency, the dirtier and more harmful the emissions. Instead of using a spark plug to combust highly refined fuel with short hydrocarbon chains, as gasoline engines do, diesel engines compress a mist of

CONSUMER LEGAL REMEDIES, APC
15317/25 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

liquid fuel and air to very high temperatures and pressures, which causes the fuel/air mixture to combust. This causes a more powerful compression of the pistons, which can produce greater engine torque (that is, more power). Diesel engines are able to do this both because they operate at a higher compression ratio than gasoline engines and because fuel contains more energy than gasoline.

112. But this greater energy and fuel efficiency comes at a cost: diesel produces dirtier and more dangerous emissions. Diesel combustion produces NOx, a variety of nitrogen and oxygen chemical compounds that only form at high temperatures. NOx pollution contributes to nitrogen dioxide, particulate matter in the air, and reacts with sunlight in the atmosphere to form ozone. Exposure to these pollutants has been linked with serious health dangers, including asthma attacks and other respiratory illnesses serious enough to send people to the hospital. Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people respiratory illnesses are at acute risk of health effects from these pollutants.

113. Given the risks, minimizing NOx is paramount. But removing these pollutants from untreated exhaust is difficult, and diesel automakers have reacted by trying to remove NOx from the exhaust using catalysts. Modern turbodiesel engines use ceramic diesel filters to trap particulates before they are emitted. Many also use a technology called "selective catalytic reduction" ("SCR") to reduce NOx emissions. SCR systems inject a measured amount of urea solution into the exhaust stream, which breaks oxides of nitrogen down into to less noxious substances before they are emitted. SCR-equipped vehicles must carry an onboard tank of fluid for this purpose, and injection of the fluid is controlled by the same engine control module that manages the fuel-air mixture and other aspects of engine operation.

114. FCA's response to this challenge was the EcoDiesel® engine. Emission reductions start in the cylinder with advanced fuel injection strategies. After the byproducts of combustion leave the engine, the EcoDiesel® technology treats these emissions using a diesel oxidation catalyst, diesel particulate filter, and SCR.

115. The Subject Vehicles use engine management computers to monitor sensors

CONSUMER LEGAL REMEDIES, APC
15.5 1/2 NORTH MABAZ DRIVE, BEVERLY HILLS, CA 90211

85

CONSUMER LEGAL REMEDIES, APC
1551 // 2 NORTH MANAGE DRIVE BEVERLY HILLS CA 90211

1  throughout the vehicle and operate nearly all of the vehicle's systems according to sophisticated

2  programming that can sense and vary factors like steering, combustion, and emissions

3  performance for different driving situations. To manage engine and emission controls, the

4  Subject Vehicles use a Bosch EDC system. Bosch GmbH and Bosch LLC designed, tested,

5  customized, manufactured, and sold these EDC systems, including software code, to FCA

6  (along with other automakers including Volkswagen, Mercedes, and General Motors) for use in

7  the Subject Vehicles.

8       116.   The system used in the Subject Vehicles is Bosch's EDC Unit 17 (also called

9  "EDC17"). A February 28, 2006, Bosch press release introduced the "New Bosch EDC17

10  engine management system" as the "brain of diesel injection" which "controls every parameter

11  that is important for effective, low-emission combustion." The EDC17 offered "[e]ffective

12  control of combustion" and a "[c]oncept tailored for all vehicle classes and markets." In the

13  press release, Bosch touted the EDC17 as follows:

14      **EDC17: Ready for future demands**
   Because the computing power and functional scope of the new EDC17 can be
15  adapted to match particular requirements, it can be used very flexibly in any
   vehicle segment on all the world's markets. In addition to controlling the precise
16  timing and quantity of injection, exhaust gas recirculation, and manifold pressure
   regulation, it also offers a large number of options such as the control of
17  particulate filters or systems for reducing nitrogen oxides. The Bosch EDC17
   determines the injection parameters for each cylinder, making specific
18  adaptations if necessary. This improves the precision of injection throughout the
   vehicle's entire service life. The system therefore makes an important
19  contribution to observing future exhaust gas emission limits.[13]

20       117.   Bosch's EDC Unit 17 controls emissions by periodically reading sensor values,

21  evaluating a control function, and controlling actuators based on the control signal.[14]  Sensor

22  readings include crankshaft position, air pressure, air temperature, air mass, fuel temperature,

23  oil temperature, coolant temperature, vehicle speed, exhaust oxygen content, as well as driver

24  inputs such as accelerator pedal position, brake pedal position, cruise control setting, and

25

26  [13] See Bosch press release, *The brain of diesel injection: New Bosch EDC17 engine management
   system* (Feb. 28, 2006), http://www.bosch-
27  resse.de/presseforum/details.htm?txtID=2603&locale =en.
   [14] Moritz Contag, Guo Li, Andre Pawlowski, Felix Domke, Kirill Levchenko, Thorsten Holz,
28  and Stefan Savage, *How They Did It: An Analysis of Emission Defeat Devices in Modern
   Automobiles* (2017), https://cseweb.ucsd. edu/~klevchen/diesel-sp17.pdf.

**COMPLAINT FOR DAMAGES**    

selected gear. Based on sensor input, EDC17 controls and influences the fuel combustion process including, in particular, fuel injection timing, which affects engine power, fuel consumption, and the composition of the exhaust gas.[15]

118.   In 2010 or 2011, VM Motori announced a new diesel engine: a V6, 3.0-liter displacement engine intended for inclusion in SUVs, trucks, and large sedans. This engine had been under development for use in a General Motors automobile for the European market.[16] However, Fiat acquired 50% of VM Italy in 2011, and began working with VM Motori to develop the engine for use in FCA vehicles to be sold in the United States.

119.   As Ram Trucks' Chief Engineer said at the time, "We were fortunate at this point in time that our partners at Fiat owned half of VM Motori, who makes this diesel engine .... We combined resources and developed them together."[17]

120.   According to its website, VM Motori is deeply involved in the development and testing of all aspects of the engine: "We take care of the engines and their applications, working together with the Customers to the least detail to ensure a perfect matching between the engine and the machine, supporting our partners from A to Z, from engine- to-machine coupling up to the production."[18]

121.   In fact, VM Motori boasts of its involvement in: "Calibration development to meet specific vehicle/end user requirements, Exhaust after-treatment system development, [and] Environmental trips (hot/cold climate, high altitude, etc.)."[19]   VM Motori also notes that its facilities include: "Rolling dyno for vehicle emission measurement [and] 17 engine test benches for emission/performance development."[20]

122.   The engine originally was developed for use in Europe, where standards for emission of oxides of nitrogen from diesel vehicles are less stringent than in the United States.

[15] *Id.*
[16] Chad Westfall, *An Inside Look At The Ram 1500 3.0L EcoDiesel*, Engine Labs (Jan. 11, 2015), http://www. enginelabs.com/engine-tech/an-inside-look-at-the-ram-1500-3-0l-ecodiesel/
[17] *Id.*
[18] *Research and Development*, VM Motori, http://www.vmmotori.com/r-s/vm-motori/r-s-2.htm.
[19] *Id.*
[20] *Id.*

**COMPLAINT FOR DAMAGES**      Exhibit B, Page 99

CONSUMER LEGAL REMEDIES, APC
15311/2 NORTH MAGNOLIA BLVD, LOS ANGELES, CA 90231

Rather than make the engine compliant with U.S. emissions standards, FCA opted to cheat on the emission test.

123.  In January of 2013, Bosch LLC announced that its "clean diesel" technology, including the EDC Unit 17, would be featured in the new 2014 Jeep Grand Cherokee 3.0-Liter EcoDiesel®.[21]  As part of that announcement, Bosch LLC stated: "The 2014 Jeep Grand Cherokee features a Bosch emission system compliant with the most stringent emission regulations in the world. From fuel tank to tailpipe, Bosch is pleased to equip this vehicle with top technologies to give consumers a great driving experience requiring fewer stops at the pump."[22]  Bosch LLC also announced that the "clean diesel" system for the Jeep Grand Cherokee would be assembled at Bosch's facility in Kentwood, Michigan.

124.  In reality, FCA—working with VM Italy and VM America on the design of the EcoDiesel®'s engines and Bosch GmbH and Bosch LLC on the design of the EDC Unit 17— was either unable or unwilling to devise a solution within the constraints of the law. And so, like their rivals at Volkswagen, they devised one outside of it. Instead of cutting their losses on "EcoDiesel," delaying the production of the Subject Vehicles, or coming clean, FCA worked closely with VM Italy and VM America and Bosch GmbH and Bosch LLC to customize the EDC Unit 17 to allow Subject Vehicles to simulate "passing" the EPA and CARB testing. Unlike during testing, the software disables or restricts certain of the emission controls during real-world driving conditions. When the emission controls are de-activated on the road, the Subject Vehicles emit up to 20 times the legal limits of NOx.

125.  These software controls designed and implemented by Bosch GmbH and Bosch LLC were concealed from regulators on COC and EO applications for the Subject Vehicles, thus deceiving the EPA and CARB into approving the Subject Vehicles for sale throughout the United States, including California. Of course, consumers, who have no way of discerning that the emission control technology de-activated during real-world driving conditions, were likewise deceived.

126.  Specifically, Bosch GmbH and Bosch LLC worked hand-in-glove with FCA, Fiat

[21] *Bosch Announces Clean Diesel Technology On 2014 Jeep Grand Cherokee, supra note 5.*
[22] *Id.*

CONSUMER LEGAL REMEDIES, APC
1531 12TH STREET SANTA MONICA, CA 90411

**COMPLAINT FOR DAMAGES**     Exhibit B, Page 100

and VM Motori to develop and implement a specific set of software algorithms for implementation in the Subject Vehicles, which enabled FCA to adjust fuel levels, exhaust gas recirculation, air pressure levels, and even urea injection rates.[23]

127.    A study recently published by researchers at the University of California, San Diego, and Ruhr-Universität Bochum in Germany revealed technical documents showing that Bosch code was used in a so-called defeat device for a Fiat vehicle. The study described the software as setting one mode for when a vehicle is being tested for emissions, but then allowing tailpipe pollution to spike in real-world driving conditions.[24] The study described Bosch's role in building the electronic control unit ("ECU") hardware and developing the software running on the ECU and found there was "no evidence that automobile manufacturers write any of the code running on the ECU."[25]   To the contrary: "All code we analyzed in this work was documented in documents copyrighted by Bosch and identified automakers as the intended customers."[26]  The study concluded: "We find strong evidence that both defeat devices were created by Bosch and then enabled by Volkswagen and Fiat for their respective vehicles."

128.    For context, when carmakers test their vehicles against EPA emission standards, they place their cars on dynamometers (essentially large treadmills or "rollers") and then perform a series of specific maneuvers prescribed by federal regulations to simulate driving and test emissions in a controlled environment. Bosch's EDC Unit 17 gave FCA the ability to detect test scenarios by monitoring vehicle speed, acceleration, engine operation, air pressure, and even the position of the steering wheel. For example, given that the steering wheel cannot be turned on a dynamometer, Bosch programmed a sensor which detected whether or not the steering wheel turned. When the EDC Unit 17's detection algorithm detected an emission test was complete, the EDC Unit 17 could de-activate or reduce the emission control systems'

---

[23] See generally *Engine management*, Bosch Auto Parts, http://de.bosch-automotive.com/en/parts_and_accessories/motor_and_sytems/diesel/engine_management_2/engine_control_unit_1/ (describing capabilities of Bosch EDC units).
[24] See Ryan Been, *Study of VW's Cheating on Diesels Examines Role of Bosch Code*, Bloomberg Technology (June 9, 2017), https://www.bloomberg.com/news/articles/2017-06-09/study-of-vw-s-cheating-on-diesels-examines-role-of-bosch-code.
[25] Moritz Contag, *et al.*, *How They Did It: An Analysis of Emission Defeat Devices in Modern Automobiles*, supra note 15
[26] *Id.*

89

**COMPLAINT FOR DAMAGES**     Exhibit B, Page 101

performance, causing the Subject Vehicle to spew illegal amounts of NOx emissions when out on the road.

129. This workaround was illegal. The CAA expressly prohibits defeat devices, defined as any auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." 40 C.F.R. § 86.1803-01; see also id. § 86.1809-10 ("No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device."). Moreover, the CAA prohibits the sale of components used as defeat devices, "where the person knows or should know that such part or component is being offered for sale or installed for such use or put to such use." 42 U.S.C. § 7522(a)(3). Finally, in order to obtain a COC, automakers must submit an application, which lists all auxiliary emission control devices installed in the vehicle, a justification for each, and an explanation of why the control device is not a defeat device.

130. As the EPA has now alleged against Fiat, FCA, VM Italy, and VM America, Defendants did not disclose, and affirmatively concealed, the presence of performance-altering software code developed with Bosch GmbH and Bosch LLC from government regulators. In other words, FCA lied to the government, its customers, its dealers, and the public at large.

131. Because FCA lied on the COC and EO applications, these COCs and EOs were fraudulently obtained. And because the Subject Vehicles did not conform "in all material respects" to the specifications provided in the COC and EO applications, the Subject Vehicles were never covered by a valid COC or EO, and thus were never legal for sale—nor were they EPA and/or CARB compliant, as represented. With the complicity of Bosch and VM Motori, FCA hid these facts from the EPA, CARB, and other regulators, from FCA dealers and consumers, and FCA continued to sell and lease the Subject Vehicles to the driving public, despite their illegality.

132. FCA's illegal workaround was enabled by a close partnership with Bosch, which enjoyed a sizable portion of its annual revenue from manufacturing parts used in the Subject

**COMPLAINT FOR DAMAGES**      Exhibit B, Page 102

CONSUMER LEGAL REMEDIES, A PC
15317/25 NORTH MAPLE DRIVE BEVERLY HILLS, CA 90211

Vehicles and other "clean" diesel vehicles.[27]  Bosch GmbH and Bosch LLC were aware that FCA used its emission control technology as a concealed auxiliary (or defeat) device and is specifically tailored to allow the Subject Vehicles to evade detection.

133.    Bosch GmbH and Bosch LLC worked closely with FCA and VM Motori to create specifications and software code for each Subject Vehicle model. Indeed, customizing a road-ready ECU is an intensive three-to five-year endeavor involving a full-time Bosch presence at an automaker's facility. VM Italy and VM America likewise worked closely with Bosch GmbH, Bosch LLC, and FCA in designing, installing, and calibrating the engines for the Subject Vehicles.

134.    All Bosch EDCs, including the EDC17, run on complex, highly proprietary engine management software over which Bosch exerts near-total control. In fact, the software is typically locked to prevent customers, like FCA, from making significant changes on their own. Accordingly, both the design and implementation are interactive processes, requiring Bosch's close collaboration with the automaker from beginning to end.

135.    Bosch GmbH and Bosch LLC's security measures further confirm that its customers cannot make significant changes to Bosch software without their involvement. Bosch boasts that its security modules protect vehicle systems against unauthorized access in every operating phase, meaning that no alteration could have been made without either a breach of that security—and no such claims have been advanced—or Bosch's knowing participation.[28]

136.    Unsurprisingly, then, at least one car company engineer has confirmed that Bosch maintains absolute control over its software as part of its regular business practices:[29]

> I've had many arguments with Bosch, and they certainly own the dataset software and let their customers tune the curves. Before each dataset is released it goes back to Bosch for its own validation.

[27] Approximately 50,000 of Bosch's 375,000 employees worked in the diesel technology operations branch of Bosch. *See Bosch probes whether its staff helped VW's emissions rigging*, Automotive News (Jan.27, 2016), http://www.autonews.com/article/20160127/COPY01/301279955/bosch-probes-whether-its-staff- helped-vws-emissions-rigging

[28] *Reliable Protection for ECUs*, ESCRYPT (May 12, 2016), https://www.escrypt.com/en/news-events/protection-for-ecus.

[29] Michael Taylor, *EPA Investigating Bosch over VW Diesel Cheater Software*, Car and Driver (Nov. 23, 2015), http://blog.caranddriver.com/epa-investigating-bosch-over-vw-diesel-cheater-software/

CONSUMER LEGAL REMEDIES, APC
1831/2 NORTH ARDMORE DRIVE, BEVERLY HILLS, CA 90211

**COMPLAINT FOR DAMAGES**          Exhibit B, Page 103

*Bosch is involved in all the development we ever do. They insist on being present at all our physical tests and they log all their own data, so someone somewhere at Bosch will have known what was going on.*

*All software routines have to go through the software verification of Bosch, and they have hundreds of milestones of verification, that's the structure . . . .*

*The car company is never entitled by Bosch to do something on their own.*

137.    Defendants' work on the EDC17 reflected a highly unusual degree of coordination among them. As they did with Volkswagen, the units required the work of numerous Bosch coders for a period of more than ten years.  Although Bosch publicly introduced the EDC17 in 2006, it had started to develop the engine management system years before.[30]

138.    Bosch was concerned about getting caught in the scheme to enable diesel emissions cheating. As reported in the German newspaper, Bild am Sonntag, and a French publication, a Volkswagen internal inquiry found that in 2007, Bosch warned Volkswagen by letter that using the emission-altering software in production vehicles would constitute an "offense."[31]  Yet, Bosch concealed the software, and its emission control functions, in various "clean" diesel vehicles, including the Subject Vehicles, from U.S. regulators and consumers.

139.    Bosch LLC worked closely with Bosch GmbH and diesel automakers, both in the United States and in Germany, to ensure that the "clean" diesels, like the Subject Vehicles, passed emission testing. Bosch LLC employees frequently communicated with regulators in the United States and actively worked to ensure that diesel vehicles were approved for sale in the United States. For example, we now know that employees of Bosch LLC and Bosch GmbH provided specific information to regulators in the United States about how Volkswagen's vehicles functioned and unambiguously stated that the vehicles met emission standards. Bosch LLC regularly communicated to its colleagues and clients in Germany about ways to deflect

---

[30] See *The brain of diesel injection: New Bosch EDC17 engine management system, supra* note 14

[31] *Bosch warned VW about illegal software use in diesel cars, report says*, Automotive News (Sept. 27, 2015), http://www.autonews.com/article/20150927/COPY01/309279989/bosch-warned-vw about-illegal-software-use-in-diesel-cars-report-says; *see also VW Scandal: Company Warned over Test Cheating Years Ago*, BBC (Sept 27, 2015), http://www.bbc.com/news/business-34373637.

92

**COMPLAINT FOR DAMAGES**        Exhibit B, Page 104

CONSUMER LEGAL REMEDIES, APC
15312 NORTH ARMAGE DRIVE, BEVERLY HILLS, CA 90211

and diffuse questions from regulators in the United States about those vehicles. On information and belief, Bosch LLC also assisted in concealing the true nature of the emission control technology from regulators in the United States with respect to the Subject Vehicles at issue here.

140.    Bosch not only kept this "dirty" secret safe, it went a step further and actively lobbied lawmakers to push "clean diesel" in the United States. As early as 2004, Bosch announced a push to convince U.S. automakers that its diesel technology could meet tougher 2007 emission standards in the United States.[32]  Bosch engaged in a multi-year, multi-million-dollar effort involving key players from Bosch in both Germany and the United States. In its efforts to promote "clean diesel" technology in the United States, Bosch GmbH acted on behalf of its global group of affiliated companies, including Bosch LLC.

141.    Bosch's promotion of diesel technology specifically targeted the United States. For example, Bosch put on "California Diesel Days"[33] and "SAE World Congress in Detroit."[34] In 2008, Bosch LLC co-sponsored the "Future Motion Made in Germany-Second Symposium on Modern Drive Technologies" at the German Embassy in Washington, D.C., with the aim of providing a venue for "stakeholders to gain insight into the latest technology trends, and to engage in a vital dialogue with industry leaders and policymakers."[35]

142.    Bosch LLC hosted multi-day conferences open to regulators and legislators and held private meetings with regulators, in which it proclaimed extensive knowledge of the "clean" diesel technology, including the calibrations necessary for the vehicles to comply with emission regulations.

143.    In April 2009, for example, Bosch organized and hosted a two-day "California

[32] Edmund Chew, *Bosch boosts US diesel lobbying*, Automotive News (Mar. 8, 2004), http://www.autonews.com/        article/20040308/SUB/403080876/bosch-boosts-us-diesel-lobbying.
[33] *Bosch drives clean diesel in California*, Bosch, http://www.bosch.us/content/language1/html/734 _4066.htm?section= 28799C0E86C147799E02226E942307F2.
[34] *See, e.g., Bosch Brings Innovation, Green Technology to SAE 2009 World Congress*, Bosch, http://www.bosch.us/content/language1/html/734_7432.htm?section=CDAF31A 468D9483198ED8577060384B3.
[35] Bosch: *Clean Diesel is Key Part of Future Technology Mix*, Bosch, http://us.bosch-press.com/tbwebdb/bosch-usa/en-US/PressText.cfm?CFID=59743263&CFTOKEN=b0c61c28412924c-BCBB064E-FD22-FC33-50650318 A8803D2B&nh=00&Search=0&id=364.

93

COMPLAINT FOR DAMAGES          Exhibit B, Page 105

CONSUMER LEGAL REMEDIES, APC
15.5125 NORTH ARMAGZ DRIVE, BEVERLY HILLS, CA 90211

Diesel Days" event in Sacramento, California. Bosch invited a roster of lawmakers, journalists, executives, regulators and non-governmental organizations with the aim of changing perceptions of diesel from "dirty" to "clean."[36] The event featured "clean diesel" vehicles as ambassadors of "clean diesel" technology. The stated goals were to "build support for light-duty diesel as a viable solution for achieving California's petroleum and emission reduction objectives." (Id.)

144.   Bosch also joined in events promoting the Subject Vehicles. At one such event hosted by Ram, Jeep and Bosch in Traverse City, Michigan, Bosch made a number of statements regarding the 3.0-liter EcoDiesel V6's performance. It stated that the "Bosch emissions control system helps ensure that virtually no particulates and minimal oxides of nitrogen (NOx) exit the tailpipe" and that a Jeep Grand Cherokee or Ram 1500 diesel's engine provides a fuel economy that is "30% better than a comparable gasoline engine."[37]

145.   In 2009, Bosch also became a founding member of the U.S. Coalition for Advanced Diesel Cars.[38]  One of this "advocacy" group's purposes included "promoting the energy efficiency and environmental benefits of advanced clean diesel technology for passenger vehicles in the U.S. marketplace."[39]  This group lobbies Congress, U.S. regulators, and CARB in connection with rules affecting "clean diesel" technology.[40]

### *FCA's Misleading Marketing*

#### A.   FCA Identifies and Combats the "Dirty Diesel" Stigma

146.   As described above, FCA, VM Motori, and Bosch began investigating strategies

[36] *Bosch drives clean diesel in California, supra* note 35; *see also California Diesel Days*, The U.S. Coalition for Advanced Diesel Cars, http://www.californiadieseldays.com/
[37] Dale Jewett, *EcoDiesel: An Essential Tool for Every Outdoorsman*, Objects in the Mirror…(blog operated by FCA Digital Media) (May 22, 2015), https://blog.fcanorthamerica.com/2015/05/22/ecodiesel-an-essential-tool-for-every-outdoorsman/.
[38] Chrissie Thompson, *New Coalition Aims To Promote Diesel Cars*, Automotive News (Feb. 2, 2009), http://www.autonews.com/article/20090202/OEM06/302029728/new-coalition-aims-to-promote-diesel-cars.
[39] *About the Coalition*, The U.S. Coalition for Advanced Diesel Cars (May 22, 2015), http://clean dieseldelivers.com/about/
[40] *Id.*; *see also, e.g.*, Letter to Mary T. Nichols & the California Air Resources Board concerning a statement made about diesel technology (Jan. 8, 2016), http://cleandieseldelivers.com/media/Mary-Nichols-Letter-01082016.pdf.

94

CONSUMER LEGAL REMEDIES, APC
15312 NORTH AVANCE DRIVE, BEVERLY HILLS, CA 90211

to develop and market diesel vehicles in the North American market in at least July 2010. FCA-MDL-001184465. As early as February 2012, Chrysler had already commissioned and presented research to understand how to market the diesel vehicles to consumers. FCA-DL-001182796-821.

147.    This research confirmed that the Defendants had a significant obstacle to overcome: consumers associated diesel engines with old technology and, more importantly, with "negative images of smog and dirt." Id.

148.    This "dirty diesel" stigma was considerable. During FCA's 2012 focus group addressing "diesel perceptions," one consumer noted "[I] can't stand diesel;" another felt "[diesel] has an image problem;" another explained that "when somebody says diesel, I just think of that black smoke;" to another, diesel evoked image of "smoke, exhaust;" another associated diesel with "old images of a truck letting off all of these emissions;" and, summing it up, one focus group participant noted "you just think dirty when you think diesel." FCA-MDL- 001422127.

149.    Unsurprisingly, then, FCA worked hard to rebut the dirty diesel stigma in communications directly with consumers and in training materials for dealers (to help the dealers persuade consumers to purchase the Subject Vehicles). In a Jeep EcoDiesel "Product Brief," for example, FCA noted "[b]uyers can be resistant to consider a diesel purchase due to several perceptions that are no longer true" including that "diesels are filthy . . . [and] too loud and smelly." FCA-MDL-000517246-53. The brief combats these perceptions by stating that "diesel engines are surprisingly responsible in view of ecological concerns." Id. It also includes "key messages" for prospective consumers including: "Diesel engines offer clean operation with typically 25% less emissions than a gasoline engine." Id. It also notes that the "3.0L EcoDiesel V6 uses Selective Catalyst Reduction (SCR) with DEF to help minimize exhaust emissions" and uses "NOx modules and sensors . . . to help control tailpipe emissions." Id.

150.    Similarly, a Ram 1500 "Targeted In-Dealership Training" guide notes that the two "most common misconceptions about diesel engines" are that "Diesels are noisy" and "Diesels are dirty." FCA-MDL-000517194-203. As to the latter, the guide instructs dealers that

CONSUMER LEGAL REMEDIES, APC
15311/2 SOUTH ANGELDINVE BEVERLY HILLS CA 90211

95

the "Diesel Exhaust Fluid (DEF) and Selective Catalyst Reduction lower the exhaust emissions of diesel engines." Id. It later explains that DEF "reduce[s] nitrous oxides coming out of the tailpipe" and "helps to create *non-harmful emissions*." Id. (emphasis in original). The guide then states that "[o]ur EcoDiesel runs extremely clean for a truck powerplant." Id.

151.    In a "news" document, again presumably targeting Ram and Jeep dealers, FCA explained that "[w]hen pitching the EcoDiesel, it may help you to keep in mind a few advantages to driving a diesel engine." FCA-MDL-000518525. One advantage was that "Diesels Are Getting Greener." Id. The document then explained that "[i]n the past, diesels were seen as polluters – a hindrance to environmentally conscious customers. Today's diesels, however, run cleaner than they ever have before. For its part, the ecologically responsible EcoDiesel V6 is the cleanest light-duty engine available." Id.

**B.     The EcoDiesel Name and Badge Communicate Environmental Friendliness and Fuel Efficiency**

152.    FCA also understood that a key component of overcoming the diesel stigma, and of marketing the Subject Vehicles' purported environmental friendliness and fuel economy, was the naming and labeling of the diesel technology. As noted above, FCA conducted research in February 2012 to address this very issue. FCA-MDL-001182796-821. That research concluded that the "[b]est names [for FCA's diesel engine] highlight 'green' theme." Id. It further concluded that "[f]uel efficiency and environmental friendliness are important; names connected with these will be most well-received." Id. (emphasis added). An excerpt from the research presentation is shown below:

CONSUMER LEGAL REMEDIES, APC
133 1/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

CONSUMER LEGAL REMEDIES, APC
13.1.1/23 SOUTH ARANGE DRIVE, BEVERLY HILLS, CA 90211



### Overall Engine Ratings

| | Preferred (Top 3 Rank) | Appeal (Top 2 Box) | Fit with SUV (Top 2 Box) | Fit With Jeep (Top 2 Box) |
|---|---|---|---|---|
| Eco-Diesel | 52% | 47% | 47% | 41% |
| 3.0L Clean Diesel | 51% | 38% | 47% | 43% |
| Enviro-Diesel | 47% | 35% | 43% | 35% |
| 3.0L Turbo Diesel | 40% | 35% | 46% | 42% |
| 3.0L Diesel Tec | 24% | 15% | 30% | 34% |
| 3.0D Multijet | 24% | 18% | 31% | 29% |
| Puri-Diesel | 21% | 14% | 18% | 20% |
| 24-Valve Diesel | 19% | 13% | 27% | 30% |
| 3.0L Diesel | 19% | 15% | 32% | 35% |

**Best names highlight "green" theme**

Fuel efficiency and environmental-friendliness are important: names connected with these will be most well received.

Least popular choices are seen as boring, confusing, or irrelevant

FCA-MDL-001182485

153.    The highest-ranked name, in terms of both appeal and preference, was "Eco-Diesel." The research explained that "'Eco' encompasses green, efficient, and economic . . . and is strongly associated with being environmentally friendly." Similarly, the research concluded that the EcoDiesel "[n]ame [i]mplies a variety of positive meanings – green, efficient, economic, etc." Unsurprisingly, the "imagery" most associated with the name "EcoDiesel" was "Environmentally-Friendly" and "Fuel Efficient." Id.

154.    Although other potential names (e.g., "Clean Diesel" and "Enviro Diesel") had slightly higher associations with environmental friendliness, "EcoDiesel" communicated the combination of "green" credentials and fuel economy the best. FCA had found its winner.

155.    FCA adopted and trademarked the "EcoDiesel" name and used it in virtually every advertisement for the Subject Vehicles. It also branded every single Subject Vehicle with an EcoDiesel badge. The two versions of the badge, used on Jeep Grand Cherokees and Ram 1500s, respectively, are shown below:





156.    This badging was *extremely important* to FCA. Jim Morrison, then the head of Jeep Brand Product marketing, gave a presentation some 20-30 times in which he explained that "consumers are immediately receptive to the EcoDiesel badging/logo" and "suggest that 'Eco-diesel badging can initially change the impression of diesel vehicles." FCA- MDL-001166458-533; Morrison Dep. Tr. 131:5-6. As the notes below the slide confirm, "[c]onsumers further believe that *the word 'Eco- Diesel' can change the perception of a diesel engine to something denoting ecologically conscious and economical to own and operate*." *Id*. (emphasis added). The full slide with notes is shown as follows:

**COMPLAINT FOR DAMAGES**            Exhibit B, Page 110

**Emotional and Financial Pillars**

**New EcoDiesel badging is appealing**

- EcoDiesel name and badge create different attention for diesel by suggesting something is new and different.
- Consumers are immediately receptive to the EcoDiesel badging/logo – having a modern implication
- Consumers suggest that 'Eco-diesel' badging can initially change the impression of diesel vehicles
- Jeep has an opportunity to re-define or "de-niche" the diesel market by establishing the brand as a diesel leader



*November 2013 Consumer and Market Insights (7th Series Research Group)*

Also resonating is the EcoDiesel name and badge.

Consumer research shows that it creates a different attention for diesels by suggesting that it's new and different ... a significant departure from the diesel engines they or their parents grew up with.

Consumers are receptive to the EcoDiesel logo. It looks modern and hints at the technological innovation inherent in this engine.

Consumers further believe that the word "Eco-Diesel" can change the perception of a diesel engine to something denoting ecologically conscious and economical to own and operate.

The research further indicates that the EcoDiesel name provides us with the opportunity to redefine the diesel market by establishing ourselves as a diesel leader.

157.   Mr. Morrison also confirmed the meaning and importance of the EcoDiesel name

**COMPLAINT FOR DAMAGES**        Exhibit B, Page 111

CONSUMER LEGAL REMEDIES, APC
15317/2 NORTH ARDAZ DRIVE, BEVERLY HILLS, CA 90211

and badge in a sworn declaration he submitted in connection with a trademark dispute. There, he declared that "Chrysler decided to combine the terms 'Eco,' 'Diesel,' and '3.0L' ... to refer to the engine because the engine is an economical, fuel-efficient, more environmentally friendly 3.0 liter diesel engine." *Unitek Solvent Services, Inc. v. Chrysler Group, LLC*, No. 1:12-cv-00794, Dkt. 86-35 at ¶ 8 (June 4, 2013). He further explained that "Chrysler [also] based its decision to use the descriptive terms 'eco' and 'ecodiesel' on the fact that numerous third parties in a variety of industries use the term 'eco' to describe ecologically or environmentally friendly products or services that have been developed to reduce carbon emission, energy consumption, or otherwise preserver the environment." *Id.* at ¶ 10.

158. Many additional documents confirm that FCA intended the name "EcoDiesel" and the EcoDiesel badge to convey both environmental friendliness and fuel economy. A September 2013 press release, for example, included a heading entitled "**Putting the 'Eco' in EcoDiesel**" under which it claimed that "[t]he new EcoDiesel V6 achieves 50-state emissions compliance for both tier II and BIN 5." FCA-MDL-000519022-24 (emphasis in original). In other words, the "Eco" in EcoDiesel means not just environmental friendliness, generally, but also emissions compliance, specifically.

159. A later Ram press release entitled "Ram has 'turned up the ECO' on full-size truck MPGs . . . to 29" further demonstrates that the "Eco" in EcoDiesel also refers to fuel economy. FCA-MDL-001344885-86; FCA-MDL-001401873.

160. Again, the EcoDiesel badge was placed prominently on every single Subject Vehicle, and the word "EcoDiesel" was used in virtually every consumer-facing communication.

161. That word and badge represented to consumers that the Subject Vehicles were environmentally friendly and fuel efficient. Both representations, it turns out, were based on a lie: the Subject Vehicles were not, in fact, environmentally friendly, and could achieve their fuel economy only through concealed emissions apparatuses that caused the vehicles to pollute excessively in real-world driving conditions.

CONSUMER LEGAL REMEDIES, APC
1531 // 2-SANTA MONICA DRIVE, BEVERLY HILLS, CA 90211

C.  **FCA Misrepresents the Subject Vehicles to Consumers in a Consistent and Pervasive Marketing Campaign**

162.  FCA's misleading representations about the Subject Vehicles, including their purported "green" credentials, superior fuel economy, and other performance characteristics were not limited to EcoDiesel badge. Indeed, FCA engaged in a full court press to market the Subject Vehicles, and to communicate to consumers the purported benefits of the EcoDiesel engine. These communication efforts included, among other things: (1) press releases aimed at generating positive news articles about the EcoDiesel attributes; (2) comprehensive dealer training materials that taught dealers how to sell the Subject Vehicles with false and misleading misrepresentations; (3) vehicle brochures disseminated at dealerships and elsewhere; (4) information and interactive features on FCA's websites and blogs; and (5) print and television marketing.

1)  **Press Releases and Media Communications**

163.  As early as 2013, FCA began issuing press releases that were sent directly to consumers and were also intended to generate consumer-facing articles and reviews about the EcoDiesel engine. There are many such examples. A representative sampling includes:

a)  January 2013 press release announcing a "new, clean, 3.0-liter EcoDiesel V-6 engine" in the Jeep Grand Cherokee. The release touts the "30 mpg highway with driving range of more than 730 miles," and the "class- leading 240 horsepower and massive 420lb.-ft of torque." Notably, it also states that the "Selective Catalytic Reduction (SCR) help[s] the new engine" be "clean" and "50-state legal." FCA-MDL-001134988-90.

b)  An October 2013 press release notifying the media that the "[n]ew 2014 Jeep Grand Cherokee EcoDiesel wins 'Green' category" of the 2014 Active Lifestyle Vehicle Awards. The release claims the Jeep EcoDiesel includes "clean-diesel technology" and delivers "best-in-class fuel economy and driving range." FCA-MDL-000519206-07.

c)  A February 2014 press release proclaiming that the "2014 Ram 1500 EcoDiesel sets new fuel-economy benchmark of 28 MPG." The release repeatedly touts the EcoDiesel's fuel economy and claims that its SCR and EGR systems—both of which were compromised by the AECDs described herein—"contribute to 50-state compliance with Tier2/Bin 5 emissions regulations." FCA-MDL-001142520-21.

d)  A November 2014 press release announcing that the "Ram 1500 EcoDiesel [was] named 2015 Green Truck of the Year by Green Car Journal." The release states that the "Ram 1500 delivers an outstanding combination of best-in-class fuel efficiency, unsurpassed torque and a surplus of towing capacity." It also quotes the editor of

CONSUMER LEGAL REMEDIES, APC
15 ½ 2 NINTH AVENUE GROVE BEVERLY HILLS CA 90211

Green Car Journal who noted that "[t]he Ram 1500 EcoDiesel exemplifies what a 'green' truck should be." FCA-MDL-000519290-01.

e) A January 2015 press release announcing that the "Jeep Grand Cherokee EcoDiesel [was] named 2015 Green SUV of the Year by Green Car Journal." The release again boasts the EcoDiesel's "best-in-class" fuel economy, "untouched" range, "class-leading" horsepower, "massive" torque, and its "clean-diesel technology." FCA-MDL-001377187-88

f) A November 2016 press release boasting "best-in-class fuel economy and longest range with exclusive EcoDiesel – 29 mpg and 754 miles with Ram 1500." FCA-MDL-001185732-34.

164. Notably, Marchionne himself was asked to approve, and did approve, a draft press release from February 2013 announcing that "Ram [was the] first to build light-duty diesel pickup." The release promoted an "outstanding combination of best-in-class fuel efficiency, best-in-class torque and impressive capability." It also stated that the "EcoDiesel . . . emissions are 60 percent less than those produced by diesel powertrains 25 years ago." FCA-MDL-001367858-59.

165. In some instances, these press releases were sent directly to consumers in "hand raiser" communications, as evidenced by a 2014 email to a prospective customer. That email "thanks [the prospective customer] for asking about the 2014 Ram 1500 EcoDiesel,"—which it says is "capable, efficient, and easy on the environment"—and links to a Ram "press release for more information." FCA-MDL-001180641.

166. Even when not sent directly to consumers, all the press releases—and the consistent representations about environmental friendliness, fuel economy, and performance contained in them—were intended to, and did in fact, result in significant buzz and media attention for the EcoDiesel vehicles, to which Plaintiffs were exposed. The representations that resulted were false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

2) **Dealer Training Materials**

167. As noted above, FCA disseminated to its dealers comprehensive training materials to help them communicate the purported EcoDiesel attributes to consumers, and ultimately, to sell more Subject Vehicles. Those materials consistently emphasized the

CONSUMER LEGAL REMEDIES, APC
15312 NORTH ARMAGE DRIVE BEVERLY HILLS, CA 90211

102

(supposed) environmental friendliness, fuel efficiency, and power of the EcoDiesel engine, among other attributes.

168.   Ram, for example, held a "targeted in-dealership training" through its dealer-focused "Chrysler Academy" and disseminated an accompanying "participant reference guide." The document explains that the training is "focuse[d] on features of Ram 1500 and will help you sell down your 2014 model year vehicles while it also helps you prepare for the 2015s." This training document includes an entire section on EcoDiesel, and as discussed above, it addresses the "common misconception" that "[d]iesels are dirty" and instructs that "Diesel Exhaust Fluid (DEF) and Selective Catalyst Reduction lower the exhaust emissions of diesel engines." Then, answering the question "How clean is the 3.0L EcoDiesel V6?" the guide explains that "[o]ur EcoDiesel runs extremely clean." It also states that the engine "[c]omplies with all diesel-related emissions standards," and notes that selling points of the diesel include its "Fuel efficiency," "Power (Torque)," and "Quality, Reliability and Durability (QRD)." Finally, the guide includes an "in the media section" highlighting positive reviews and articles. FCA-MDL-000517194-245.

169.   Jeep held a similar Chrysler Academy event for dealers and also disseminated an accompanying "product reference guide" with eight pages devoted exclusively to the EcoDiesel engine. FCA-MDL-000518573-620. As with the Ram guide, the Jeep guide addresses the dirty diesel stigma, and offers selling points to rebut it. The guide explains that the EcoDiesel engine exhibits "confident power, surprisingly clean operation" and claims that "it is going to convert a host of new customers to the impressive benefits of pulse-quickening acceleration and efficient and ecological clean diesel operation." It highlights the "clean operation and effective emissions control," specifically noting that the SCR and EGR systems combine to mitigate NOx and produce "clean diesel operation." Finally, as shown below, it includes a "Key messages" section emphasizing the importance of fuel efficiency, "clean operation," and "torque":

**COMPLAINT FOR DAMAGES**        Exhibit B, Page 115

## DIRTY POLLUTER? – EXACTLY THE OPPOSITE – CLEANER AND MORE ECOLOGICAL THAN GASOLINE ENGINES

Today's clean diesel technology is:

- 30% more fuel efficient than its gasoline counterpart
- Produces around 25% less carbon dioxide ($CO_2$)
- Generates over 96% fewer emissions than the diesel engines of 1990s

### Key messages

1. Today's diesel engines help conserve fossil fuel resources with a **30% reduction in fuel consumption** versus a gasoline engine

2. Diesel engines offer clean operation with typically **25% less emissions** than a gasoline engine

3. Diesel engines are fun to drive by offering **50% more torque** than a comparable gasoline engine

The 3.0L EcoDiesel V6 provides all these benefits at superb levels compared to the other diesel engines available in the SUV segment!

These themes are echoed almost verbatim in another, 13-page Chrysler Academy "Product Brief" focused exclusively on the EcoDiesel engine. FCA-MDL-001183753-65. As shown below, that product brief includes almost identical "key messages for your prospects," and notes that the engine is "surprisingly responsible in view of ecological concerns."

**COMPLAINT FOR DAMAGES**          Exhibit B, Page 116



170.    Yet another Chrysler Academy "Web Launch" training session explains that its purpose was "to help participants" better understand the vehicles and, critically, to "[u]understand elements for effective presentations to shoppers." It includes similar language about fuel economy, power, and environmental friendliness. It also explains that "for buyers who respect the environment, they should know this is a very clean diesel ... very green without question." FCA-MDL-001183766-901.

171.    These are but a few examples that highlight the comprehensive training that FCA

**COMPLAINT FOR DAMAGES**          Exhibit B, Page 117

provided for its dealers. The objective of these trainings was to arm the dealers with selling points that they could relay to consumers—and they did just that. For the Subject Vehicles, the consistent selling point was the no-compromise combination of fuel efficiency, environmental friendliness, and power. This selling point was false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

3)    **Vehicle Brochures**

172.    FCA also communicated directly with consumers through its vehicle brochures, available both online and at the dealerships. These brochures are chock full of representations about the EcoDiesel engine's purported fuel economy, environmental friendliness, and power.

173.    The brochure for the 2014 Jeep Grand Cherokee, for example, devotes an entire page to the EcoDiesel engine. That page depicts the EcoDiesel badge and also an image of the engine with a green leaf on top. It states that the engine achieves "best-in class: 30 MPG fuel economy[,] 730-mile driving range[,] 420 lb-ft of torque[, and] 7400-lb maximum towing." The document further claims that "its reduced CO2 emissions display reverence for the environment" and even goes so far as to state that "*[p]roudly, the EcoDiesel meets and even exceeds the low emissions requirements in all 50 states.*" (Emphasis added.) Excerpts from the two-page brochure spread are shown below:

CONSUMER LEGAL REMEDIES, APC
15531/2 NORTH MANGE DRIVE, BEVERLY HILLS, CA 90211



Thirty miles per gallon? True story. Grand Cherokee's new, available 3.0L EcoDiesel V6 engine delivers best-in-class economies* that treat your fuel budget with respect, while its reduced $CO_2$ emissions display reverence for the environment. Proudly, the EcoDiesel meets and even exceeds the low emissions requirements in all 50 states. Best-in-class fuel economy* arrives with an estimated 22 city/30 hwy mpg,* and a driving range of more than 730 highway miles per tank. That's because, compared to gasoline, a gallon of diesel fuel converts to a greater amount of useable energy. So you can leave Detroit, MI, with a full tank and arrive in New York City without ever stopping to refuel. And with its command of 240 hp and a hefty 420 lb-ft of torque, the EcoDiesel provides a surge of towing strength that can haul up to 7,400 lb when properly equipped. Stats so good, they're worth repeating every chance you get.

174.    The 2015 brochure makes similar claims. It again features the EcoDiesel badge and environmental imagery. And it again boasts "best-in-class ... 30 hwy mpg fuel economy" and "a driving range of 730 highway miles." It also states that the vehicles are "clean" and 50-state compliant, and even opens with this environmentally-focused introduction: "Love the planet along with great fuel economy? Then the Jeep Brand's Diesel engine will ring true. It

**COMPLAINT FOR DAMAGES**          Exhibit B, Page 119

lets you adhere to your principles and get extra points for embracing innovative technology."



175.    The 2016 brochure also features the EcoDiesel badge, and touts best-in-class fuel economy, range, horsepower, and torque. And it too states that "[t]he EcoDiesel exceeds the low- emissions requirements in all 50-states":

108



176.    The Ram 1500 brochures make similar claims. Like the Jeep Brochures, the 2014 Ram 1500 brochure devotes an entire page to the EcoDiesel engine, depicts the EcoDiesel badge, and repeatedly touts the truck's "best-in-class" fuel economy and "impressive" range. It also boasts that the truck is "clean by nature" with "minimal CO2 levels" and a "[t]op-notch DEF system."

177.    The 2015 brochure also advertises "top-tier mpg ratings," "superb driving range and best-in-class 28 mpg highway," and claims the truck is "clean by nature" with "minimal CO2 levels" and a "zero-hassle DEF system."

178.    The 2016 brochure boasts "best-in-class 29 mpg highway fuel economy," "up to 754-mile range," "240 horsepower," "420 lb-ft of torque," "minimal CO2 levels" and a "zero-hassle DEF system."

179.    The brochures are tied together by common themes and sometimes identical

CONSUMER LEGAL REMEDIES, APC
153 1/2 NORTH MANSE DRIVE, BEVERLY HILLS, CA 90211

language. The key representations made throughout were that the Subject Vehicles delivered a no-compromise combination of fuel efficiency, environmental friendliness, and performance. Those representations were false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

### 4)   FCA Website

180.   FCA hosted a number of blogs and websites that promoted the EcoDiesel technology, including the official Ram and Jeep websites, which many named Plaintiffs visited before making their purchase/lease decisions. Both company sites reiterated FCA's consistent messaging for the Subject Vehicles—i.e., that they were clean, fuel efficient, and high performing.



181.   A February 9, 2014, capture of the Jeep website, for example, includes a diesel tab, under which it displays the EcoDiesel badge and tells viewers to "[f]orget everything you thought you knew about diesel. The all-new jeep EcoDiesel engine offers innovative technology that is efficient, increases range, and improves power – all while leaving little trace of being

CONSUMER LEGAL REMEDIES, APC
15312 NORTH ARMAGE DRIVE BEVERLY HILLS CA 90211

CONSUMER LEGAL REMEDIES, APC
1511/2 N.NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

1    there."[41]

2        182.   The Jeep website also includes separate pages featuring its supposed "Best-in-

3    Class maximum towing capacity," "incredible 730-mile highway driving range," and "superior

4    fuel economy." As to fuel economy, the website also includes (and has included since at least

5    2014) a "savings calculator" that allows consumers to enter their miles driven per day and then

6    calculates their annual fuel savings using "Clean Diesel."[42]

[41] Available at: http://web.archive.org/web/20140209113901/http://m.jeep.com/en/jeep_capabilities/eco-diesel-calculator/#introduction (last visited April 19, 2018).
[42] Available at: https://m.jeep.com/en/jeep_capabilities/eco-diesel-calculator/#savings (last visited April 19, 2018).

111

**COMPLAINT FOR DAMAGES**     Exhibit B, Page 123

SAVINGS

# DISCOVERED

—

The efficient and durable 3.0L EcoDiesel V6 engine will help you save money at the pump and
provides greater maintenance intervals for fewer tune-ups.
Did we mention low $CO_2$ emissions? Could this be the perfect engine?

## Savings Calculator

Not only does the 3.0L EcoDiesel engine provide superior fuel economy*, but you'll also go
farther between fill-ups. Enter your daily commute in the box below to discover how much
time and money you could save * If you chose clean diesel fuel over regular gasoline.

### Enter your commute to discover how much you could save:

4 0

Miles Per Day

### Your Mileage

Based on your daily commute, we have approximated
your weekly and annual mileage *

| Weekly | Annually |
|--------|----------|
| 280 | 14.600 |
| Miles | Miles |

### Fuel Costs*

For a more accurate savings calculation,
enter your local pricing information:

| Gasoline | Diesel |
|----------|--------|
| 3  8 3 | 3  9 4 |
| Per Gallon | Per Gallon |
| *3.83 California Average | *3.94 California Average |

### With Clean Diesel, You Save*

$1.098
Per Year

You drive approximately 14,600 miles a year. You need an
engine that can keep up with your busy lifestyle. The 3.0L
EcoDiesel V6 engine will take you farther, for less.

**COMPLAINT FOR DAMAGES**

Exhibit B, Page 124

CONSUMER LEGAL REMEDIES, APC
13312 NORTH ASSOCIATE DRIVE BEVERLY HILLS CA 90211

183.   Ram's website made similar representations, touting the fuel economy, horsepower, torque, and towing capacity of the EcoDiesel engine, and claiming that it was "[e]quipped with a diesel oxidation catalyst, diesel particulate filter and selective catalyst reduction so it is emissions-compliant in all 50-states."[43]



STRENGTH MEETS EFFICIENCY
**3.0L ECODIESEL V6 ENGINE**

The available 3.0L EcoDiesel V6 engine: one of the most advanced light-duty truck engines we've ever built.

- Produces 240 horsepower and an exceptional 420 lb-ft of torque
- Equipped with a diesel oxidation catalyst, diesel particulate filter and selective catalyst reduction so it is emissions-compliant in all 50 states

**21** CITY MPG | **29** HWY MPG⁺

**HORSEPOWER 240** | **TORQUE 420** LB-FT | **TOWING 9,210** LBS | **PAYLOAD 1,600** LBS

184.   Like Jeep, Ram also included a fuel savings calculator, as well as graphics comparing the best-in-class fuel economy to the competition:[44]

---

[43] Available at: http://web.archive.org/web/20160316042712/http://www.ramtrucks.com/en/ram 1500/capability /#link-3 (March 2016 web archive); http://web.archive.org/web/20150215044120/http:// www.ramtrucks. com:80/en/ram_1500/capabil ity#link-3 (Feb. 2015 web archive); http://web.archive.org/web/ 20140214053830 /http://www.ramtrucks.com:80/en/ram_1500/capabil ity/#link-3 (Feb. 2014 web archive) (all visited last on April 19, 2018).
[44] FCA-MDL-001184455-62; EcoDiesel – Ram 1500 HFE, Ram Trucks (FCA), available at https://www.ram trucks.com/en/ecodiesel/ (last accessed July 19, 2017).

**COMPLAINT FOR DAMAGES**          Exhibit B, Page 125

CONSUMER LEGAL REMEDIES, APC
15312 NORTH MAGNOLIA DRIVE, BEVERLY HILLS, CA 90211





185.   FCA made many similar representations throughout the many websites it operated, including but not limited to the following:

a)   The EcoDiesel engine is designed for those "who want to drive an efficient,

**COMPLAINT FOR DAMAGES**          Exhibit B, Page 126

environmentally friendly truck without sacrificing capability or performance."[45]

b) The Ram 1500 EcoDiesel is "the NAFTA market's first and only light-duty pickup powered by clean diesel technology."[46]

c) "Thanks to advanced emissions-control technology . . . [EcoDiesel's] exhaust is ultra-clean, making this engine available in all 50 states."(Id.)

d) "Equipped with a diesel oxidation catalyst, diesel particulate filter and selective catalyst reduction, the EcoDiesel® V6 engine will be emissions- compliant in all 50 states."[47]

e) "Chrysler Group engineers adapted the engine—manufactured by Fiat- owned V.M. Motori—to meet the NAFTA region's stringent emissions and on-board diagnostic regulations. The new EcoDiesel® V-6 is Tier 2/Bin 5 compliant."[48]

f) The emissions on the EcoDiesel® engine data sheet meet Tier2 Bin5 requirements.[49]

g) "[T]he Bosch emissions control system helps ensure that virtually no particulates and minimal oxides of nitrogen (NOx) exit the tailpipe."[50]

186. Many named Plaintiffs visited FCA's websites to learn about the Subject Vehicles. On those websites, as in all the other ways FCA communicated to consumers, FCA's message was clear and consistent: the EcoDiesel engine delivers a no-compromise package of fuel economy, range, performance, and environmental-friendliness. Those representations were false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

5) **Print and Television Media**

187. FCA reiterated its consistent representations—particularly the fuel economy representations—through print media and television commercials.

188. The print ad campaign was robust. One FCA-produced document identifies over

---

[45] The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You, Ram Zone (Ram trucks blog operated by FCA US LLC) (July 16, 2013),https://blog.ramtrucks.com/features/the-2014-ram- 1500 -with-ecodiesel-engine-available-soon-at- a-dealer-near-you/.

[46] Chrysler Group's 3.0-liter EcoDiesel V-6, 500e Battery-Electric Drive System Among Ward's 10 Best Engines for 2014, Chrysler Group LLC (FCA) (Dec. 12, 2013), http://www.fcanorth america.com/News/ ChryslerDocuments/Chrysler GroupLLC_Sustain2013Dec12.pdf (emphasis added).

[47] The 2014 Ram 1500 with EcoDiesel Engine, Available Soon at a Dealer Near You, supra note 47.

[48] Chrysler Group's 3.0-liter EcoDiesel V-6, 500e Battery-Electric Drive System Among Ward's 10 Best Engines for 2014, supra note 48.

[49] EcoDiesel: An Essential Tool for Every Outdoorsman, supra note 39.

[50] Id., supra note 39.

**COMPLAINT FOR DAMAGES**     Exhibit B, Page 127

CONSUMER LEGAL REMEDIES, APC
1531 1/2 NORTH AKNAE DRIVE BEVERLY HILLS CA 90211

1   250 Ram print ad buys in several dozen publications from June 2014 to October 2016. FCA-

2   MDL-000519349. Another document shows expenditures of almost $300,000 to place Jeep

3   EcoDiesel print ads in a variety of magazines in June through August 2013. FCA-MDL-

4   001360559. Yet another document identifies additional ad buys for 14 newspapers across the

5   country. FCA-MDL-000519351.

6       189.    Critically, virtually all of the print ads for the Subject Vehicles contain the same

7   or similar relevant representations, including: (1) the word "EcoDiesel" and/or the EcoDiesel

8   badge, and (2) fuel economy claims such as specific MPG ratings, "most fuel efficient," and

9   "best-in- class" fuel economy. Three illustrative examples, one for the Jeep Grand Cherokee

10  Subject Vehicles and two for the Ram 1500 Subject Vehicles, are shown below:

CONSUMER LEGAL REMEDIES, APC
15312 NORTH MASSACHUSE BEVERLY HILLS CA 90211



CONSUMER LEGAL REMEDIES, APC
1541/2 NORTH ARDEN DRIVE BEVERLY HILLS CA 90211

117

**COMPLAINT FOR DAMAGES**

Exhibit B, Page 129

CONSUMER LEGAL REMEDIES, APC
15312 NORTH MOOD CROWL BEVERLY HILLS, CA 90211

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



**COMPLAINT FOR DAMAGES**                    Exhibit B, Page 130



**COMPLAINT FOR DAMAGES**   Exhibit B, Page 131

190.    The television commercial campaign was also extensive, and also conveyed consistent messages. One FCA document shows 17,595 discrete commercial buys between January 2014 and September 2016, including during prominent and widely-viewed programing. FCA-MDL-000519350.

191.    Some examples of the relevant commercials (a portion of which are not included in the chart described above) include:

    a)  A commercial entitled "West" that prominently features the EcoDiesel badge, and promotes the Ram 1500 EcoDiesel's "28 highway MPG" and "9,200 lbs towing." FCA-MDL-000512961.

    b)  A commercial entitled "Roar" that prominently features the EcoDiesel badge, and promotes the Ram 1500 EcoDiesel's "28 highway MPG" and "420 lb-ft torque." FCA-MDL-000512962.

    c)  A commercial entitled "Runaway" that prominently features the EcoDiesel badge and promotes the Jeep Grand Cherokee EcoDiesel's "best-in-class 30 MPG hwy" and "730-mile driving range." FCA-MDL-000518756. Per the commercial buy document described above, this commercial ran approximately 1,000 times in January 2014.

    d)  A commercial entitled "Take Every Mile" that features the EcoDiesel badge and promotes the Jeep Grand Cherokee EcoDiesel's "730-mile driving range." FCA-MDL-000518759. Per the commercial buy document described above, this commercial ran approximately 400 times in two weeks in February 2016.

    e)  A commercial entitled "The Truth About Diesel" that "bust[s] some myths about diesel engines," including that "all SUVs get bad gas mileage, diesel engines are dirty, and they run sluggish." All three myths were "totally busted," and the video specifically boasts the Jeep Grand Cherokee EcoDiesel's "30 MPG and a 730-mile driving range." It also depicts a man "check[ing] the data" on the emissions from the tailpipe and remarking "Wow, the greenhouse gas emissions are lower than a regular gasoline engine." FCA-MDL-001418576.

192.    Like the rest of FCA's consumer communications, these commercials represented that the Subject Vehicles were green (both through explicit representations and depictions of the EcoDiesel name and badge) and fuel efficient. These representations were pervasive and consistent. They were also false (because the vehicles contained concealed components that compromised the emissions control systems in real-world driving conditions) and deceptive (because the vehicles could not perform as represented without the concealed emission control components).

193.    The Defendants saw the EcoDiesel technology as a huge opportunity to increase their sales and profits. They understood that to realize this goal, they would have to overcome

**COMPLAINT FOR DAMAGES**     Exhibit B, Page 132

CONSUMER LEGAL REMEDIES, APC
153 1/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

the "dirty diesel" stigma, and convince consumers that the Subject Vehicles offered a no-compromise package of fuel efficiency, environmental friendliness, and power. FCA's efforts to communicate this message to consumers were far reaching and consistent. They were also false and deceptive.

194.    Defendants had multiple opportunities, and obligations, throughout their marketing communications to disclose the uniform truth about the Subject Vehicles—namely, that all their emissions, fuel economy, and performance claims were predicated on concealed emissions control components and software that caused the Subject Vehicles to pollute excessively in real-world driving conditions. This uniform omission and unvarying concealment prevented any and all consumers from making a purchase based on all material facts.

**D.    The Defendants Knew These Representations Were False and Misleading**

195.    Unfortunately, the EcoDiesel technology did not work as represented. In developing the Subject Vehicles, the Defendants came to understand that they could not make the vehicles environmentally friendly or "50-state compliant"—as they represented to consumers through consistent and pervasive communications—and that the vehicles could not achieve the fuel economy and performance that were central to FCA's marketing efforts without installing components and software that de-activated or reduced the emission control system during real-world driving conditions. The Defendants concealed this fact from regulators and consumers alike, and cheated Plaintiffs of the vehicles they thought they were buying.

196.    The Defendants' scheme focused on at least two of the emissions control systems in the Subject Vehicles—both of which FCA pitched to consumers as enablers of the Subject Vehicles purported "clean" operation: (1) the Exhaust Gas Recirculation ("EGR") system and (2) the Selective Catalytic Reduction ("SCR") system.

197.    The EGR system reduces NOx in diesel emissions by lowering the temperature of the exhaust gas exiting the engine. The SCR system takes the NOx leftover from the EGR System and converts it into harmless nitrogen and water. Together, the EGR and SCR systems are vital to mitigating the pollution from the Subject Vehicles' diesel emissions.

198.    As identified in the EPA's NOV, the Defendants installed a number of

121

**COMPLAINT FOR DAMAGES**    Exhibit B, Page 133

undisclosed auxiliary emission control devices ("AECDs") in the Subject Vehicles that compromised the EGR and SCR systems and resulted in substantially increased NOx emissions during real-world driving conditions. As exemplified herein, the Defendants knew that these AECDs were not allowed, but that the Subject Vehicles could not achieve the fuel economy or performance that the Defendants marketed without them.

**1)   EGR AECD Strategy: EGR Rate Reduction**

199.    Burning diesel fuel creates NOx. The amount of NOx produced by a diesel vehicle is a function of temperature: the hotter the exhaust gas is when it exits the engine, the more NOx generated.

200.    The EGR system minimizes NOx by lowering the temperature of the engine exhaust through a recirculation process. The higher the rate of exhaust gas recirculation (the EGR rate), the lower the exhaust gas temperature. The lower the exhaust temperature, the lower the NOx. But, critically, the higher the EGR rate in a vehicle, the worse fuel economy it achieves. Defendants employed the EGR AECDs in the Subject Vehicles to either reduce the EGR rate or shut it off entirely, thereby artificially and secretly increasing the Subject Vehicles' fuel economy and drivability at the expense of increased NOx.

201.    One of the strategies Defendants used to reduce the EGR rate was through what the EPA has named AECD 5, which detects the engine temperature in the Subject Vehicles and reduces the EGR rate during the vehicles' "warm-up phase" (the phase when the engine is heating up after a cold start). The EPA described AECD 5 as "EGR rate reduction based on engine temperature model." Defendants referred to it as "T_Eng" and various derivatives thereof (e.g., "t_engine" and "tEng").

202.    VM Motori knew as early as 2010 that T_Eng was an AECD that, if concealed, would be illegal. (FCA-MDL-000456083) In April 2010, a FCA powertrain division employee attempted to assure VM Motori's Controls and Calibration Director, Sergio Pasini, that T_Eng did not employ "cycle detection". FCA-MDL-000452591. "Cycle detection" refers to any mechanism that allows a vehicle to detect when it is undergoing regulatory emissions testing, and modify its emissions accordingly. But Pasini knew better. Just two months later, he told his

CONSUMER LEGAL REMEDIES, APC
8331/2 NORTH ARDMORE DRIVE, BEVERLY HILLS, CA 90211

122

VM Motori colleagues, "the [EGR] rate will be managed mainly on t_engine which is, no matter what FIAT says, a cycle detection." Id. VM Motori regularly admitted that the T_Eng function employed "cycle detection" (12/2011 correspondence—FCA-MDL-000168161); "cycle recognition" (1/2012 correspondence—FCA-MDL-000377513; FCA-MDL-000377513_T001 (English translation)); and "cycle beating" (02/2013 correspondence—FCA-MDL-000430441-44; 06/2013—FCA-MDL-000295256). Pasini also understood that this AECD was not being disclosed to the EPA. FCA-MDL-000377499; FCA-MDL-000377499_T001-02 (English translation). In a May 2013 email, for example, Pasini told more than a dozen of his VM Motori colleagues that the T_Eng function was not active during emission testing and "has not been declared to regulators." Id.

203.    FCA also knew that T_Eng was at an unacceptable AECD level, and critically, all the Defendants understood that it was necessary to achieve the desired fuel economy. In December 2011, VM Motori identified T_Eng as a "sort of 'cycle detection" to increase fuel economy (FCA-MDL-000168161) and said FCA gave them approval to use it (FCA-MDL-000377211). In January 2012, FCA Executive Bob Lee connected T_Eng to FCA's objective of achieving greater fuel economy in a presentation entitled "Fuel Economy Status Target." FCA-MDL-000000116. In February 2012, VM Motori directed Bosch to implement T_Eng, and told Bosch that VM Motori would explain to FCA that *T_Eng was "what you need if you want 30 mpg."* FCA-MDL-000015652 (emphasis added). FCA later explored ideas to replace T_Eng with a different strategy, but it abandoned that process after *VM Motori informed FCA's Diesel Calibration Manager* that the "F[uel] E[conomy] impact [of replacing T_Eng] is *probably around 2 mpg highway*." FCA-MDL-000430044 (emphasis added). In an email sent the next day, VM Motori's Emanuele Palma told colleagues that "*Chrysler knows tEng is the only way to get to 30 mpg, so don't worry about this topic*." Id. (emphasis added).

204.    Like VM Motori and FCA, Bosch also knew that T_Eng was an AECD that likely qualified as "defeat device" under applicable regulations. FCA-MDL-000015652. In February 2012, Bosch warned VM Motori that T_Eng is an emissions "defeat device" and that they risked "serious penalties" if regulators found T_Eng to be cycle detection. Id. VM Motori refused to

CONSUMER LEGAL REMEDIES, APC
15312 NORTH ARMAGE DRIVE, BEVERLY HILLS, CA 90211

abandon T_Eng, however, and told Bosch "we are working closely with Chrysler [and] the feedback we've had so far about [using T_Eng] is positive." Id. The same month, Bosch sought to limit its liability from VM Motori's use of T_Eng, and even considered asking VM Motori to sign a risk release. RBL-MDL2777-PE-300402775-78. Yet, Bosch not only incorporated T_Eng into the emissions software for the Subject Vehicles (FCA-MDL-000351953), Bosch appears to have gone so far as to have advised VM Motori not to disclose T_Eng to regulators, if it planned to use the function (see, e.g., RBL-MDL2777-PE-300530521-23). Of course, this is exactly what they did.

205.    On December 2, 2015, Morrie Lee of FCA Regulatory Affairs asked FCA Senior Manager Emanuele Palma "[w]hat compelling or driving reason does a[n] [automobile manufacturer] have to reduce EGR operation in the field?" FCA-MDL-000002857. Palma responded simply: "**Low EGR** → low soot, good drivability, **F[uel] E[conomy]**." Id. (emphasis added). Two days later, Lee told the EPA that FCA's failure to document T_Eng as an AECD was "an oversight of understanding." FCA-MDL-000002011. The documents cited herein show otherwise.

**2)    SCR AECD Strategy: Dosing Disablement**

206.    The SCR system uses DEF—a solution of urea and water—to convert NOx into harmless nitrogen and water after it exits the EGR system and before it is emitted from the tailpipe. The part of the emissions system where this process occurs is called the SCR catalyst. In theory, the SCR system injects or "doses" measured quantities of DEF into the exhaust stream based on a software program that injects the right amount of DEF to neutralize the amount of NOx being emitted by the engine.

207.    However, Defendants employed the SCR AECDs to either reduce the DEF dosing amount or shut it down entirely. With the DEF dosing reduced or disabled, the Subject Vehicles emit more NOx.

208.    Reduced DEF dosing was important to Defendants for at least two reasons. First, the more DEF the Subject Vehicles consumed, the more frequently consumers would have to refill the DEF tank—an inconvenience that would make the vehicles less marketable. Second,

CONSUMER LEGAL REMEDIES, APC
1533 1/2 NORTH MANSFIELD AVE, BEVERLY HILLS CA 90211

by the time the first Subject Vehicles hit the market, the Defendants realized that the chemicals in the DEF were breaking down the materials in the SCR catalyst and causing these components to fail prematurely, which could be mitigated by reducing DEF dosing (at the expense of increased emissions).

209.    The Defendants relied heavily on an alternative DEF dosing mode called "online dosing," which limited the injection of DEF into the SCR catalyst, thereby compromising the SCR system. The EPA identified this alternative dosing functionality as AECD 7.[51] Bosch and VM Motori first discussed "online dosing" in March 2011. FCA-MDL-000281212-14. Both parties acknowledged that, if used, online dosing would have to be disclosed as an AECD. Id. ("online dosing . . . could also be used outside cert cycle [but] needs to be declared at CARB"). Yet, in November 2012, Bosch implemented a software change to prevent online dosing from activating during EGR diagnostic monitoring (RBL-MDL2777-PE-300068645-48), and in February 2013, Kasser Jaffri of FCA's On Board Diagnostic group expressed concern to VM Motori that CARB might see online dosing as "cycle beating" (FCA-MDL-000430441). Jaffri concluded that, if applied, online dosing would have to be disclosed as an AECD. FCA-MDL-000478134 ("Chrysler will request an AECD for [online dosing]"). It did not do so.

210.    VM Motori then told FCA in March 2013 that it was not going to use the online dosing strategy. FCA-MDL-000433186. They used it anyway. In September 2013, Jaffri reported to FCA Senior Manager Dan Hennessey, head of the On Board Diagnostic group, that online dosing was (1) active in the vehicles; (2) had not been disclosed to CARB or the EPA; and (3) "reduces the conversion efficiency effectiveness," thereby resulting in increased NOx emissions. FCA-MDL-000740696. Understandably, Jaffri observed that this "continues to be an area of concern." Id. He also told Hennessy that when online dosing was active, diagnostic monitoring meant to track the performance of the SCR system "cannot be run," because, if active, the diagnostic monitoring would reveal that the SCR system was not functioning. Id.

211.    In September 2014, FCA senior management, including March Shost and Dan

---

[51] Defendants also employed related strategies to reduce DEF dosing, including tying the dosing to SCR adaptation (the process by which the SCR system modifies the dosing rate based on in-use monitoring) (FCA-MDL-000383765), and the load governor (the component that controls the flow of DEF into the SCR catalyst) (FCA-MDL-000750062).

**COMPLAINT FOR DAMAGES**      Exhibit B, Page 137

CONSUMER LEGAL REMEDIES, APC
13311/25 NORTH ARDMORE DRIVE, BEVERLY HILLS, CA 90211

Hennessey, received a presentation from Emanuele Palma entitled "WK/DS MY15 DEF dosing strategy." One slide in that presentation labeled "online dosing strategy" noted that FCA's competitors were using online dosing and that FCA could too—but, critically, that the dosing strategy needed "to be agreed with the agencies." FCA-MDL-000417114-25. No such agreement was reached, as FCA never disclosed the functionality.

212.    In July 2015, FCA acknowledged that tests conducted on the Model Year 2014 Subject Vehicles showed that the vehicles were not meeting NOx emissions standards because the SCR catalysts—which Bosch provided for the Subject Vehicles (RBL-MDL2777-PE-300160491-504) were failing (FCA-MDL-000713128). In a presentation given that month entitled "SCR Catalyst Responsibility Share," Bosch noted in its "investigation history" chronology that it began to investigate the SCR catalyst as the reason FCA development vehicles were experiencing excess NOx emissions in February 2013. RBL-MDL2777-PE-300166279-362. The investigation chronology further identified a "dosing calibration strategy change" to reduce dosing rates. Id. Bosch admitted that VM Motori made the change on Bosch's recommendation. Id.

213.    In sum, the Defendants all knew that the Subject Vehicles contained undisclosed apparatuses that reduced or disabled the emissions control systems in real-world driving conditions, and they knew that without those undisclosed apparatuses, the Subject Vehicles could not deliver the fuel economy and performance that FCA promised. Defendants concealed this fact from consumers and regulators and, in so doing, cheated Plaintiffs of the vehicles they thought they were buying.

### *"Dieselgate" Scandalizes The Global Auto Industry*

214.    The world was shocked to learn that Volkswagen had manufactured over 11 million diesel cars that were on the roads in violation of European emission standards, and over 565,000 vehicles operating in the United States in violation of EPA and state emission standards. But Volkswagen was not the only one.

215.    In the wake of the Volkswagen "defeat device" scandal, scientific literature and reports and testing indicate that many other so-called "clean diesel" vehicles emit far more

CONSUMER LEGAL REMEDIES, APC
15312 NORTH ARGO DRIVE, BEVERLY HILLS, CA 90211

pollution on the road than in lab tests.[52]  The EPA has since widened its probe of diesel emissions to include the Subject Vehicles at issue here.

216.  In May 2015, a study conducted on behalf of the Dutch Ministry of Infrastructure and the Environment found that all sixteen (16) diesel vehicles made by different manufacturers, when tested, emitted significantly more NOx on real-world trips but nevertheless passed laboratory tests. The report concluded that "[i]n most circumstances arising in normal situations on the road, the system scarcely succeeded in any effective reduction of NOx emissions."[53]

217.  The report further remarked:

> It is remarkable that the NOx emission under real-world conditions exceeds the type approval value by [so much]. It demonstrates that the settings of the engine, the EGR [(exhaust gas recirculation)] and the SCR during a real-world test trip are such that they do not result in low NOx emissions in practice. In other words: **In most circumstances arising in normal situations on the road, the systems scarcely succeed in any effective reduction of NOx emissions.**[54]

The lack of any "effective reduction of NOx emissions" is devastating to "clean diesel" advertising, including that for the Subject Vehicles at issue here.

218.  Other organizations are beginning to take notice of the emission deception. The Transportation and Environment ("T&E") organization, a European group aimed at promoting sustainable transportation, compiled data from "respected testing authorities around Europe." T&E stated in September 2015 that real-world emission testing showed drastic differences from laboratory tests, such that models tested emitted more pollutants on the road than in the lab. "For virtually every new model that comes onto the market the gap between test and real-world performance leaps," the report asserts.[55]

---

[52] The EPA's Sept. 18, 2015, Notice of Violation to Volkswagen Group of America, Inc., available at https://www.epa.gov/sites/production/files/2015-10/documents/vw-nov-caa-09-18-15.pdf. As detailed therein, software detects when the vehicle is undergoing official emission testing and turns full emission controls on only during the test. But otherwise, while the vehicle is running, the emission controls are suppressed. This results in cars that meet emission standards in the laboratory or at the state testing station, but during normal operation they emit NOx at up to 40 times the standard allowed under U.S. laws and regulations. Volkswagen has admitted to installing a defeat device in its diesel vehicles.
[53] Detailed investigations and real-world emission performance of Euro 6 diesel passenger cars, TNO innovation for life TNO Report, TNO 2015 R10702 (May 18, 2015), http://publications.tno.nl/publication/34616868/a1Ug1a/TNO-2015-R10702.pdf.
[54] *Id.* at 6 (emphasis added).
[55] VW's cheating is just the tip of the iceberg, Transport & Environment (Sept. 21, 2015), http://www. transportenvironment.org/publications/vw%E2%80%99s-cheating-just-tip-iceberg.

219.    In a summary report, T&E graphically depicted the widespread failure of most manufacturers to meet emission standards:[56]



220.    The T&E report found that the current system for testing cars in a laboratory produces "meaningless results," because manufacturers like FCA can engineer their cars to "pass" the laboratory tests but emit many times as much pollution under normal driving conditions.[57]

[56] Five facts about diesel the car industry would rather not tell you, Transport & Environment (Sept.                                                                       2015), http://www.transportenvironment.org/sites/te/files/publications/2015_09_Five_facts   about_ diesel_FINAL. pdf.
[57] Id.

128

**COMPLAINT FOR DAMAGES**          Exhibit B, Page 140

CONSUMER LEGAL REMEDIES, APC
9301 WILSHIRE BLVD, BEVERLY HILLS, CA 90211

221.    Emissions Analytics is a U.K. company formed to "overcome the challenge of finding accurate fuel consumption and emission figures for road vehicles." With regard to its recent on-road emission testing, the company explains:

> [I]n the European market, we have found that real-world emissions of the regulated nitrogen oxides are four times above the official level, determined in the laboratory. Real-world emissions of carbon dioxide are almost one-third above that suggested by official figures.
>
> For car buyers, this means that fuel economy on average is one quarter worse than advertised. This matters, even if no illegal activity is found.[58]

### *FCA Is Caught Cheating*

#### A.   **Testing Reveals Cheating**

222.    In late 2016 testing was done of the 2015 Ram 1500 pickup using a Portable Emissions Measurement System ("PEMS"). Testing revealed that FIAT Chrysler also cheated in that it had concealed the fact that the Ram 1500 spews more than the legal amount of emissions and fails to meet its own "no NOx" out-of-the-tailpipe promise.

223.    The applicable standard both at the federal and state level is 50 mg/mile of NOx for "FTP Style" driving: i.e., city driving. Testing was conducted with a PEMS unit to simulate driving conditions under both the FTP certification cycle and the highway certification cycle. The Ram 1500 emits an average of 159 mg/mile of NOx and a maximum of 1,283 mg/mile on flat roads, and 222 mg/mile of NOx with a maximum of 1,859 mg/mile on hills. For highway driving, the average was 232 mg/mile and a maximum of 1,615 mg/mile, compared to the 70 mg/mile standard. On hills, the numbers are 353 mg/mile and 3,240 mg/mile. Testing also revealed a device triggered by ambient revealed the presence of a device that is triggered when ascending hills, as the emission control system temperature that significantly degrades the performance of the NOx emission reduction system, with ambient threshold temperatures above approximately 95°F and below 40-50°F. The resulting NOx emissions increase by a factor of 10 when above or below these threshold temperatures. Testing also appears to be significantly degraded after a short period of steady driving on hills. As a result, NOx emissions increase after about 500-1000 seconds on hills with grades as low as 1%, where emissions are often 10

[58] Emissions Analytics Press Release, (Sept. 28, 2015), available at http://www.abvwc.com/home/emissions-analytics.(last accessed July 19, 2017).

**COMPLAINT FOR DAMAGES**          Exhibit B, Page 141

CONSUMER LEGAL REMEDIES, APC
15 N / 23 NORTH ABSAG DRIVE, BEVERLY HILLS, CA 90211

times the highway standard. For grades as little as 0.4%, emissions were found to be as high as 6 times the highway standard.

224.    The Ram 1500's emission software is a "Bosch EDC17," as is the Jeep Grand Cherokee's emission software. The same basic emission system is in the Grand Cherokee EcoDiesel® and the engines are identical.

225.    In separate testing, a 2014 Ram 1500 equipped with an EcoDiesel® engine and featuring SCR NOx after-treatment technology was tested on a chassis dynamometer as well as on the road. In both scenarios, gaseous exhaust emissions, including oxides of nitrogen (NOx), nitrogen oxide (NO), carbon monoxide (CO), carbon dioxide (CO2), and total hydrocarbons (THC) were measured on a continuous basis using a PEMS from Horiba®.

226.    The tests showed significantly increased NOx emissions during on-road testing as opposed to testing on a chassis dynamometer (i.e., in the laboratory). On the road, over an urban/suburban route, the vehicle produced average NOx emissions that exceeded federal certification standards by approximately 15-19 times. When tested on a highway, the average NOx emissions measured _**35 times**_ the EPA Tier 2 Bin 5 standard.

**B.      The EPA Issues A Notice of Violation to Fiat and FCA.**

227.    On January 12, 2017, the EPA issued a NOV to Fiat and FCA for failing to justify or disclose defeat devices in model year 2014–2016 Ram 1500 EcoDiesel® and 2014–2016 Jeep Grand Cherokee EcoDiesel® vehicles (the Subject Vehicles at issue here). CARB also issued a Notice of Violation to Fiat and FCA. Since then, the EPA, by and through the Department of Justice, has sued Fiat, FCA, VM Italy, and VM America for violations of the CAA.

228.    The EPA's NOV and lawsuit arose in part from emission testing performed by the EPA at the National Vehicle and Fuel Emissions Laboratory. The EPA performed this testing "using driving cycles and conditions that may reasonably be expected to be encountered in normal operation and use, for the purposes of investigating a potential defeat device."

229.    The EPA identified at least eight AECDs in the Subject Vehicles that were concealed on COC applications:

**COMPLAINT FOR DAMAGES**      Exhibit B, Page 142

- AECD 1 (Full EGR Shut-Off at Highway Speed)

- AECD 2 (Reduced EGR with Increasing Vehicle Speed)

- AECD 3 (EGR Shut-off for Exhaust Valve Cleaning)

- AECD 4 (DEF Dosing Disablement during SCR Adaptation)

- AECD 5 (EGR Reduction due to Modeled Engine Temperature)

- AECD 6 (SCR Catalyst Warm-Up Disablement)

- AECD 7 (Alternative SCR Dosing Modes)

- AECD 8 (Use of Load Governor to Delay Ammonia Refill of SCR Catalyst)

230.   The EPA testing found that "some of these AECDs appear to cause the vehicle to perform differently when the vehicle is being tested for compliance with the EPA emission standards using the Federal emission test procedure (e.g., FTP, US06) than in normal operation and use." For example:

a) AECD 3, when combined with either AECD 7 or AECD 8, disables the EGR system without increasing the effectiveness of SCR system. Under some normal driving conditions, this disabling reduces the effectiveness of the overall emission control system. The AECD 3 uses a timer to shut off the EGR, which does not appear to the EPA to meet any exceptions to the regulatory definition of "defeat device."

b) AECD 5 & 6 together reduce the effectiveness of the NOx emission control system, using a timer to discontinue warming of the SCR after-treatment system, which reduces its effectiveness.

c) AECD 4, particularly when combined with AECD 8, increases emissions of tailpipe NOx during normal vehicle operation and use. The operation of AECD 1, AECD 2, and/or AECD 5 increase the frequency of occurrence of AECD 4.

d) AECDs 7 & 8 work together to reduce NOx emissions during variable-grade and high-load conditions.

231.   The EPA further found that Fiat and FCA did not disclose or justify these control devices in their COC applications, as required by EPA regulations, and that Fiat and FCA were therefore in violation of the CAA each time they sold, offered for sale, introduced in commerce, or imported one of the approximately 103,828 Subject Vehicles. The EPA is now seeking injunctive relief and penalties.

**C.   Bosch Software Documentation Further Verifies the Violations**

232.   Researchers have obtained Bosch software documentation describing the functions, modules, structure, variables and calibration parameters believed to be installed in

CONSUMER LEGAL REMEDIES, APC

1531/2 NORTH MAPLE DRIVE, BEVERLY HILLS, CA 90211

1    Subject Vehicles. The documentation is over 10,000 pages long and contains hundreds of

2    functions and thousands of variables developed by Bosch that describe the operation of the

3    engine. These parameters and functions correlate with many of the violations alleged by the

4    EPA and CARB. Critically, these functions, designed and implemented by Bosch, have

5    elements that have no legitimate purpose in normal use. At the same time, these same elements,

6    when enabled, allow the functions to reduce the effectiveness of emission controls in real world

7    driving conditions, but not during an emission test cycle.

8        **1)    AECDs 1 and 2: Reducing or Disabling EGR at Highway Speeds**

9        233.    The function named "*AirCtl_RatDesValCalc*" described in the Bosch

10   documentation as "*Exhaust gas recirculation control - EGR ratio setpoint calculation*" is used

11   to calculate the desired EGR rate. The software documentation contains figures with flow

12   diagrams describing the inputs, outputs, and calculation performed by this software function.

13   Bosch has included vehicle speed as an input used by the EGR control function to modify the

14   EGR rate (and, thus, NOx emission). Vehicle speed is notable because there is no legitimate

15   reason for the EGR rate to depend directly on vehicle speed.

16       234.    By allowing EGR rate to depend directly on vehicle speed, Bosch provided a

17   means by which Fiat and FCA could reduce the effectiveness of the emission control system

18   under conditions which may reasonably be expected to be encountered in normal vehicle

19   operation and use. This function may be, and is likely to have been, used to implement the

20   undisclosed AECDs 1 and 2 identified in the EPA NOV to Fiat and FCA.

21       **2)    AECD 3: EGR Shut-Off for Exhaust Valve Cleaning**

22       235.    AECD 3 identified in the EPA NOV has also been identified in Bosch's software

23   documentation in the function named "*AirCtl_Mon*" described in the Bosch documentation as

24   "*Exhaust gas recirculation control – Monitoring and shut-off.*" Bosch described this AECD as

25   ostensibly providing a cleaning mechanism for the engine exhaust valves when the Subject

26   Vehicle is in overrun (*i.e.*, the engine is turning without combustion, such as when the vehicle

27   is going downhill). To accomplish this cleaning, the function created by Bosch closes the EGR

28   valve (turning off EGR), so a "huge gush of clean air" can remove deposits. However, Bosch

CONSUMER LEGAL REMEDIES, APC
1531/2 NORTH MASCUZ DRIVE BEVERLY HILLS CA 90211

also programmed a software switch (named "*AirCtl_swtOvrRunOff_C*") that allowed Fiat and FCA to enable exhaust valve cleaning in normal (non-overrun) operation, effectively disabling EGR.

236. Together with an activation delay added by Bosch—controlled by *AirCtl_tiEngRunDrvCycMin_C*, which is described as "*Calibration time after which exhaust valve cleaning routine can start*"—the *AirCrl_Mon* function can be readily used as a defeat device. To do so, Bosch would calibrate the ECU to enable valve cleaning in outside of overrun (*AirCtl_swtOvrRunOff_C* = TRUE), but only after the duration of a typical emission test cycle (*AirCtl_tiEngRunDrvCycMin_C* = 1800 seconds). This would disable EGR after an emission test cycle, resulting in increased NOx emission. This function may be, and is likely to have been, used to implement undisclosed AECD 3 identified in in the EPA and CARB NOVs.

### 3) AECD 7: Alternative SCR Dosing Modes

237. Bosch included a timer in another function, without a legitimate purpose. The Bosch function named "*SCRFFC_Main*," described in documentation as "*Calculation of the NH3 precontrol quantity*" has an input variable timer entitled "*CoEng_tiNormal*," which holds the time duration since the engine was started. This variable can be used to reduce SCR efficiency, and, therefore, increase NOx emission, after a certain time has elapsed. In particular, this timer may be set to the duration of a typical emission test cycle. There is no legitimate reason for SCR control to depend directly on the time duration since engine start. By making SCR control depend directly on time duration since engine start, however, Bosch has provided a means by which Fiat and FCA could reduce the effectiveness of the emission control system in real world driving conditions. This function may be, and is likely to have been, used to implement undisclosed AECD 7 identified in the EPA and CARB NOVs.

### D. West Virginia University Testing of the Subject Vehicles

238. Beginning in 2015, researchers at the West Virginia University Center for Alternative Fuels, Engines, and Emissions—the same researchers instrumental in uncovering Volkswagen's fraud—tested 5 model year 2014 and 2015 vehicles produced by FCA. The test vehicles comprised the Subject Vehicles at issue here: Jeep Grand Cherokees and Ram 1500

CONSUMER LEGAL REMEDIES, APC

1  diesel vehicles, all equipped with the 3.0L EcoDiesel® engine and featuring SCR NOx after-
2  treatment technology.[59]

3      239.    All test vehicles were evaluated on a vehicle chassis dynamometer representing
4  the test conditions for regulatory compliance. Each vehicle was also tested over-the-road using
5  a PEMS device during a variety of driving conditions including urban/suburban and highway
6  driving.

7      240.    One of the Jeep Grand Cherokees and one of the Ram 1500 vehicles was tested
8  prior to, as well as after, a mandatory vehicle recall in April 2016 – the "R69 recall" – which
9  included a software "reflash" by FCA that concerned the vehicles' emission control systems.

10     241.    Results indicated that both Jeep Grand Cherokee in MY 2014 exhibited
11  significantly increased NOx emissions during on-road operation as compared to the results
12  observed through testing on the chassis dynamometer. For MY 2015, Jeep vehicles produced
13  from 4 to 8 times more NOx emissions during urban/rural on-road operation than the
14  certification standard, while Ram 1500 vehicles emitted approximately 25 times the NOx
15  permitted by EPA Tier2-Bin5 standard for highway driving conditions.

16     242.    The researchers noted that for the vehicles tested post-recall using the
17  dynamometer, NOx emissions were similar or slightly lower than that observed for vehicles
18  tested pre-recall. But on-road emissions were still very different from emissions observed
19  through chassis dynamometer testing, even though they were slightly improved from the levels
20  observed during pre-recall testing.

21  **E.    European Investigation and Testing**

22     243.    FCA and Bosch have both found themselves in trouble with German regulators
23  in the wake of the Volkswagen scandal.

24     244.    German prosecutors have launched an investigation into Bosch, reportedly

25

26

27  [59] Marc C. Besch, Sri Hari Chalagalla, and Dan Carder, *On-Road & Chassis Dynamometer Testing of Light-Duty Diesel Passenger Cars*, Center for Alternative Fuels, Engines, and Emissions, West Virginia University, available at http://www.cafee.wvu.edu/files/d/c586c1dd-b361-410d-a88d-34e8834eda6/testing-of-light-duty-diesel-passenger-cars.pdf (last accessed
28  July 19, 2017).

**COMPLAINT FOR DAMAGES**      Exhibit B, Page 146

CONSUMER LEGAL REMEDIES, APC
15312 NORTH MANAGEMENT, BEVERLY HILLS, CA 90211

raiding Bosch's offices in Stuttgart.[60]  In April 2016, Bosch GmbH representatives met with Germany's Federal Motor Transport Authority ("KBA") on at least two occasions. In an April 14, 2016, meeting, Bosch admitted there were a number of anomalies in the calibration of its engine control units provided to FCA for diesel vehicles sold in Europe. Bosch confirmed that it had delivered the control units for the vehicles as well as the associated software and that Bosch employees had integrated the emission-related applications into the software. Bosch admitted that the software reduced the EGR rate and the regeneration of NSC (NOx storage catalyst) after an elapsed period of driving time or number of cycles. Specifically, 22 minutes after the start of the engine (the estimated duration of emission testing), the software reduced the EGR rate to nearly zero and de-activated NSC regeneration. Another trigger for de-activation of the NSC regeneration occurred after the vehicle had been driven a distance of 100 kilometers. Bosch confirmed that the NOx emissions for the vehicles exceeded the legal limits by a factor of 4-5. The KBA's takeaway from its meetings with Bosch was there is a defeat device in the vehicles and Bosch shared responsibility for the defeat device with FCA. Media reports have confirmed the same.[61]

245.   After the meeting with Bosch, the KBA performed testing on the Fiat diesel vehicles and confirmed that the emission controls were disabled after 22 minutes of driving time, causing the vehicles to emit more than 10 times the legal limit of NOx. The KBA concluded that the vehicles were designed to cheat on emission tests, which normally run for about 20 minutes.[62]  As a result, the KBA's transport minister announced: "We will need to carry out further tests on Fiat models."[63]  In August 2016, the German government formally concluded that Fiat vehicles sold in the EU had used defeat devices.

[60] See Edward Taylor, *Stuttgart prosecutor targets Bosch in Daimler diesel investigation*, Reuters (May 26, 2017), http://www.reuters.com/article/us-daimler-emissions-bosch-idUSKBN18M172.
[61] Media reports similarly said that Bosch had confirmed to German regulators that certain Fiat vehicles were cheating on emission testing. See, e.g., Sueddeutsche Zeitung, Apr. 22, 2016, *"Fiat Is Next to be Accused"*; *Test of Fiat diesel model shows irregular emissions*: Bild am Sonntag,Reuters (Apr. 24, 2016), http://www.reuters.com/article/us-fiat-emissions-germany-idUSKCN0XL0MT; David Tracy, *Here's How Fiat Might also be Cheating on Emissions Tests:Report*, Jalopnik (Apr. 25, 2016), http://jalopnik.com/heres-how-fiat-might-also-be-cheating-on- emissions-test-1772948181.
[62] *Test of Fiat diesel model shows irregular emissions*: Bild am Sonntag, *supra* note 61.
[63] *Here's How Fiat Might also be Cheating on Emissions Tests*: Report, *supra* note 61.

135

246.   More recently, a 17-page long-form article published by the German weekly investigative news magazine Der Spiegel, on April 20, 2018, details the central role Bosch played in the "diesel scandal." The article reports that prosecutors in Germany are investigating Bosch for providing and programming illegal software for use in Fiat vehicles, among many others.[64]

**F.     Joint University of California, San Diego and German Study of the Fiat 500X**

247.   The testing of European regulators has been confirmed by independent testing conducted here in the United States. A recent peer-reviewed study by researchers at the University of California, San Diego and Ruhr-Universität Bochum in Germany analyzed firmware in the EDC Unit 17 of the Fiat 500X and found a defeat device affecting the logic governing NOx storage catalyst regeneration.[65] Unlike the Volkswagen defeat device, the researchers found that the mechanism in the Fiat 500X relied on timing, reducing the frequency of NSC approximately 26 minutes and 40 seconds after the engine was started. (By reducing the frequency of NOx storage catalyst regeneration, a manufacturer can improve fuel economy and increase the service life of the diesel particulate filter, at the cost of increased NOx emissions.)

248.   According to the study, the conditions used to determine when to regenerate the NSC were duplicated, and each set of conditions could start a regeneration cycle. The researchers obtained Bosch copy-righted documentation for a Fiat vehicle, which described two sets of conditions using the terms "during homologation cycle" and "during real driving." The term "homologation" is commonly used in Europe to describe the process of testing an automobile for regulatory conformance. Bosch's authorship of the document and use of the terms "homologation [testing]" and "real driving" to describe the regeneration conditions demonstrate that it not only created the mechanism for FCA but was also aware of the mechanism's intended purpose of circumventing emission testing.

[64] Frank Dohmen, et al., *A Sinister Alliance: The automobile supplier Bosch is on its way to taking center stage in the Diesel scandal*, Der Spiegel, Issue 17 (April 20, 2018), https://magazin.spiegel.de/SP/2018/17/156941296 /index.html?utm_source=spon&utm_campaign=vorab (paywall, German language).
[65] Moritz Contag, et al., *How They Did It: An Analysis of Emission Defeat Devices in Modern Automobiles, supra* note 15.

CONSUMER LEGAL REMEDIES, APC
15 N 12 NORTH MANCZ DROVE, BEVERLY HILLS, CA 90211

**COMPLAINT FOR DAMAGES**     Exhibit B, Page 148

249.   Together, these facts reveal that Defendants have fraudulently concealed the functions of its emission control technology from regulators and consumers alike. Further, they demonstrate that FCA's claims about its EcoDiesel® Subject Vehicles as "clean diesel" with "ultralow emissions" and "no NOx" emitted through the tailpipe is false or misleading.

### *The Damage Caused By FCA's Dirty Diesel Scheme*

250.   Plaintiffs paid a significant premium for the EcoDiesel features that FCA falsely advertised. Indeed, consumers paid between $3,120 and $5,000 more for the EcoDiesel option than for the comparable gasoline vehicles.[66]  In return, FCA promised power, performance, fuel economy, and environmental friendliness (and vehicles that were legal to drive). FCA could not deliver on that promise. Plaintiffs suffered significant harm as a result.

251.   FCA may not be able to bring the Subject Vehicles into compliance with emissions standards. If that is the case, those vehicles will have to be removed from the road.

252.   But even if FCA can bring the Subject Vehicles into compliance with emission standards, it will not be able to do so without substantially degrading their performance characteristics, including their horsepower and/or fuel efficiency and/or maintenance requirements. Consequently, Plaintiffs will not possess the vehicles they thought they purchased and will not have received the benefit of the bargain. This will also result in a diminution in value of every Subject Vehicle, and it will cause owners and lessees of Subject Vehicles to pay more for the use of their Subject Vehicles.

253.   Assuming, for the sake of argument, that the Subject Vehicles could be brought into compliance with emission standards without any material degradation to performance or maintenance characteristics—and if that were the case, it begs the question as to why FCA cheated in the first place—Plaintiffs would still have been deprived of the benefit of the bargain for all the years they owned and/or leased the Subject Vehicles that could not and did not deliver all of the characteristics for which Plaintiffs paid a premium, and were not compliant with U.S. .

---

[66] John Lamm, 2014, *Jeep Grand Cherokee EcoDiesel® V-6, First Drive* Review, Car and Driver (February 2013), http://www.caranddriver.com/reviews/2014-jeep-grand-cherokee-ecodiesel-v-6- first-drive-review; Andrew Wendler, 2015, *Ram 1500 EcoDiesel® 4x4, Instrumented Test*, Car and Driver (August 2015), http://www.caranddriver. com/reviews/2015-ram-1500-4x4-ecodiesel- 4x4-test-review.

**COMPLAINT FOR DAMAGES**   Exhibit B, Page 149

law.

254.   In sum, had regulators or the public known the true facts, Plaintiffs would not have purchased or leased the Subject Vehicles (in fact, they could not have legally been sold), or would have paid substantially less for them.

### *FCA Had Exclusive Knowledge Of The Fraudulent Emissions Systems Defect And Failed To Disclose It To Plaintiffs*

255.   FCA had superior and exclusive knowledge of the Subject Vehicles' fraudulent emissions systems defect, and knew or should have known that it was not known or reasonably discoverable by Plaintiffs, before Plaintiffs purchased their vehicles.

256.   Plaintiffs are informed and believe, and based thereon allege, that before Plaintiffs purchased their vehicles, FCA knew that the Subject Vehicles contained undisclosed apparatuses that reduced or disabled the emissions control systems in real-world driving conditions, and they knew that without those undisclosed apparatuses, the Subject Vehicles could not deliver the fuel economy and performance that FCA promised. Defendants concealed this fact from consumers and regulators and, in so doing, cheated Plaintiffs of the vehicles they thought they were buying.

257.   Despite FCA's knowledge of the fraudulent emissions systems defect present in Subject Vehicles, FCA continued to fail to disclose it to new and subsequent purchasers and lessees of Subject Vehicles, including Plaintiffs. Indeed, the very purpose of the "defeat device" that FCA installed in the Subject Vehicles is to conceal the fact that the Subject Vehicles' emissions control systems were being reduced or disabled in real-world driving conditions. As such, FCA intended to prevent reasonable consumers, including Plaintiffs, from discovering the fraudulent emissions control systems installed in the Subject Vehicles.

258.   It therefore goes without saying that FCA has never disclosed the fraudulent emissions control systems defect to Plaintiffs prior to the purchase of their vehicles or at any point during ownership of their vehicles, and FCA has never instructed its dealerships to disclose said defect to drivers or potential purchasers or lessees of Subject Vehicles.

259.   The existence of the fraudulent emissions control systems defect is a material

CONSUMER LEGAL REMEDIES, APC
1531/2 NINTH AVENUE DRIVE, BEVERLY HILLS, CA 90211

138

1    fact that a reasonable consumer would consider when deciding whether to purchase or lease a

2    vehicle. Had Plaintiffs known that their = vehicles were equipped with the fraudulent emissions

3    control systems defect and financial liability it creates, they would not have purchased their

4    vehicles, or would have paid substantially less for them. By failing to disclose the fraudulent

5    emissions control systems defect, FCA denied Plaintiffs information that was material to their

6    decision to purchase/lease their vehicles and material to their willingness to use their vehicles.

7         ***FCA Has Actively Concealed The Fraudulent Emissions Control Systems Defect***

8         260.   While FCA has been fully aware of the fraudulent emissions control systems

9    defect affecting Plaintiffs' vehicles, FCA and its agents actively concealed the existence and

10   nature of the fraudulent emissions control systems defect from Plaintiffs at the time of purchase,

11   repair, and thereafter. Specifically, FCA failed to disclose or actively concealed at and after the

12   time of purchase or repair:

13        a.    any and all known material defects or material nonconformity of the Subject

14              Vehicles, including the fraudulent emissions control systems defect; and

15        b.    The Subject Vehicles contained an illegal emissions control defeat device, were

16              not in good working order as advertised, were defective, and were not fit for the

17              intended purposes.

18        261.   To this day, FCA still has not notified Plaintiffs that their vehicles suffer from a

19   fraudulent emissions control systems defect.

20   ***FCA's Warranties Cover The Fraudulent Emissions Control Systems Defect, But FCA Is***

21                          ***Incapable Of Correcting It***

22        262.   For each Subject Vehicle sold by FCA, including Plaintiffs' vehicles, an express

23   written warranty was issued which covered the vehicle, including but not limited to, the

24   emissions control system.

25        263.   FCA's warranty covers any repairs needed to correct defects in materials or

26   workmanship of covered parts. The basic coverage period lasts 36 months or 36,000 miles,

27   whichever comes first, and the federal emissions warranty coverage potentially lasts up to 96

28   months or 80,000 miles, whichever comes first. The warranty begins on the date the vehicle is

CONSUMER LEGAL REMEDIES, APC
153 1/2 NORTH ARNAZ DRIVE, BEVERLY HILLS, CA 90211

**COMPLAINT FOR DAMAGES**     Exhibit B, Page 151

delivered to the first retail buyer or put into use, whichever is earliest.

264.    As set forth, supra, the Subject Vehicles, including Plaintiffs' vehicles, contained an emission treatment system that was designed to de-activate during real-world driving conditions such that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests.  Therefore, FCA will never be able to conform the Subject Vehicles' emissions systems as advertised to consumers, including Plaintiffs.

265.    FCA also sold or leased Subject Vehicles, including Plaintiffs' vehicles, under an implied warranty of merchantability. FCA's express warranty confirms that FCA offers implied warranties, including the implied warranty of merchantability, for the same duration as the express warranty. FCA impliedly warranted that Subject Vehicles, including Plaintiffs' vehicles, were merchantable in that they were in a non-defective condition for use by their owners or lessees for the ordinary purpose for which they were intended. FCA is under a duty to design, construct, manufacture, inspect, and test Subject Vehicles, including Plaintiffs' vehicles, so as to make them suitable for the ordinary purposes of their use as advertised to consumers, including Plaintiffs.

266.    FCA breached its warranties for Subject Vehicles, including Plaintiffs' vehicles, when it: designed, manufactured, and sold Subject Vehicles with an emission treatment system that was designed to de-activate during real-world driving conditions such that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests.  In breach of FCA's warranties, Subject Vehicles, including Plaintiffs' vehicles, are defective and unfit for the ordinary purposes for which they are intended to be used, and are not merchantable.

### *All Statute Of Limitations Periods Are Tolled By The Discovery Rule And The Doctrine Of Fraudulent Concealment*

267.    FCA misrepresented the qualities of the emission treatment system in Plaintiffs' vehicles at the time of the sale of the vehicles. FCA also concealed the fact that Plaintiffs' vehicles contained an emission treatment system that was designed to de-activate during real-world driving conditions such that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests.

140

**COMPLAINT FOR DAMAGES**

Exhibit B, Page 152

CONSUMER LEGAL REMEDIES, A PC.
15112 SOUTH ARANO DRIVE, BEVERLY HILLS, CA 90211

268.   FCA continued to misrepresent its ability to repair Plaintiffs' vehicles in conformity with the warranty throughout the warranty period.

269.   At all relevant times, FCA was aware of the defects in the Subject Vehicles' emission treatment system.

270.   As described in more detail, *supra*, at no point prior to the sale of Plaintiffs' vehicles or during Plaintiffs' ownership of their vehicles did FCA or an authorized dealer ever inform Plaintiffs of the fact that their vehicles contained an emission treatment system that was designed to de-activate during real-world driving conditions such that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests.

271.   FCA had a duty to disclose the concealed facts alleged above because FCA knew that Plaintiffs did not know a material fact and further knew that such facts were not readily accessible to Plaintiffs because FCA actively concealed those facts.

272.   FCA had a duty to disclose the concealed facts alleged above because FCA made misrepresentations in its marketing materials and window stickers and through its authorized sales representatives about the quality, characteristics, and safety of the Subject Vehicles' emissions treatment system.

273.   FCA had a duty to disclose the concealed facts alleged above because FCA actively concealed material facts in order to induce a false belief.

274.   FCA made such false representations (and continued to do so) regarding the emissions treatment systems in Plaintiffs' vehicles despite its extensive internal knowledge that Plaintiffs' vehicles contained an emission treatment system that was designed to de-activate during real-world driving conditions such that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests.

275.   FCA intended for Plaintiffs to rely on those misrepresentations to conceal the fact that the defective emissions control systems could not be repaired.

276.   Prior to the sale of Plaintiffs' vehicles, and at all times thereafter, FCA therefore failed to disclose to Plaintiffs the existence of the inherent defects in their vehicles, and FCA failed to disclose its inability to repair these inherent defects, which prevented Plaintiffs' vehicles

**COMPLAINT FOR DAMAGES**     Exhibit B, Page 153

CONSUMER LEGAL REMEDIES, APC

from conforming to their applicable warranties. In effect, after the sale of the Subject Vehicles, FCA fraudulently concealed from purchasers and lessees, including Plaintiffs, the fact that the dealers were unable to properly repair the defects to the emissions control systems, and knew that the limited work that FCA had authorized its dealerships to perform on those vehicles would not properly repair them.

277. Because FCA failed to disclose these foregoing facts to Plaintiffs, all statute of limitations periods with respect to the sale of Plaintiffs' vehicles were tolled by the doctrines of fraudulent concealment, the delayed discovery rule, and/or equitable tolling. As alleged herein. FCA wrongfully concealed the fact:

    1) that Plaintiffs' vehicles are equipped with defective emissions control systems, and

    2) that its dealerships were incapable of making inadequate repairs to address the root cause of the emissions control systems defect.

278. Plaintiffs did not discover the operative facts that are the basis of their claims alleged herein because the facts were concealed in confidential and privileged documents, which a consumer would not know about and could not obtain.

279. No amount of diligence by Plaintiffs could have led to the discovery of these facts because they were kept secret by FCA and therefore, Plaintiffs were not at fault for failing to discover these facts.

280. Plaintiffs did not have actual knowledge of facts sufficient to put them on notice. Plaintiffs did not know, or could have known, about FCA's inability to repair the defects in their vehicles because, as alleged above, FCA kept this information highly confidential.

///

///

///

///

///

///

CONSUMER LEGAL REMEDIES, APC
1531/2 NORTH ARNAZ DRIVE BEVERLY HILLS, CA 90211

# FIRST CAUSE OF ACTION
## BY ALL PLAINTIFFS AGAINST FCA
## BREACH OF EXPRESS WARRANTY
### (Cal. Com. Code §§ 2313 and 10210)

281. Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

282. FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

283. With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

284. Plaintiffs' vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8)).

285. Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or 24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

286. FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their vehicles.

287. However, FCA knew or should have known that the warranties were false and/or

CONSUMER LEGAL REMEDIES, APC
15317 2 NORTH ARMANI DRIVE, BEVERLY HILLS, CA 90211

143

misleading. FCA was aware that the emissions systems in the vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

288.    Plaintiffs reasonably relied on FCA's express warranties concerning emissions when purchasing or leasing their vehicles. However, the Plaintiffs' vehicles did not perform as warranted. Unbeknownst to Plaintiffs, their vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. FCA therefore breached its express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

289.    Any opportunity to cure the express breach is unnecessary and futile.

290.    As a direct and proximate result of FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

### SECOND CAUSE OF ACTION

### BY ALL PLAINTIFFS AGAINST FCA

### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

### (Cal. Com. Code §§ 2314 and 10212)

291.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

292.    FCA is and was at all relevant times a "merchant" with respect to motor vehicles under Cal. Com. Code §§ 2104(1) and 10103(c), and a "seller" of motor vehicles under § 2103(1)(d).

293.    With respect to leases, FCA is and was at all relevant times a "lessor" of motor vehicles under Cal. Com. Code § 10103(a)(16).

294.    Plaintiffs' vehicles are and were at all relevant times "goods" within the meaning of Cal. Com. Code §§ 2105(1) and 10103(a)(8).

295.    A warranty that Plaintiffs' vehicles were in merchantable condition and fit for

the ordinary purpose for which vehicles are used is implied by law pursuant to Cal. Com. Code §§ 2314 and 10212.

296.   FCA sold and/or leased vehicles to Plaintiffs that were not in merchantable condition and/or fit for their ordinary purpose in violation of the implied warranty. Plaintiffs' vehicles were not in merchantable condition because their design violated state and federal laws. Plaintiffs' vehicles were not fit for their ordinary purpose as they were built to evade state and federal emission standards.

297.   FCA's breaches of the implied warranty of merchantability caused damage to the Plaintiffs. The amount of damages due will be proven at trial.

### THIRD CAUSE OF ACTION

### BY ALL PLAINTIFFS AGAINST FCA

### VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR

### BREACH OF EXPRESS WARRANTIES

### (Cal. Civ. Code §§ 1791.2 & 1793.2(d))

298.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

299.   Plaintiffs who purchased or leased the vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

300.   Plaintiffs' vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

301.   FCA is a "manufacturer[s]" of Plaintiffs' vehicles within the meaning of Cal. Civ. Code § 1791(j).

302.   Plaintiffs bought or leased new motor vehicles manufactured by FCA.

303.   FCA made express warranties to Plaintiffs within the meaning of Cal. Civ. Code §§ 1791.2 and 1793.2, as described above.

304.   Federal law requires manufacturers of light-duty vehicles to provide two federal emission control warranties: a "Performance Warranty" and a "Design and Defect Warranty." The Performance Warranty applies to repairs that are required during the first two years or

145

CONSUMER LEGAL REMEDIES, APC
15312 NORTH ARROWHEAD DRIVE, BEVERLY HILLS, CA 90211

24,000 miles, whichever occurs first, when a vehicle fails an emissions test. Under this warranty, certain major emission control components are covered for the first eight years or 80,000 miles, whichever comes first. These major emission control components subject to the longer warranty include the catalytic converters, the electronic engine control unit (ECU), and the onboard emissions diagnostic device or computer. The Design and Defect Warranty covers repair of emission control or emission related parts which fail to function or function improperly due to a defect in materials or workmanship. This warranty provides protection for two years or 24,000 miles, whichever comes first, or, for the major emission control components, for eight years or 80,000 miles, whichever comes first.

305.   FCA provided these warranties to Plaintiffs. These warranties formed the basis of the bargain that was reached when Plaintiffs purchased or leased their vehicles.

306.   However, FCA knew or should have known that the warranties were false and/or misleading. FCA was aware that the emissions systems in the vehicles sold and leased to Plaintiffs were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing, and therefore, knew that the emission systems contained defects.

307.   Plaintiffs reasonably relied on FCA's express warranties concerning emissions when purchasing or leasing their vehicles. However, Plaintiffs' vehicles did not perform as warranted. Unbeknownst to Plaintiffs, their vehicles were designed to pollute at higher than legal limits during normal driving, and could not achieve advertised performance and efficiency metrics without this cheating design. This design and the devices that effectuate it are defects. FCA therefore breached its express warranty by providing a product containing defects that were never disclosed to Plaintiffs.

308.   Any opportunity to cure the express breach is unnecessary and futile.

309.   As a direct and proximate result of FCA's breach of express warranties, Plaintiffs suffered significant damages, and seek damages in an amount to be determined at trial.

310.   Pursuant to Cal. Civ. Code §§ 1793.2 and 1794, Plaintiffs seek an order enjoining FCA's unfair and/or deceptive acts or practices, damages, punitive damages, and any other just

CONSUMER LEGAL REMEDIES, APC
15312 NORTH ARMAZ DRIVE, BEVERLY HILLS, CA 90211

146

and proper relief available under the Song-Beverly Consumer Warranty Act.

## FOURTH CAUSE OF ACTION

## BY ALL PLAINTIFFS AGAINST FCA

## VIOLATIONS OF SONG-BEVERLY CONSUMER WARRANTY ACT FOR BREACH

## OF IMPLIED WARRANTY OF MERCHANTABILITY

### (Cal. Civ. Code §§ 1791.1 and 1792)

311.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

312.   Plaintiffs who purchased or leased the vehicles in California are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

313.   Plaintiffs' vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

314.   FCA is a "manufacturer" of Plaintiffs' vehicles within the meaning of Cal. Civ. Code § 1791(j).

315.   FCA impliedly warranted to Plaintiffs that their vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792, however, Plaintiffs' vehicles do not have the quality that a buyer would reasonably expect.

316.   Cal. Civ. Code § 1791.1(a) states: "Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

A.   Pass without objection in the trade under the contract description.

B.   Are fit for the ordinary purposes for which such goods are used.

C.   Are adequately contained, packaged, and labeled.

D.   Conform to the promises or affirmations of fact made on the container or label.

317.   Plaintiffs' vehicles would not pass without objection in the automotive trade because of the defects in the vehicles' "clean" diesel engine system. Because of the defects in Plaintiffs' vehicles' EcoDiesel® engine systems, they are not in merchantable condition and thus not fit for ordinary purposes.

**COMPLAINT FOR DAMAGES**     Exhibit B, Page 159

318.    Plaintiffs' vehicles are not adequately labeled because the labeling fails to disclose the defects in the vehicles' diesel engine system. Plaintiffs' vehicles do not conform to the promises and affirmations made by FCA.

319.    FCA's breach of the implied warranty of merchantability caused damage to Plaintiffs who purchased or leased the defective vehicles. The amount of damages due will be proven at trial.

320.    Pursuant to Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiffs seek an order enjoining FCA's unfair and/or deceptive acts or practices, damages, punitive damages, and any other just and proper relief available under the Song-Beverly Consumer Warranty Act.

## FIFTH CAUSE OF ACTION

## BY ALL PLAINTIFFS AGAINST FCA

## BREACH OF EXPRESS CALIFORNIA EMISSIONS WARRANTIES

### (Cal. Civ. Code § 1793.2, et seq.)

321.    Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

322.    Each of Plaintiff's vehicle is covered by express California Emissions Warranties as a matter of law. See Cal. Health & Safety Code § 43205; Cal. Code Regs. tit. 13, § 2037.

323.    The express California Emissions Warranties generally provide "that the vehicle or engine is...[d]esigned, built, and equipped so as to conform with all applicable regulations adopted by the Air Resources Board." This provision applies without any time or mileage limitation.

324.    The California Emissions Warranties also specifically warrant Plaintiffs against any performance failure of the emissions control system for three years or 50,000 miles, whichever occurs first, and against any defect in any emission-related part for seven years or 70,000 miles, whichever occurs first.

325.    California law imposes express duties "on the manufacturer of consumer goods sold in this state and for which the manufacturer has made an express warranty." Cal. Civ. Code § 1793.2.

148

326.   Among those duties, "[i]f the manufacturer or its representative in this state is unable to service or repair a new motor vehicle...to conform to the applicable express warranties after a reasonable number of attempts, the manufacturer shall either promptly replace the new motor vehicle or promptly make restitution to the buyer" at the vehicle owner's option. See Cal. Civ. Code § 1793.2(d)(2).

327.   Plaintiffs are excused from the requirement to "deliver nonconforming goods to the manufacturer's service and repair facility within this state" because FCA is refusing to accept them and delivery of Plaintiffs' California vehicles "cannot reasonably be accomplished." Cal. Civ. Code § 1793.2(c).

328.   This complaint is written notice of nonconformity to FCA by Plaintiffs and "shall constitute return of the goods." Id.

329.   In addition to all other damages and remedies, Plaintiffs are entitled to "recover a civil penalty of up to two times the amount of damages" for the aforementioned violation. See Cal. Civ. Code § 1794(e)(1). Any "third-party dispute resolution process" offered by FCA does not relieve FCA from the civil penalty imposed because FCA is not offering the process to Plaintiffs for resolution of these California Emissions Warranties issues and the process is not "substantially" compliant. See Cal. Civ. Code 2 § 1794(e)(2); Cal. Civ. Code § 1793.22(d); 16 C.F.R. § 703.2.

### SIXTH CAUSE OF ACTION
### BY ALL PLAINTIFFS AGAINST FCA
#### (Fraud by Omission)

330.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

331.   FCA committed fraud by allowing to be sold to Plaintiffs their vehicles without disclosing that their EcoDiesel® engine emissions systems were designed to deactivate under real-world driving conditions, and to emit oxides of nitrogen within legal limits only when undergoing emissions testing.

332.   In particular, Plaintiffs are informed, believe, and thereon allege that prior to

Plaintiffs acquiring their vehicles, FCA was well aware and knew that the vehicles contained defects in their EcoDiesel® engine systems that were designed to de-activate during real-world driving conditions such that they could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests but failed to disclose this fact to Plaintiffs at the time of sale and thereafter.

333.   Plaintiffs are informed and believe, and based thereon allege, that before Plaintiffs purchased their vehicles, FCA knew that the Subject Vehicles contained undisclosed apparatuses that reduced or disabled the emissions control systems in real-world driving conditions, and they knew that without those undisclosed apparatuses, the Subject Vehicles could not deliver the fuel economy and performance that FCA promised. Defendants concealed this fact from consumers and regulators and, in so doing, cheated Plaintiffs of the vehicles they thought they were buying.

334.   Despite FCA's knowledge of the fraudulent emissions systems defect present in Subject Vehicles, FCA continued to fail to disclose it to new and subsequent purchasers and lessees of Subject Vehicles, including Plaintiffs. Indeed, the very purpose of the "defeat device" that FCA installed in the Subject Vehicles is to conceal the fact that the Subject Vehicles' emissions control systems were being reduced or disabled in real-world driving conditions. As such, FCA intended to prevent reasonable consumers, including Plaintiffs, from discovering the fraudulent emissions control systems installed in the Subject Vehicles.

335.   It therefore goes without saying that FCA has never disclosed the fraudulent emissions control systems defect to Plaintiffs prior to the purchase of their vehicles or at any point during ownership of their vehicles, and FCA has never instructed its dealerships to disclose said defect to drivers or potential purchasers or lessees of Subject Vehicles.

336.   The existence of the fraudulent emissions control systems defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a vehicle. Had Plaintiffs known that their vehicles were equipped with the fraudulent emissions control systems defect and financial liability it creates, they would not have purchased their vehicles. By failing to disclose the fraudulent emissions control systems defect, FCA denied

CONSUMER LEGAL REMEDIES, APC
15317/25 NORTH MOSAIC DRIVE, BEVERLY HILLS, CA 90211

Plaintiffs information that was material to their decision to purchase/lease their vehicles and material to their willingness to use their vehicles.

337. FCA was under a duty to Plaintiffs to disclose the defective nature of their vehicles and their EcoDiesel® engine system because:

    a. FCA was in a superior position to know the true state of facts about the material defects contained in Plaintiffs' vehicles;

    b. FCA knew at all times relevant that Plaintiffs' vehiclescontained an emission treatment system that was designed to de-activate during real-world driving conditions such that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests;

    c. FCA actively concealed the defective nature of Plaintiffs' vehicles and their EcoDiesel® engine systems from Plaintiffs; and

    d. Plaintiffs could not reasonably have been expected to learn or discover the defects in their vehicles' EcoDiesel® engine systems and its potential consequences until well after Plaintiffs purchased their vehicles.

338. In failing to disclose the defects in the Subject Vehicles' EcoDiesel® engine systems to Plaintiffs, FCA has knowingly and intentionally concealed material facts and breached its duty not to do so.

339. The facts concealed or not disclosed by FCA to Plaintiffs are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Plaintiffs' vehicles. Had Plaintiffs known that their vehicles and their EcoDiesel® engine systems were defective at the time of sale, they would not have purchased their vehicles.

340. Plaintiffs are reasonable consumers who do not expect their vehicles to contain an emission treatment system that was designed to de-activate during real-world driving conditions such that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs further expect and assume that FCA will not sell or lease vehicles with known material defects, including but not limited to those

151

involving the vehicle's emissions systems, and will disclose any such defect to its consumers before selling such vehicles.

341.   As a result of FCA's misconduct, each Plaintiff to this Complaint has suffered and will continue to suffer actual damages.

## SEVENTH CAUSE OF ACTION

## BY ALL PLAINTIFFS AGAINST FCA

### (Violation of California's Business & Professions Code § 17000, *et seq.*)

342.   Plaintiffs incorporate herein by reference each and every allegation contained in the preceding and succeeding paragraphs as though herein fully restated and re-alleged.

343.   California Business & Professions Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising."

344.   Reasonable consumers, such as Plaintiffs, do not expect their vehicles to contain an emission treatment system that was designed to de-activate during real-world driving conditions such that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs further expect and assume that FCA will not sell or lease vehicles with known material defects, including but not limited to those involving the vehicle's emissions systems, and will disclose any such defect to its consumers before selling such vehicles.

345.   FCA knew Plaintiffs' vehicles and their EcoDiesel® engine systems suffered from inherent defects, were defectively or deceptively designed or manufactured, and were not suitable for their intended use.

346.   In failing to disclose to Plaintiffs the defects in the Subject Vehicles' EcoDiesel® engine systems, FCA knowingly and intentionally concealed material facts and breached its duty to Plaintiffs not to do so.

347.   By its conduct, FCA has engaged in unfair competition and unlawful, unfair, and fraudulent business practices.

348.   FCA was under a duty to Plaintiffs to disclose the defective nature of their

**COMPLAINT FOR DAMAGES**        Exhibit B, Page 164

CONSUMER LEGAL REMEDIES, APC
15315 2 NINTH AVENUE DRIVE BEVERLY HILLS, CA 90211

vehicles and their EcoDiesel® engine system because:

   a. FCA was in a superior position to know the true state of facts about the material defects contained in Plaintiffs' vehicles;

   b. FCA knew at all times relevant that Plaintiffs' vehicles contained an emission treatment system that was designed to de-activate during real-world driving conditions such that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests;

   c. FCA actively concealed the defective nature of Plaintiffs' vehicles and their EcoDiesel® engine systems from Plaintiffs; and

   d. Plaintiffs could not reasonably have been expected to learn or discover the defects in their vehicles' EcoDiesel® engine systems and its potential consequences until well after Plaintiffs purchased their vehicles.

349.    The facts concealed or not disclosed by FCA to Plaintiffs are material in that a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Plaintiffs' vehicles. Had Plaintiffs known that their vehicles and their EcoDiesel® engine systems were defective at the time of sale, they would not have purchased their vehicles or would have paid substantially less for them.

350.    Plaintiffs are reasonable consumers who do not expect their vehicles to contain an emission treatment system that was designed to de-activate during real-world driving conditions such that it could not achieve the advertised towing power, performance, and/or fuel economy without cheating emission tests. Plaintiffs further expect and assume that FCA will not sell or lease vehicles with known material defects, including but not limited to those involving the vehicle's emissions systems, and will disclose any such defect to its consumers before selling such vehicles.

351.    Even to this day, FCA continues to conceal the defective nature of Plaintiffs' vehicles and their EcoDiesel® engine systems.

352.    FCA's conduct was and is likely to deceive consumers, including Plaintiffs. FCA's unfair and/or deceptive acts or practices occurred repeatedly in FCA's trade or business,

CONSUMER LEGAL REMEDIES, APC
15312 NORTH ARASACZ DRIVE, BEVERLY HILLS, CA 90211

and were capable of deceiving a substantial portion of the purchasing public, including Plaintiffs.

353.   FCA's acts, conduct and practices were unlawful, in that they constituted:

a.   Violations of the California Consumer Legal Remedies Act;

b.   Violations of the Song-Beverly Consumer Warranty Act; and

c.   Violations of the express warranty provisions of California Commercial Code section 2313.

354.   As a result of their reliance on FCA's omissions and/or misrepresentations, Plaintiffs suffered an ascertainable loss of money, property, and/or value of their vehicles. Additionally, as a result of the defects in the Subject Vehicles' EcoDiesel® engine systems, each Plaintiff to this Complaint has suffered and will continue to suffer actual damages.

355.   As a direct and proximate result of FCA's unfair and deceptive practices, Plaintiffs have suffered and will continue to suffer actual damages.

356.   FCA has been unjustly enriched and should be required to make restitution to each Plaintiff to this Complaint pursuant to §§ 17203 and 17204 of the Business & Professions Code.

357.   Each Plaintiff to this Complaint seeks all remedies available pursuant to §17070, *et seq.* of the Business & Professions Code, including full compensatory damages allowable by law, attorneys' fees, costs, the repair or replacement of his or her vehicle, the refund of monies paid in connection with the purchase/lease of his or her vehicle, appropriate equitable relief including injunctive relief, a declaratory judgment, a court order enjoining FCA's wrongful acts and practices, and any other relief to which each Plaintiff may be entitled.

## PRAYER

WHEREFORE, each Plaintiff to this Complaint prays for judgment against Defendant, and each of them, as follows:

a.   For each Plaintiff's actual damages in an amount according to proof;

b.   For restitution;

c.   For a civil penalty in the amount of two times each Plaintiff's actual damages

CONSUMER LEGAL REMEDIES, APC
15312 NORTH ARAGO DRIVE, BEVERLY HILLS, CA 90211

pursuant to Civil Code section 1794, subdivision (c) or (e);

d.      For any consequential and incidental damages;

e.      For costs of the suit and each Plaintiff's reasonable attorneys' fees pursuant to Civil Code section 1794, subdivision (d);

f.      For costs of the suit and each Plaintiff's reasonable attorneys' fees pursuant to §17070, *et seq.* of the Business & Professions Code;

g.      For any remedies pursuant to the Song-Beverly Act, the California Uniform Commercial Code and/or any other remedy that the Court deems proper;

h.      For prejudgment interest at the legal rate;

i.      For punitive damages; and,

j.      For such other relief as the Court may deem proper.

### DEMAND FOR INDIVIDUAL JURY TRIALS

Each Plaintiff to this Complaint hereby demands that his or her individual causes of action asserted herein be tried **individually** before a jury, and **does not** seek to collectively "join" any of his or her claims with any other Plaintiff for the purposes of conducting a "joint trial."

Dated: May 2, 2019          CONSUMER LEGAL REMEDIES, APC

BY:      _____
          MICHAEL D. RESNICK
          Attorneys for Plaintiffs

CONSUMER LEGAL REMEDIES, APC
15312 NORTH AMSDALE DRIVE, BEVERLY HILLS, CA 90211

**COMPLAINT FOR DAMAGES**      Exhibit B, Page 167

Electronically FILED by Superior Court of California, County of Los Angeles on 05/03/2019 01:38 PM Sherri R. Carter, Executive Officer/Clerk of Court, by R. Perez,Deputy Clerk

**CM-010**

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address):* | FOR COURT USE ONLY |
|---|---|
| Michael Resnick (SBN 245215) & Neil Gieleghem (SBN 107389)<br>Consumer Legal Remedies, APC<br>153 1/2 North Arnaz Drive<br>Beverly Hills, California 90211 | |

TELEPHONE NO.: (833) 429-9222   FAX NO.: (213) 210-2196
ATTORNEY FOR *(Name):* Plaintiffs Aaron Iskenderian, et al.

SUPERIOR COURT OF CALIFORNIA, COUNTY OF Los Angeles
STREET ADDRESS: 111 North Hill Street
MAILING ADDRESS:
CITY AND ZIP CODE: Los Angeles, 90012
BRANCH NAME: Stanley Mosk Courthouse

CASE NAME:
AARON ISKENDERIAN, et al. v. FCA US LLC

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☑ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000 or less) | ☐ Counter   ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | 19STCV15506 |
| | | | | JUDGE: |
| | | | | DEPT: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check one box below for the case type that best describes this case:

**Auto Tort**
- ☐ Auto (22)
- ☐ Uninsured motorist (46)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- ☐ Asbestos (04)
- ☐ Product liability (24)
- ☐ Medical malpractice (45)
- ☐ Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- ☐ Business tort/unfair business practice (07)
- ☐ Civil rights (08)
- ☐ Defamation (13)
- ☐ Fraud (16)
- ☐ Intellectual property (19)
- ☐ Professional negligence (25)
- ☐ Other non-PI/PD/WD tort (35)

**Employment**
- ☐ Wrongful termination (36)
- ☐ Other employment (15)

**Contract**
- ☑ Breach of contract/warranty (06)
- ☐ Rule 3.740 collections (09)
- ☐ Other collections (09)
- ☐ Insurance coverage (18)
- ☐ Other contract (37)

**Real Property**
- ☐ Eminent domain/Inverse condemnation (14)
- ☐ Wrongful eviction (33)
- ☐ Other real property (26)

**Unlawful Detainer**
- ☐ Commercial (31)
- ☐ Residential (32)
- ☐ Drugs (38)

**Judicial Review**
- ☐ Asset forfeiture (05)
- ☐ Petition re: arbitration award (11)
- ☐ Writ of mandate (02)
- ☐ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- ☐ Antitrust/Trade regulation (03)
- ☐ Construction defect (10)
- ☐ Mass tort (40)
- ☐ Securities litigation (28)
- ☐ Environmental/Toxic tort (30)
- ☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- ☐ Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- ☐ RICO (27)
- ☐ Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- ☐ Partnership and corporate governance (21)
- ☐ Other petition *(not specified above)* (43)

2. This case ☐ is   ☑ is not   complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):* a. ☑ monetary   b. ☐ nonmonetary; declaratory or injunctive relief   c. ☑ punitive
4. Number of causes of action *(specify):* Seven (7)
5. This case ☐ is   ☑ is not   a class action suit.
6. If there are any known related cases, file and serve a notice of related cases. *(You may use form CM-015.)*

Date: May 2, 2019
Michael D. Resnick
_____ ▸ _____
(TYPE OR PRINT NAME)                          (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

Form Adopted for Mandatory Use
Judicial Council of California
CM-010 [Rev. July 1, 2007]

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courtinfo.ca.gov

Exhibit B, Page 56

**CM-010**

## INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the *Civil Case Cover Sheet* contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check one box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the *Civil Case Cover Sheet* to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

### CASE TYPES AND EXAMPLES

**Auto Tort**
Auto (22)–Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice– Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

**CIVIL CASE COVER SHEET**

Exhibit B, Page 169

| SHORT TITLE: | CASE NUMBER |
|---|---|
| AARON ISKENDERIAN, et al. v. FCA US LLC | |

## CIVIL CASE COVER SHEET ADDENDUM AND
## STATEMENT OF LOCATION
## (CERTIFICATE OF GROUNDS FOR ASSIGNMENT TO COURTHOUSE LOCATION)

This form is required pursuant to Local Rule 2.3 in all new civil case filings in the Los Angeles Superior Court.

**Step 1:** After completing the Civil Case Cover Sheet (Judicial Council form CM-010), find the exact case type in Column A that corresponds to the case type indicated in the Civil Case Cover Sheet.

**Step 2:** In Column B, check the box for the type of action that best describes the nature of the case.

**Step 3:** In Column C, circle the number which explains the reason for the court filing location you have chosen.

### Applicable Reasons for Choosing Court Filing Location (Column C)

1. Class actions must be filed in the Stanley Mosk Courthouse, Central District.
2. Permissive filing in central district.
3. Location where cause of action arose.
4. Mandatory personal injury filing in North District.
5. Location where performance required or defendant resides.
6. Location of property or permanently garaged vehicle.
7. Location where petitioner resides.
8. Location wherein defendant/respondent functions wholly.
9. Location where one or more of the parties reside.
10. Location of Labor Commissioner Office.
11. Mandatory filing location (Hub Cases – unlawful detainer, limited non-collection, limited collection, or personal injury).

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C<br>Applicable Reasons –<br>See Step 3 Above |
|---|---|---|---|
| **Auto Tort** | Auto (22) | ☐ A7100  Motor Vehicle - Personal Injury/Property Damage/Wrongful Death | 1, 4, 11 |
| | Uninsured Motorist (46) | ☐ A7110  Personal Injury/Property Damage/Wrongful Death – Uninsured Motorist | 1, 4, 11 |
| **Other Personal Injury/Property Damage/Wrongful Death Tort** | Asbestos (04) | ☐ A6070  Asbestos Property Damage<br>☐ A7221  Asbestos - Personal Injury/Wrongful Death | 1, 11<br>1, 11 |
| | Product Liability (24) | ☐ A7260  Product Liability (not asbestos or toxic/environmental) | 1, 4, 11 |
| | Medical Malpractice (45) | ☐ A7210  Medical Malpractice - Physicians & Surgeons<br>☐ A7240  Other Professional Health Care Malpractice | 1, 4, 11<br>1, 4, 11 |
| | Other Personal Injury Property Damage Wrongful Death (23) | ☐ A7250  Premises Liability (e.g., slip and fall)<br>☐ A7230  Intentional Bodily Injury/Property Damage/Wrongful Death (e.g., assault, vandalism, etc.)<br>☐ A7270  Intentional Infliction of Emotional Distress<br>☐ A7220  Other Personal Injury/Property Damage/Wrongful Death | 1, 4, 11<br>1, 4, 11<br>1, 4, 11<br>1, 4, 11 |

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Exhibit B, Page 170

| SHORT TITLE: | CASE NUMBER |
|---|---|
| AARON ISKENDERIAN, et al. v. FCA US LLC | |

| | A Civil Case Cover Sheet Category No. | B Type of Action (Check only one) | C Applicable Reasons - See Step 3 Above |
|---|---|---|---|
| **Non-Personal Injury/ Property Damage/ Wrongful Death Tort** | Business Tort (07) | ☐ A6029  Other Commercial/Business Tort (not fraud/breach of contract) | 1, 2, 3 |
| | Civil Rights (08) | ☐ A6005  Civil Rights/Discrimination | 1, 2, 3 |
| | Defamation (13) | ☐ A6010  Defamation (slander/libel) | 1, 2, 3 |
| | Fraud (16) | ☑ A6013  Fraud (no contract) | 1, 2, 3 |
| | Professional Negligence (25) | ☐ A6017  Legal Malpractice | 1, 2, 3 |
| | | ☐ A6050  Other Professional Malpractice (not medical or legal) | 1, 2, 3 |
| | Other (35) | ☐ A6025  Other Non-Personal Injury/Property Damage tort | 1, 2, 3 |
| **Employment** | Wrongful Termination (36) | ☐ A6037  Wrongful Termination | 1, 2, 3 |
| | Other Employment (15) | ☐ A6024  Other Employment Complaint Case | 1, 2, 3 |
| | | ☐ A6109  Labor Commissioner Appeals | 10 |
| **Contract** | Breach of Contract/ Warranty (06) (not insurance) | ☐ A6004  Breach of Rental/Lease Contract (not unlawful detainer or wrongful eviction) | 2, 5 |
| | | ☐ A6008  Contract/Warranty Breach -Seller Plaintiff (no fraud/negligence) | 2, 5 |
| | | ☐ A6019  Negligent Breach of Contract/Warranty (no fraud) | 1, 2, 5 |
| | | ☑ A6028  Other Breach of Contract/Warranty (not fraud or negligence) | 1, 2, 5 |
| | Collections (09) | ☐ A6002  Collections Case-Seller Plaintiff | 5, 6, 11 |
| | | ☐ A6012  Other Promissory Note/Collections Case | 5, 11 |
| | | ☐ A6034  Collections Case-Purchased Debt (Charged Off Consumer Debt Purchased on or after January 1, 2014) | 5, 6, 11 |
| | Insurance Coverage (18) | ☐ A6015  Insurance Coverage (not complex) | 1, 2, 5, 8 |
| | Other Contract (37) | ☐ A6009  Contractual Fraud | 1, 2, 3, 5 |
| | | ☐ A6031  Tortious Interference | 1, 2, 3, 5 |
| | | ☐ A6027  Other Contract Dispute(not breach/insurance/fraud/negligence) | 1, 2, 3, 8, 9 |
| **Real Property** | Eminent Domain/Inverse Condemnation (14) | ☐ A7300  Eminent Domain/Condemnation     Number of parcels_____ | 2, 6 |
| | Wrongful Eviction (33) | ☐ A6023  Wrongful Eviction Case | 2, 6 |
| | Other Real Property (26) | ☐ A6018  Mortgage Foreclosure | 2, 6 |
| | | ☐ A6032  Quiet Title | 2, 6 |
| | | ☐ A6060  Other Real Property (not eminent domain, landlord/tenant, foreclosure) | 2, 6 |
| **Unlawful Detainer** | Unlawful Detainer-Commercial (31) | ☐ A6021  Unlawful Detainer-Commercial (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Residential (32) | ☐ A6020  Unlawful Detainer-Residential (not drugs or wrongful eviction) | 6, 11 |
| | Unlawful Detainer-Post-Foreclosure (34) | ☐ A6020F Unlawful Detainer-Post-Foreclosure | 2, 6, 11 |
| | Unlawful Detainer-Drugs (38) | ☐ A6022  Unlawful Detainer-Drugs | 2, 6, 11 |

LACIV 109 (Rev 2/16)                    **CIVIL CASE COVER SHEET ADDENDUM**                    Local Rule 2.3
LASC Approved 03-04                    **AND STATEMENT OF LOCATION**                    Page 2 of 4

Exhibit B, Page 171

| SHORT-TITLE:<br>AARON ISKENDERIAN, et al. v. FCA US LLC | CASE NUMBER |
|---|---|

| | A<br>Civil Case Cover Sheet<br>Category No. | B<br>Type of Action<br>(Check only one) | C Applicable<br>Reasons - See Step 3<br>Above |
|---|---|---|---|
| **Judicial Review** | Asset Forfeiture (05) | ☐ A6108  Asset Forfeiture Case | 2, 3, 6 |
| | Petition re Arbitration (11) | ☐ A6115  Petition to Compel/Confirm/Vacate Arbitration | 2, 5 |
| | Writ of Mandate (02) | ☐ A6151  Writ - Administrative Mandamus | 2, 8 |
| | | ☐ A6152  Writ - Mandamus on Limited Court Case Matter | 2 |
| | | ☐ A6153  Writ - Other Limited Court Case Review | 2 |
| | Other Judicial Review (39) | ☐ A6150  Other Writ /Judicial Review | 2, 8 |
| **Provisionally Complex Litigation** | Antitrust/Trade Regulation (03) | ☐ A6003  Antitrust/Trade Regulation | 1, 2, 8 |
| | Construction Defect (10) | ☐ A6007  Construction Defect | 1, 2, 3 |
| | Claims Involving Mass Tort (40) | ☐ A6006  Claims Involving Mass Tort | 1, 2, 8 |
| | Securities Litigation (28) | ☐ A6035  Securities Litigation Case | 1, 2, 8 |
| | Toxic Tort<br>Environmental (30) | ☐ A6036  Toxic Tort/Environmental | 1, 2, 3, 8 |
| | Insurance Coverage Claims<br>from Complex Case (41) | ☐ A6014  Insurance Coverage/Subrogation (complex case only) | 1, 2, 5, 8 |
| **Enforcement of Judgment** | Enforcement<br>of Judgment (20) | ☐ A6141  Sister State Judgment | 2, 5, 11 |
| | | ☐ A6160  Abstract of Judgment | 2, 6 |
| | | ☐ A6107  Confession of Judgment (non-domestic relations) | 2, 9 |
| | | ☐ A6140  Administrative Agency Award (not unpaid taxes) | 2, 8 |
| | | ☐ A6114  Petition/Certificate for Entry of Judgment on Unpaid Tax | 2, 8 |
| | | ☐ A6112  Other Enforcement of Judgment Case | 2, 8, 9 |
| **Miscellaneous Civil Complaints** | RICO (27) | ☐ A6033  Racketeering (RICO) Case | 1, 2, 8 |
| | Other Complaints<br>(Not Specified Above) (42) | ☐ A6030  Declaratory Relief Only | 1, 2, 8 |
| | | ☐ A6040  Injunctive Relief Only (not domestic/harassment) | 2, 8 |
| | | ☐ A6011  Other Commercial Complaint Case (non-tort/non-complex) | 1, 2, 8 |
| | | ☐ A6000  Other Civil Complaint (non-tort/non-complex) | 1, 2, 8 |
| **Miscellaneous Civil Petitions** | Partnership Corporation<br>Governance (21) | ☐ A6113  Partnership and Corporate Governance Case | 2, 8 |
| | Other Petitions (Not<br>Specified Above) (43) | ☐ A6121  Civil Harassment | 2, 3, 9 |
| | | ☐ A6123  Workplace Harassment | 2, 3, 9 |
| | | ☐ A6124  Elder/Dependent Adult Abuse Case | 2, 3, 9 |
| | | ☐ A6190  Election Contest | 2 |
| | | ☐ A6110  Petition for Change of Name/Change of Gender | 2, 7 |
| | | ☐ A6170  Petition for Relief from Late Claim Law | 2, 3, 8 |
| | | ☐ A6100  Other Civil Petition | 2, 9 |

LACIV 109 (Rev 2/16)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 3 of 4

Exhibit B, Page 172

| SHORT TITLE:                                    | CASE NUMBER |
| AARON ISKENDERIAN, et al. v. FCA US LLC         |             |

**Step 4: Statement of Reason and Address:** Check the appropriate boxes for the numbers shown under Column C for the type of action that you have selected. Enter the address which is the basis for the filing location, including zip code. (No address required for class action cases).

| REASON:                                                            | ADDRESS:                   |
|--------------------------------------------------------------------|----------------------------|
| ☐ 1. ☑ 2. ☑ 3. ☐ 4. ☐ 5. ☐ 6. ☐ 7.  ☐ 8. ☐  9. ☐ 10. ☐ 11.        | 1125 South Bronson Avenue  |

| CITY:        | STATE: | ZIP CODE: |
|--------------|--------|-----------|
| Los Angeles  | CA     | 90019     |

**Step 5: Certification of Assignment:** I certify that this case is properly filed in the ___Central___ District of the Superior Court of California, County of Los Angeles [Code Civ. Proc., §392 et seq., and Local Rule 2.3(a)(1)(E)].

Dated: ___May 2, 2019___

_____
(SIGNATURE OF ATTORNEY/FILING PARTY)

**PLEASE HAVE THE FOLLOWING ITEMS COMPLETED AND READY TO BE FILED IN ORDER TO PROPERLY COMMENCE YOUR NEW COURT CASE:**

1. Original Complaint or Petition.

2. If filing a Complaint, a completed Summons form for issuance by the Clerk.

3. Civil Case Cover Sheet, Judicial Council form CM-010.

4. Civil Case Cover Sheet Addendum and Statement of Location form, LACIV 109, LASC Approved 03-04 (Rev. 02/16).

5. Payment in full of the filing fee, unless there is court order for waiver, partial or scheduled payments.

6. A signed order appointing the Guardian ad Litem, Judicial Council form CIV-010, if the plaintiff or petitioner is a minor under 18 years of age will be required by Court in order to issue a summons.

7. Additional copies of documents to be conformed by the Clerk. Copies of the cover sheet and this addendum must be served along with the summons and complaint, or other initiating pleading in the case.

LACIV 109 (Rev 2/16)
LASC Approved 03-04

**CIVIL CASE COVER SHEET ADDENDUM
AND STATEMENT OF LOCATION**

Local Rule 2.3
Page 4 of 4

Exhibit B, Page 173

## VOLUNTARY EFFICIENT LITIGATION STIPULATIONS



**Superior Court of California
County of Los Angeles**



**Los Angeles County
Bar Association
Litigation Section**

**Los Angeles County
Bar Association Labor and
Employment Law Section**



**Consumer Attorneys
Association of Los Angeles**



**Southern California
Defense Counsel**



**Association of
Business Trial Lawyers**

**California Employment
Lawyers Association**

LACIV 230 (NEW)
LASC Approved 4-11
For Optional Use

The Early Organizational Meeting Stipulation, Discovery Resolution Stipulation, and Motions in Limine Stipulation are voluntary stipulations entered into by the parties.  The parties may enter into one, two, or all three of the stipulations; however, they may not alter the stipulations as written, because the Court wants to ensure uniformity of application.  These stipulations are meant to encourage cooperation between the parties and to assist in resolving issues in a manner that promotes economic case resolution and judicial efficiency.

*The following organizations endorse the goal of promoting efficiency in litigation and ask that counsel consider using these stipulations as a voluntary way to promote communications and procedures among counsel and with the court to fairly resolve issues in their cases.*

◆Los Angeles County Bar Association Litigation Section◆

◆ Los Angeles County Bar Association
Labor and Employment Law Section◆

◆Consumer Attorneys Association of Los Angeles◆

◆Southern California Defense Counsel◆

◆Association of Business Trial Lawyers◆

◆California Employment Lawyers Association◆

Exhibit B, Page 174

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY: | | STATE BAR NUMBER: | | Reserved for Clerk's File Stamp |
|---|---|---|---|---|
| TELEPHONE NO.: FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | | | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – DISCOVERY RESOLUTION | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide a fast and informal resolution of discovery issues through limited paperwork and an informal conference with the Court to aid in the resolution of the issues.**

**The parties agree that:**

1. Prior to the discovery cut-off in this action, no discovery motion shall be filed or heard unless the moving party first makes a written request for an Informal Discovery Conference pursuant to the terms of this stipulation.

2. At the Informal Discovery Conference the Court will consider the dispute presented by parties and determine whether it can be resolved informally. Nothing set forth herein will preclude a party from making a record at the conclusion of an Informal Discovery Conference, either orally or in writing.

3. Following a reasonable and good faith attempt at an informal resolution of each issue to be presented, a party may request an Informal Discovery Conference pursuant to the following procedures:

    a. The party requesting the Informal Discovery Conference will:

        i. File a Request for Informal Discovery Conference with the clerk's office on the approved form (copy attached) and deliver a courtesy, conformed copy to the assigned department;

        ii. Include a brief summary of the dispute and specify the relief requested; and

        iii. Serve the opposing party pursuant to any authorized or agreed method of service that ensures that the opposing party receives the Request for Informal Discovery Conference no later than the next court day following the filing.

    b. Any Answer to a Request for Informal Discovery Conference must:

        i. Also be filed on the approved form (copy attached);

        ii. Include a brief summary of why the requested relief should be denied;

| SHORT TITLE | CASE NUMBER |
|---|---|
| | |

    iii.   Be filed within two (2) court days of receipt of the Request; and

    iv.   Be served on the opposing party pursuant to any authorized or agreed upon method of service that ensures that the opposing party receives the Answer no later than the next court day following the filing.

  c.  No other pleadings, including but not limited to exhibits, declarations, or attachments, will be accepted.

  d.  If the Court has not granted or denied the Request for Informal Discovery Conference within ten (10) days following the filing of the Request, then it shall be deemed to have been denied. If the Court acts on the Request, the parties will be notified whether the Request for Informal Discovery Conference has been granted or denied and, if granted, the date and time of the Informal Discovery Conference, which must be within twenty (20) days of the filing of the Request for Informal Discovery Conference.

  e.  If the conference is not held within twenty (20) days of the filing of the Request for Informal Discovery Conference, unless extended by agreement of the parties and the Court, then the Request for the Informal Discovery Conference shall be deemed to have been denied at that time.

4.  If (a) the Court has denied a conference or (b) one of the time deadlines above has expired without the Court having acted or (c) the Informal Discovery Conference is concluded without resolving the dispute, then a party may file a discovery motion to address unresolved issues.

5.  The parties hereby further agree that the time for making a motion to compel or other discovery motion is tolled from the date of filing of the Request for Informal Discovery Conference until (a) the request is denied or deemed denied or (b) twenty (20) days after the filing of the Request for Informal Discovery Conference, whichever is earlier, unless extended by Order of the Court.

It is the understanding and intent of the parties that this stipulation shall, for each discovery dispute to which it applies, constitute a writing memorializing a "specific later date to which the propounding [or demanding or requesting] party and the responding party have agreed in writing," within the meaning of Code Civil Procedure sections 2030.300(c), 2031.320(c), and 2033.290(c).

6.  Nothing herein will preclude any party from applying *ex parte* for appropriate relief, including an order shortening time for a motion to be heard concerning discovery.

7.  Any party may terminate this stipulation by giving twenty-one (21) days notice of intent to terminate the stipulation.

8.  References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day.

| SHORT TITLE | CASE NUMBER |
|---|---|
| | |

**The following parties stipulate:**

Date: _____

_____          ➤ _____
            (TYPE OR PRINT NAME)                              (ATTORNEY FOR PLAINTIFF)

Date: _____

_____          ➤ _____
            (TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)

Date: _____

_____          ➤ _____
            (TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)

Date: _____

_____          ➤ _____
            (TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)

Date: _____

_____          ➤ (ATTORNEY FOR _____ )
            (TYPE OR PRINT NAME)

Date: _____

_____          ➤ (ATTORNEY FOR _____ )
            (TYPE OR PRINT NAME)

Date: _____

_____          ➤ (ATTORNEY FOR _____ )
            (TYPE OR PRINT NAME)

Exhibit B, Page 177

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:      FAX NO. (Optional): <br> E-MAIL ADDRESS (Optional): <br> ATTORNEY FOR (Name): | | |

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| STIPULATION – EARLY ORGANIZATIONAL MEETING | CASE NUMBER: |
|---|---|

**This stipulation is intended to encourage cooperation among the parties at an early stage in the litigation and to assist the parties in efficient case resolution.**

**The parties agree that:**

1.  The parties commit to conduct an initial conference (in-person or via teleconference or via videoconference) within 15 days from the date this stipulation is signed, *to discuss and consider whether there can be agreement on the following:*

    a.  Are motions to challenge the pleadings necessary? If the issue can be resolved by amendment as of right, or if the Court would allow leave to amend, could an amended complaint resolve most or all of the issues a demurrer might otherwise raise? If so, the parties agree to work through pleading issues so that a demurrer need only raise issues they cannot resolve. Is the issue that the defendant seeks to raise amenable to resolution on demurrer, or would some other type of motion be preferable? Could a voluntary targeted exchange of documents or information by any party cure an uncertainty in the pleadings?

    b.  Initial mutual exchanges of documents at the "core" of the litigation. (For example, in an employment case, the employment records, personnel file and documents relating to the conduct in question could be considered "core." In a personal injury case, an incident or police report, medical records, and repair or maintenance records could be considered "core.");

    c.  Exchange of names and contact information of witnesses;

    d.  Any insurance agreement that may be available to satisfy part or all of a judgment, or to indemnify or reimburse for payments made to satisfy a judgment;

    e.  Exchange of any other information that might be helpful to facilitate understanding, handling, or resolution of the case in a manner that preserves objections or privileges by agreement;

    f.  Controlling issues of law that, if resolved early, will promote efficiency and economy in other phases of the case. Also, when and how such issues can be presented to the Court;

    g.  Whether or when the case should be scheduled with a settlement officer, what discovery or court ruling on legal issues is reasonably required to make settlement discussions meaningful, and whether the parties wish to use a sitting judge or a private mediator or other options as

| SHORT TITLE | CASE NUMBER |
|---|---|
| | |

discussed In the "Alternative Dispute Resolution (ADR) Information Package" served with the complaint;

h. Computation of damages, including documents, not privileged or protected from disclosure, on which such computation is based;

i. Whether the case is suitable for the Expedited Jury Trial procedures (see information at *www.lacourt.org* under "*Civil*" and then under "*General Information*").

2. The time for a defending party to respond to a complaint or cross-complaint will be extended to _____ for the complaint, and _____ for the cross-
     (INSERT DATE)                                     (INSERT DATE)
complaint, which is comprised of the 30 days to respond under Government Code § 68616(b), and the 30 days permitted by Code of Civil Procedure section 1054(a), good cause having been found by the Civil Supervising Judge due to the case management benefits provided by this Stipulation. A copy of the General Order can be found at *www.lacourt.org* under "*Civil*", click on "*General Information*", then click on "*Voluntary Efficient Litigation Stipulations*".

3. The parties will prepare a joint report titled "Joint Status Report Pursuant to Initial Conference and Early Organizational Meeting Stipulation, and if desired, a proposed order summarizing results of their meet and confer and advising the Court of any way it may assist the parties' efficient conduct or resolution of the case. The parties shall attach the Joint Status Report to the Case Management Conference statement, and file the documents when the CMC statement is due.

4. References to "days" mean calendar days, unless otherwise noted. If the date for performing any act pursuant to this stipulation falls on a Saturday, Sunday or Court holiday, then the time for performing that act shall be extended to the next Court day

The following parties stipulate:

Date:

_____                    ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR PLAINTIFF)
Date:

_____                    ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)
Date:

_____                    ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)
Date:

_____                    ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR DEFENDANT)
Date:

_____                    ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)
Date:

_____                    ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)
Date:

_____                    ➤ _____
(TYPE OR PRINT NAME)                              (ATTORNEY FOR _____)

LACIV 229 (Rev 02/15)
LASC Approved 04/11          **STIPULATION – EARLY ORGANIZATIONAL MEETING**          Page 2 of 2

Exhibit B, Page 179

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| | | |

TELEPHONE NO.:                          FAX NO. (Optional):
E-MAIL ADDRESS (Optional):
ATTORNEY FOR (Name):

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **INFORMAL DISCOVERY CONFERENCE**<br>(pursuant to the Discovery Resolution Stipulation of the parties) | CASE NUMBER: |
|---|---|

1. This document relates to:
   ☐   Request for Informal Discovery Conference
   ☐   Answer to Request for Informal Discovery Conference

2. Deadline for Court to decide on Request: _____ (insert date 10 calendar days following filing of the Request).

3. Deadline for Court to hold Informal Discovery Conference: _____ (insert date 20 calendar days following filing of the Request).

4. For a Request for Informal Discovery Conference, **briefly** describe the nature of the discovery dispute, including the facts and legal arguments at issue.  For an Answer to Request for Informal Discovery Conference, **briefly** describe why the Court should deny the requested discovery, including the facts and legal arguments at issue.

LACIV 094 (new)
LASC Approved 04/11
For Optional Use

**INFORMAL DISCOVERY CONFERENCE**
(pursuant to the Discovery Resolution Stipulation of the parties)

Exhibit B, Page 180

| NAME AND ADDRESS OF ATTORNEY OR PARTY WITHOUT ATTORNEY | STATE BAR NUMBER | Reserved for Clerk's File Stamp |
|---|---|---|
| TELEPHONE NO.:           FAX NO. (Optional): E-MAIL ADDRESS (Optional): ATTORNEY FOR (Name): | | |

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

COURTHOUSE ADDRESS:

PLAINTIFF:

DEFENDANT:

| **STIPULATION AND ORDER – MOTIONS IN LIMINE** | CASE NUMBER: |
|---|---|

**This stipulation is intended to provide fast and informal resolution of evidentiary issues through diligent efforts to define and discuss such issues and limit paperwork.**

**The parties agree that:**

1. At least _____ days before the final status conference, each party will provide all other parties with a list containing a one paragraph explanation of each proposed motion in limine. Each one paragraph explanation must identify the substance of a single proposed motion in limine and the grounds for the proposed motion.

2. The parties thereafter will meet and confer, either in person or via teleconference or videoconference, concerning all proposed motions in limine. In that meet and confer, the parties will determine:

   a. Whether the parties can stipulate to any of the proposed motions. If the parties so stipulate, they may file a stipulation and proposed order with the Court.

   b. Whether any of the proposed motions can be briefed and submitted by means of a short joint statement of issues. For each motion which can be addressed by a short joint statement of issues, a short joint statement of issues must be filed with the Court 10 days prior to the final status conference. Each side's portion of the short joint statement of issues may not exceed three pages. The parties will meet and confer to agree on a date and manner for exchanging the parties' respective portions of the short joint statement of issues and the process for filing the short joint statement of issues.

3. All proposed motions in limine that are not either the subject of a stipulation or briefed via a short joint statement of issues will be briefed and filed in accordance with the California Rules of Court and the Los Angeles Superior Court Rules.

| SHORT TITLE: | CASE NUMBER |
|---|---|
| | |

**The following parties stipulate:**

Date:

_____          ➤ _____
(TYPE OR PRINT NAME)                                  (ATTORNEY FOR PLAINTIFF)

Date:

_____          ➤ _____
(TYPE OR PRINT NAME)                                  (ATTORNEY FOR DEFENDANT)

Date:

_____          ➤ _____
(TYPE OR PRINT NAME)                                  (ATTORNEY FOR DEFENDANT)

Date:

_____          ➤ _____
(TYPE OR PRINT NAME)                                  (ATTORNEY FOR DEFENDANT)

Date:

_____          ➤ _____
(TYPE OR PRINT NAME)                                  (ATTORNEY FOR _____)

Date:

_____          ➤ _____
(TYPE OR PRINT NAME)                                  (ATTORNEY FOR _____)

Date:

_____          ➤ _____
(TYPE OR PRINT NAME)                                  (ATTORNEY FOR _____)

**THE COURT SO ORDERS.**

Date: _____          _____
                                                            JUDICIAL OFFICER

LACIV 075 (new)                **STIPULATION AND ORDER – MOTIONS IN LIMINE**          Page 2 of 2
LASC Approved 04/11

Exhibit B, Page 182



# Superior Court of California, County of Los Angeles

<div style="border:1px solid">

## ALTERNATIVE DISPUTE RESOLUTION (ADR)
## INFORMATION PACKAGE

**THE PLAINTIFF MUST SERVE THIS ADR INFORMATION PACKAGE ON EACH PARTY WITH THE COMPLAINT.**

**CROSS-COMPLAINANTS** must serve this ADR Information Package on any new parties named to the action with the cross-complaint.

</div>

### What is ADR?
ADR helps people find solutions to their legal disputes without going to trial. The main types of ADR are negotiation, mediation, arbitration and settlement conferences. When ADR is done by phone or computer, it may be called Online Dispute Resolution (ODR). These "alternatives" to litigation and trial are described below.

### Advantages of ADR
- **Saves Time:** ADR is faster than going to trial.
- **Saves Money:** Parties can save on court costs, attorney's fees and witness fees.
- **Keeps Control** with the parties: Parties choose their ADR process and provider for voluntary ADR.
- **Reduces stress/protects privacy:** ADR is done outside the courtroom, in private offices, by phone or online.

### Disadvantages of ADR
- **Costs:** If the parties do not resolve their dispute, they may have to pay for ADR and litigation and trial.
- **No Public Trial:** ADR does not provide a public trial or a decision by a judge or jury.

### Main Types of ADR:

1. **Negotiation:** Parties often talk with each other in person, or by phone or online about resolving their case with a settlement agreement instead of a trial. If the parties have lawyers, they will negotiate for their clients.

2. **Mediation:** In mediation, a neutral "mediator" listens to each person's concerns, helps them evaluate the strengths and weaknesses of their case, and works with them to try to create a settlement agreement that is acceptable to all. Mediators do not decide the outcome. Parties may go to trial if they decide not to settle.

   **Mediation may be appropriate when the parties**
   - want to work out a solution but need help from a neutral person.
   - have communication problems or strong emotions that interfere with resolution.

   **Mediation may not be appropriate when the parties**
   - want a public trial and want a judge or jury to decide the outcome.
   - lack equal bargaining power or have a history of physical/emotional abuse.

Exhibit B, Page 183

How to arrange mediation in Los Angeles County
Mediation for civil cases is voluntary and parties may select any mediator they wish. Options include:

a. The Civil Mediation Vendor Resource List
Parties may contact these organizations to request a "Resource List Mediation" for reduced-cost or free (for selected cases) mediation in person or with ODR (by phone or online).

○ JAMS, Inc.: Case Manager (213) 253-9776, mdawson@jamsadr.com
○ Mediation Center of Los Angeles: Case Manager: (833) 476-9145 info@mediationLA.org

These organizations cannot accept every case and they may decline cases at their discretion.
Visit www.lacourt.org/ADR.ResList for important information and FAQs before contacting them.
NOTE: This service is not available for family law, probate or small claims.

b. Los Angeles County Dispute Resolution Programs
https://wdacs.lacounty.gov/programs/drp/
○ Free, day-of-trial mediations at the courthouse for small claims, unlawful detainers (evictions) and, at the Stanley Mosk Courthouse, limited civil. No appointment needed.
○ Free or low-cost mediations before the day of trial for these and other case types.
○ For ODR by phone or computer for small claims or unlawful detainer (eviction) cases before the day of trial, visit
http://www.lacourt.org/division/smallclaims/pdf/OnlineDisputeResolutionFlyer-EngSpan.pdf

c. Mediators and ADR and Bar organizations that provide mediation may be found on the internet.

3. **Arbitration:** Arbitration is less formal than trial, but like trial, the parties present evidence and arguments to the person who decides the outcome. In "binding" arbitration, the arbitrator's decision is final; there is no right to trial. In "nonbinding" arbitration, any party can request a trial after the arbitrator's decision. For more information about arbitration, visit http://www.courts.ca.gov/programs-adr.htm

4. **Mandatory Settlement Conferences (MSC):** MSCs are ordered by the Court and are often held close to the trial date. The parties and their attorneys meet with a judge or settlement officer who does not make a decision but assists the parties in evaluating the strengths and weaknesses of the case and in negotiating a settlement. For information about the Court's MSC programs for civil cases, visit: www.lacourt.org/division/civil/settlement

**Los Angeles Superior Court ADR website:** www.lacourt.org/division/civil/settlement
For general information and videos about ADR, visit http://www.courts.ca.gov/programs-adr.htm

LASC CIV 271 NEW 03/19
For Mandatory Use
California Rules of Court, rule 3.221

LASC2

Exhibit B, Page 184

| SUPERIOR COURT OF CALIFORNIA COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Stanley Mosk Courthouse<br>111 North Hill Street, Los Angeles, CA 90012 | **FILED**<br>Superior Court of California<br>County of Los Angeles<br>**05/03/2019**<br>Sherri R. Carter, Executive Officer / Clerk of Court<br>By: _____Ricardo Perez_____ Deputy |
| NOTICE OF CASE ASSIGNMENT<br><br>UNLIMITED CIVIL CASE | |
| **Your case is assigned for all purposes to the judicial officer indicated below.** | CASE NUMBER:<br>19STCV15506 |

### THIS FORM IS TO BE SERVED WITH THE SUMMONS AND COMPLAINT

| | ASSIGNED JUDGE | DEPT | ROOM | | ASSIGNED JUDGE | DEPT | ROOM |
|---|---|---|---|---|---|---|---|
| ✓ | Mel Red Recana | 45 | | | | | |

Given to the Plaintiff/Cross-Complainant/Attorney of Record

on 05/03/2019
   (Date)

Sherri R. Carter, Executive Officer / Clerk of Court

By Ricardo Perez _____, Deputy Clerk

LACIV 190 (Rev 6/18)
LASC Approved 05/06

**NOTICE OF CASE ASSIGNMENT – UNLIMITED CIVIL CASE**

Exhibit B, Page 185

## INSTRUCTIONS FOR HANDLING UNLIMITED CIVIL CASES

The following critical provisions of the California Rules of Court, Title 3, Division 7, as applicable in the Superior Court, are summarized for your assistance.

### APPLICATION
The Division 7 Rules were effective January 1, 2007. They apply to all general civil cases.

### PRIORITY OVER OTHER RULES
The Division 7 Rules shall have priority over all other Local Rules to the extent the others are inconsistent.

### CHALLENGE TO ASSIGNED JUDGE
A challenge under Code of Civil Procedure Section 170.6 must be made within 15 days after notice of assignment for all purposes to a judge, or if a party has not yet appeared, within 15 days of the first appearance.

### TIME STANDARDS
Cases assigned to the Independent Calendaring Courts will be subject to processing under the following time standards:

### COMPLAINTS
All complaints shall be served within 60 days of filing and proof of service shall be filed within 90 days.

### CROSS-COMPLAINTS
Without leave of court first being obtained, no cross-complaint may be filed by any party after their answer is filed. Cross-complaints shall be served within 30 days of the filing date and a proof of service filed within 60 days of the filing date.

### STATUS CONFERENCE
A status conference will be scheduled by the assigned Independent Calendar Judge no later than 270 days after the filing of the complaint. Counsel must be fully prepared to discuss the following issues: alternative dispute resolution, bifurcation, settlement, trial date, and expert witnesses.

### FINAL STATUS CONFERENCE
The Court will require the parties to attend a final status conference not more than 10 days before the scheduled trial date. All parties shall have motions in limine, bifurcation motions, statements of major evidentiary issues, dispositive motions, requested form jury instructions, special jury instructions, and special jury verdicts timely filed and served prior to the conference. These matters may be heard and resolved at this conference. At least five days before this conference, counsel must also have exchanged lists of exhibits and witnesses, and have submitted to the court a brief statement of the case to be read to the jury panel as required by Chapter Three of the Los Angeles Superior Court Rules.

### SANCTIONS
The court will impose appropriate sanctions for the failure or refusal to comply with Chapter Three Rules, orders made by the Court, and time standards or deadlines established by the Court or by the Chapter Three Rules. Such sanctions may be on a party, or if appropriate, on counsel for a party.

**This is not a complete delineation of the Division 7 or Chapter Three Rules, and adherence only to the above provisions is therefore not a guarantee against the imposition of sanctions under Trial Court Delay Reduction. Careful reading and compliance with the actual Chapter Rules is imperative.**

### Class Actions
Pursuant to Local Rule 2.3, all class actions shall be filed at the Stanley Mosk Courthouse and are randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be a class action it will be returned to an Independent Calendar Courtroom for all purposes.

### *Provisionally Complex Cases
Cases filed as provisionally complex are initially assigned to the Supervising Judge of complex litigation for determination of complex status. If the case is deemed to be complex within the meaning of California Rules of Court 3.400 et seq., it will be randomly assigned to a complex judge at the designated complex courthouse. If the case is found not to be complex, it will be returned to an Independent Calendar Courtroom for all purposes.